IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.  11-CV-01012-RBJ-KLM

**CGC HOLDING COMPANY, LLC**, a Colorado limited liability company;
**CRESCENT SOUND YACHT CLUB, LLC**, a Florida limited liability company;
**HARLEM ALGONQUIN LLC**, an Illinois limited liability company; and
**JAMES T. MEDICK**; on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

**TANYA HUTCHENS**; **JENNIFER HUTCHENS**, a/k/a Jennifer Araujo; **CANADIAN
FUNDING CORPORATION**; an Ontario corporation; **308 ELGIN STREET INC.**, an Ontario
corporation; **FIRST CENTRAL MORTGAGE FUNDING INC.**, an Ontario corporation;
**FIRST CENTRAL HOLDINGS INC.**, an Ontario corporation; **BARRY J. POULSON**;
**ARSENAU POULSON**, a partnership; **ALVIN MEISELS**; **BLANEY McMURTRY LLP**, an
Ontario limited liability partnership; **REZNICK, PARSONS, MEISELS, TABERNER**, a
partnership; **RONALD GACHE**; **BROAD AND CASSEL**, a partnership
**H. JAN LUISTERMANS**, a/k/a Herman Luisterman; **REALTY 1 REAL ESTATE
SERVICES LTD**, an Ontario corporation; and **DOE LIMITED 1 – 100**,

     Defendants.

---

ORDER on PENDING MOTIONS

---

     This order addresses nine pending motions, including motions to dismiss for lack of

jurisdiction; motions to dismiss for failure to state a claim; motions to abstain or stay; and a

motion for a preliminary injunction.  It resolves all pending motions except plaintiffs' motion to

certify a class and certain relatively minor motions that the Court will resolve electronically

without a separate written order.  The Court also will issue an order directing the parties to set a

scheduling conference, where the manner of dealing with the class certification motion and the

prospective schedule of this case generally will be addressed.

**Facts**

Plaintiffs allege that defendant Sandy Hutchens was the mastermind of a loan fraud scheme designed to extract monies from victims in the United States.  The other defendants are alleged to have been participants in the implementation of the scheme.  Plaintiffs, who applied for loans that were never made, allege that they were duped into advancing substantial loan processing fees which were not refunded when the scheme was discovered.  Plaintiffs assert five claims for relief: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; (2) conversion; (3) negligent misrepresentation; (4) constructive trust; and (5) unjust enrichment.

I will include more detailed descriptions of the alleged facts below in the context of the specific motions that have been filed by the various defendants.

## I.      PERSONAL JURISDICTION GENERALLY.

Before discussing the several pending motions to dismiss for lack of personal jurisdiction, it will be useful to review basic points and authorities governing personal jurisdiction under both state and federal law.

### State Long-Arm Statute Jurisdiction

Personal jurisdiction in Colorado is governed by Colorado's "long arm" statute, C.R.S. §13-1-124(1), which provides that the transaction of business or the commission of a tortious act in Colorado subjects a person to the jurisdiction of Colorado's courts.  The statute was intended to extend the jurisdiction of Colorado courts to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution.  *Jenner & Block v. District Court,* 590 P.2d 964, 965 (Colo. 1979).

Under the due process clause of the Fourteenth Amendment a defendant must have had sufficient minimum contacts with the state such that assertion of jurisdiction does not offend traditional notions of fair play and substantial justice.  *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).  The defendant must have done something "purposefully to avail itself of privilege of conducting activities" in Colorado.  *Le Manufacture Francaise v. District Court,* 620 P.2d 1040, 1044 (Colo. 1980) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). Jurisdiction can be either general, where a defendant's contacts are of such a continuous and systematic nature that being haled into court in the forum would not offend his due process rights, or specific, where the claims arise out of the defendant's contacts with the forum. *Archangel Diamond Corp. v. Lukoil,* 123 P.3d 1187, 1190 (Colo. 2005).

The commission of an intentional tort that causes damage to individuals or entities located in Colorado can be sufficient constitutionally to subject the alleged tortfeasor to the jurisdiction of Colorado courts.  *See D&D Fuller CATV Constr., Inc. v. Pace,* 780 P.2d 520, 525 (Colo. 1989); *Jenner & Block,* 590 P.2d at 966.  *See also Calder v. Jones,* 465 US. 783, 788-91 (1984) (an intentional tort calculated to cause and that does cause harm to an individual in a different state constitutionally subjects the tortfeasor to jurisdiction in the latter state).  Under *Calder* as construed by the Colorado Supreme Court and the Tenth Circuit Court of Appeals, it is not enough that tortious conduct fortuitously has some effect in a state.  Rather, in order to satisfy the "purposefully availed" test, the conduct must in some way have been aimed at the Colorado plaintiffs, and the relationship of the case to Colorado must not be attenuated or remote.  *Archangel Diamond Corp.,* 123 P.3d at 1999-1200; *Far West Capital, Inc. v. Towne,* 46 F.3d 1071 (10th Cir. 1995).

A court may, as a matter of discretion, elect to consider a motion to dismiss for lack of personal jurisdiction on the documentary evidence (the complaint and affidavits or other evidence submitted by the parties) or after holding an evidentiary hearing.  If the court considers only documentary evidence, the plaintiff need only make a prima facie showing of personal jurisdiction, i.e., raise a reasonable inference that jurisdiction exists.  Uncontroverted allegations in the complaint are accepted as true.  If the allegations are controverted, then conflicts are resolved in the plaintiff's favor for this purpose.  *Archangel*, 123 P.3d at 1192.  *See Wenz v. Memery Crystal*, 55 F. 3d 1503, 1505 (10th Cir. 1995).

If the court elects to conduct an evidentiary hearing, for example "if the record is rife with contractions, or when plaintiff's affidavits are patently incredible," then the plaintiff's burden increases to a preponderance of the evidence.  *Archangel,* 123 P.3d at 1192-93.  Under Colorado law, courts may not resolve material issues of disputed fact concerning personal jurisdiction against a plaintiff without an evidentiary hearing.  *Id.* at 1192.

The Court held oral argument on October 12, 2011.  The parties did not come prepared to submit evidence.  The Hutchens group of defendants indicated that they would like for the Court to hold a second hearing concerning the jurisdictional issues at which they would present evidence.  Plaintiffs indicated that they were not requesting an evidentiary hearing.  The other defendants either indicated that they did not want an evidentiary hearing or remained silent on the issue.  The Court elects to resolve the personal jurisdiction issues on the documentary evidence.

**Federal Question Jurisdiction: Domestic Defendants**

"Before a federal court can assert personal jurisdiction in a federal question case, the court must determine (1) 'whether the applicable statute potentially confers jurisdiction' by authorizing service of process on the defendant and (2) 'whether the exercise of jurisdiction comports with due process.'"  *Peay v. Bellsouth Med. Assistance Plan,* 205 F.3d 1206, 1209 (10th Cir. 2000).

In the present case plaintiffs assert a violation of RICO.  It is undisputed that RICO authorizes nationwide service of process.  18 U.S.C. § 1965.  Accordingly, if a defendant is served within the United States, the first *Peay* requirement is met.

Regarding the second requirement, *Peay* held that "in a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant."  205 F.3d at 1212.  "The burden is on the defendant to show that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'"  *Id.*

The *Peay* court set forth five factors that the trial court should consider in determining whether the defendant has met that burden: (1) defendant's contacts with the forum state, (2) inconvenience to the defendant, (3) judicial economy, (4) probable situs of discovery proceedings, (5) nature of the regulated activity.

**Federal Question Jurisdiction: Non-Domestic Defendants**

RICO does not authorize extraterritorial service of process.  18 U.S.C. § 1965.  *See, e.g., Stauffacher v. Bennett*, 969 F.2d 455, 460-61 (7th Cir. 1992).  However, *Stauffacher* and other similar cases were decided under the old Fed. R. Civ. P. 4(f), which was repealed in 1993 and

replaced with Fed. R. Civ. P. 4(k)(2).  *See Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000) (hereafter "*Central States*").

> Rule 4(k)(2) provides:
>
> ***Federal Claim Outside State-Court Jurisdiction.***  For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Of relevance to the present case, the Seventh Circuit in *Central States* held that Rule 4(k)(2) permits jurisdiction to be exercised by the service of process outside the United States (coincidentally in Canada on a Canadian company in that case) notwithstanding that the federal statute under which the case arose (ERISA) did not authorize extraterritorial service.  The court provided three reasons for its conclusion.

First, whereas statutes might authorize service within a certain area – within the United States in the case of ERISA and RICO – Rule 4(k)(2)(B) expands the reach of service to the extent "consistent with" United States laws.  "Thus, if a statutory provision permits nationwide service but is silent with respect to worldwide service, then worldwide service is 'consistent with' this statute, since such service does not contradict or oppose the statutory language." *Central States,* 230 F. 3d at 941.

Second, Rule 4(k)(1)(D), now 4(k)(1)(C), provides that service establishes jurisdiction "when authorized by a federal statute."  Therefore, "[i]f establishing personal jurisdiction by serving process was considered inconsistent with a law which is silent on the issue, then Rule 4(k)(2) would not have any effect." *Id.* at 942.  That would mean

that if a statute expressly authorizes jurisdiction, Rule 4(k)(1)(C) would apply; but if the statute did not expressly authorize jurisdiction, then Rule 4(k)(2) would not apply and would be rendered meaningless.

Third, the court concluded that Rule 4(k)(2) was created to respond to the Supreme Court's decision in *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97 (1987). This is a commonly shared view. *See, e.g.*, *Progressive Games, Inc. v. Amusements Extra, Inc.*, 83 F.Supp.2d 1185, 1189 (D. Colo. 1999). The Court in *Omni* suggested that "a narrowly tailored service of process provision, authorizing service on an alien in a federal-question case when the alien is not amenable to service under the applicable state long-arm statute, might well serve the ends of the CEA and other federal statutes." 484 U.S. at 111. The *Central States* panel found that history to be supportive of its conclusion that Rule 4(k)(2) provides a basis for jurisdiction through service of process unless it conflicts with a federal law. 230 F. 3d at 942.

So far as this Court can determine, the Tenth Circuit has not yet addressed this issue. However, I find the reasoning of *Central States* to be persuasive. *See also L.H. Carbide Corp. v. Piece Maker Co.*, 852 F.Supp. 1425 (N.D. Ind.1994) (Rule 4(k)(2) was created "to include the authorization of service of summons upon a non-resident of the United States in federal-question cases so long as such service comports with due process under the Fifth Amendment."); 4 Charles A. Wright & Arthur R. Miller, Federal Practice & Proc. Civil 2d § 1067.1 (1999) (Rule 4(k)(2) "authorizes the exercise of extraterritorial jurisdiction over any non-resident of the United States in federal-question cases if Fifth Amendment due process requirements are satisfied.").

## II.      PERSONAL JURISDICTION MOTIONS.

### 1.  Docket #83(Sandy Hutchens): DENIED.

Mr. Hutchens is a Canadian resident and citizen.  He is alleged to have been the central conspirator responsible for creating and managing an enterprise designed to defraud the plaintiffs through the advance fee scheme.  Complaint at ¶¶2, 75 and *passim*.  Mr. Hutchens created four Canadian companies: Canadian Funding Corporation ("CFC"); 308 Elgin Street, Inc. ("308 Elgin"); and First Central Mortgage Funding, Inc. ("FCMF"); and First Central Holdings, Inc. ("FCH").  *Id.* ¶¶25-27.  Plaintiffs allege, and defendants have not controverted with affidavits or otherwise, that the four companies are alter egos of Mr. Hutchens.  *Id.* ¶¶58-62.  In order to prevent plaintiffs from conducting meaningful due diligence, which might have discovered his extensive criminal history, Mr. Hutchens used aliases rather than his real name; caused loan commitments to be made to would-be borrowers in the United States; collected advanced fees with no intention of funding the loans; refused to return the monies which he intended to misappropriate; and shifted the funds to various companies he or his wife, co-defendant Tanya Hutchens, owns.  ¶¶37,58-64,75,76,80,81, 89-91.

With specific reference to Colorado, the plaintiffs add via affidavits that Mr. Hutchens or his alter egos issued, or had others issue, wire transfer instructions to plaintiff CGC Holding Company, LLC ("CGC"), a Colorado limited liability company; sent defendant H. Jan Luistermans, a Canadian realtor, to Colorado to inspect real property to be used as collateral for loans and to issue reports, uniformly favorable, on the collateral; repeatedly modified the loan conditions by emails, phone calls or faxes directed to CGC in Colorado; retained a Colorado attorney, Mr. McElhiney, of the law firm of Lindquist & Vennum in Denver, to act as his or the "lender's" lawyer for purposes of closing the CGC loan; directed numerous faxes, emails and

phone calls between January and March of 2010 to Allen Sellmer , a Colorado mortgage broker in Greeley, Colorado, with respect to a loan and loan conditions for plaintiff James Medick; sent a fax via FCH to a Ms. Miller at the Bank of the West in Denver with regard to a loan to be collateralized by Colorado property owned by the Brownes; and sent or had sent numerous communications through the corporate defendants in regard to the Browne loan.  Affidavit of Dwight Bainbridge, Doc. 5-1: ¶¶8-11,13-17; Affidavit of David Isbell, Doc. 97-11: ¶¶4[*sic*], Affidavit of Diane Miller, Doc. 97-15: ¶¶3,5; Affidavit of Allen Sellmer, Doc. 97-16: ¶¶ 1,3-18,19.

The allegations in the complaint and the supporting affidavits have not been controverted by defense affidavits or exhibits.  The Court finds that Sandy Hutchens has sufficient minimum contacts to subject him to jurisdiction under the Colorado long arm statute.  He is alleged to have transacted business in Colorado by promoting and implementing his advance fee loan scheme in Colorado.  He purposefully availed himself of the privilege of doing business in Colorado even if he, personally, did not set foot in Colorado.  He is alleged to have committed the intentional tort of conversion of funds from Colorado entities and individuals and to have caused losses in Colorado.

Therefore, the motion to dismiss for lack of personal jurisdiction as to Sandy Hutchens is denied based upon a finding that plaintiff has met the burden of establishing a prima facie case of specific jurisdiction under the long arm statute.

### 2.  Docket #92 (Jennifer Hutchens): DENIED.

Defendant Jennifer Hutchens (subsequently "Jennifer") is alleged to have been one of the three central co-conspirators responsible for the advance fee scheme.  Complaint at ¶75-76. Plaintiffs allege that Jennifer never used her last name, Hutchens.  Rather, she went by Jennifer

or Jennifer Araujo and represented herself to plaintiffs and others as the "Manager of Underwriting" for the four corporate defendants. Complaint at ¶6. She emailed Dwight Bainbridge in Colorado on September 13, 2009 regarding the loan commitment and terms and conditions of the loan. Bainbridge Aff. at ¶6. It is unclear whether the subsequent contact containing the wiring instructions was from Jennifer. According to plaintiffs, Jennifer contacted Jill Evans and Diane Miller, both located in Colorado on September 22, 2009 regarding a loan for the Brownes. Again, on September 28, 2009 Jennifer is alleged to have contacted Kathy Browne and Melissa Hann of Security Title Guaranty Co. in preparation for closing the Browne loan. Security Title Guaranty Co. is located in Parker, Colorado. Jennifer emailed Allen Sellmer on March 26, 2010 regarding a loan for James Medick; emailed him again on April 28, 2010 to relay information from Sandy Hutchens; Sellmer Aff. at ¶16; and emailed him again on May 14, 2010 to pass along Sandy Hutchens' message that there was a problem with the appraisal. Sellmer Aff. at ¶17.

Jennifer relies on *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) for the proposition that Colorado "must be the focal point of the tort" in order for the Court to exercise jurisdiction. *Id.* at 1072. The panel listed three factors to be considered: (1) intentional conduct by the defendant, (2) expressly aimed at the forum state, with (3) knowledge that the brunt of the injury would be felt in the forum state. *Ibid.* Here, Jennifer intentionally sent the loan commitment and cover letter to CGC in Colorado while allegedly knowing that no loans would or could close and that the brunt of the injury would therefore be felt in Colorado. *Ibid.*

The Court finds that Jennifer had sufficient contact with Colorado, including being a central participant in tortious conduct that is alleged to have occurred in and caused losses in

Colorado, such that the exercise of personal jurisdiction under the long arm statute comports with due process. Her motion to dismiss for lack of jurisdiction is denied.

### 3. Docket #83 (Tanya Hutchens): DENIED.

Tanya Hutchens, the wife of Sandy Hutchens, is alleged to have prepared all or virtually all of the loan commitment letters; to own the Doe corporations which received the proceeds of the scheme; to have found fault based on "trumped up defects" in the loan application; and to have managed the enterprise which she conspired to operate with her husband, Sandy Hutchens, and daughter, Jennifer Hutchens. Complaint at ¶¶5,28, 36-37,75,76.

Mrs. Hutchens, like the other Hutchens defendants, did not submit an affidavit refuting the allegations. She is alleged to have been a "primary participant in the alleged wrongdoing intentionally directed at a [Colorado] resident." *Calder*, 465 U.S. at 790. Her acts, like those of her husband and daughter, are alleged to have been part and parcel of the alleged tort committed. Ms. Hutchens directed her conduct into Colorado by writing the loan commitments for a Colorado based company and individual, George Browne, and finding fault with or defects in the loan applications. The Court finds that plaintiffs have established a prima facie case that her contacts with Colorado are sufficient for the Court to exercise jurisdiction over her without offending traditional notions of fair place and substantial justice. Her motion to dismiss for lack of personal jurisdiction is denied.

### 4. Docket #83 (the "Alter Ego" Companies): DENIED.

Four companies are alleged to be alter egos of Sandy Hutchens through which he carried out the advance fee loan scheme.

FCMF. Plaintiffs allege that FCMF issued loan commitments without the capacity to fund the loans and took steps designed to create the impression that it was a bona fide lender

such as conducting business from addresses that appeared to be those of a lending institution despite operating the scheme from the Hutchens' residence; sending an agent to inspect collateral; and receiving advance fees pursuant to bogus loan commitments, which it then transferred to the Doe Limited defendants.  ¶¶30,32,37,38,77.  More specifically, in relation to CGC's claims, FCMF is alleged to have sent a loan commitment to CGC; sent wiring instructions to CGC; sent Mr. Luistermans to Colorado to inspect the property to be used as collateral; sent an inspection confirmation letter stating it was ready to proceed; repeatedly added or modified loan conditions which created a shifting target for CGC, including requiring a new appraisal; and eventually refused to return the moneys paid as advanced fees.  Bainbridge Aff. at ¶¶6-7,10-11,15-17.

FCH.  Plaintiffs allege that FCH was another key vehicle through which the advanced fee scheme was conducted.  Dwight Bainbridge states that FCH sent a Letter of Intent to CGC on September 10, 2009.  He was instructed to wire the funds to FCH and, in fact, wired $7,500 in fees to FCH on September 14, 2009; $170,000 on September 22, 2009; and $5,000 on September 28, 2009.  The money was never returned by FCH, Mr. Hutchens or others.  Bainbridge Aff. ¶¶ 5-6,8-9,12.  Based on the allegations, the harm to Colorado residents caused by FCH occurred in Colorado and could not have occurred elsewhere.

308 Elgin.  This company is alleged to have issued loan commitments without the capacity to fund the loans; listed false addresses for place of business, received via wire transfer, advanced fees pursuant to loan commitments; transferred those fees to entities controlled by Tanya Hutchens, and refused to return the fees when they failed to close the loan after repeatedly altering the loan conditions so that plaintiffs could never meet them.  Complaint at ¶¶6-7,10,-

11,13-14,30,32,37,77.  Plaintiffs do not allege that 308 Elgin had specific contacts with

Colorado.

CFC.  Plaintiffs claim that CFC informed Margolis in Illinois that it was ready to issue a

loan commitment; issued a loan commitment to Margolis for Illinois property; sent wiring

instructions, responded to a request for verification of available funds by stating it has an

allocation of $100,000,000 USD for funding; received advance fees; added or modified loan

conditions such that plaintiffs could never meet the new demands and the loan never closed; and

refused to return the advance fees upon demand.  In addition, plaintiffs claim that CFC

essentially did similar things in Florida.  Martin Lapedus, Hutchens' accountant at the time in

question, stated in his affidavit that "[d]espite never having funded a mortgage in excess of

$115,000 Hutchens represented to the plaintiffs that CFC was in a position to fund three

transactions.  The first . . . in Caribe Cove, Florida.  The second . . . at Caleb's Club in Orlando

Florida and the third . . . on Grand Palisades at Lake Austin and Ayres Rock, Orlando, Florida."

(Doc. #5-5).

Conclusions regarding the Alter Ego Companies

The Court finds that FCMH and FCH are subject to personal jurisdiction in Colorado

under the Colorado long-arm statute.  They allegedly served as Mr. Hutchens' alter egos in his

dealings with CGC and, generally, with respect to his Colorado-directed activities.

Plaintiffs do not argue that 308 Elgin and CFC are subject to personal jurisdiction under

the Colorado long arm statute.  Rather, they assert personal jurisdiction with respect to those

alter ego companies pursuant to Fed. R. Civ. P. 4(k)(2).  As indicated above, one requirement of

Rule 4(k)(2) is that they not be subject to jurisdiction of courts of general jurisdiction in any

state.  Frankly, it seems to me to be arguable that these two entities might be subject to

jurisdiction in the courts of general jurisdiction of Florida and/or Illinois.  However, through

counsel they have firmly denied that they are subject to jurisdiction in any state of the United

States.  No one has argued or demonstrated otherwise.  If that is correct, and I will accept

defendants' stated position, then Rule 4(k)(2)(A) has been satisfied, and I turn to the

requirements of Rule 4(k)(2)(B).

      For the reasons set forth above in respect to federal jurisdiction as to non-domestic

defendants, I conclude that the exercise of personal jurisdiction in Colorado, while not

authorized by RICO, is consistent with RICO.  This satisfies one of the two requirements of Rule

4(k)(2)(B)(1).  As for whether the other requirement, consistency with the United States

Constitution, is satisfied, I apply the five-factor test set forth in *Peay* for determining the

requirements of the Fifth Amendment due process clause:

1. <u>Defendant's contacts with the forum state</u>.  I assume that these defendants have no

   contacts with Colorado.  However, the *Peay* analysis does not require "minimum

   contacts" with Colorado as such.  *Republic of Panama v. BCCI Holdings (Luxembourg)
   S.A.,* 119 F.3d 935, 946-47 (11th Cir. 1997) (cited with approval in *Peay*).  Rather, this is

   one factor to consider, and it militates against finding personal jurisdiction in this case.

2. <u>Inconvenience to the defendant</u>.  There is no marginal inconvenience to 308 Elgin and

   CFC who are being defended with the other Hutchens defendants by common counsel.

3. <u>Judicial economy</u>.  Judicial economy is best served by having all related disputes

   resolved in one case, particularly where a conspiracy is alleged.

4. <u>Probable situs of discovery proceedings</u>.  Some discovery will take place in Canada.

   Additional discovery that pertains to 308 Elgin and CFC might occur in Florida or

   Illinois, where they are alleged to have had dealings, and perhaps in Colorado.  This

discovery is likely to occur regardless whether these entities are parties, so the marginal inconvenience to them appears to be slight.

5. <u>Nature of the regulated activity</u>.  Defendants are alleged to have participated in a broad reaching enterprise designed to defraud plaintiffs out of advanced fees.

The Court finds that defending this case in Colorado, essentially as part of the Hutchens group of defendants, will not impose an undue or unfair burden on them.  Certainly they have not shown otherwise.  Accordingly, the Court denies the motions to dismiss for lack of jurisdiction as to the four "alter ego" companies.

**5.  Docket #85 (Alvin Meisels, Blaney McMurtry): DENIED.**

Although plaintiff did not argue during the hearing that the Court should exercise jurisdiction over defendant Meisels and Blaney McMurtry (collectively referred to as "Meisels" unless otherwise indicated) pursuant to the Colorado long-arm statute during the hearing, they did so in their Complaint and in their omnibus Response.

Meisels allegedly made numerous false and misleading representations to plaintiffs, including that Sandy Hutchens was a reputable businessman; that CFC, FCMF and 308 Elgin were bona fide lenders; that CFC, FCMF and 308 Elgin had closed numerous loans; that he had represented FCMF since its formation; and that CFC, FCMF and 308 Elgin had the capacity to close the loan commitments which had been made to the respective inquirer.  Plaintiffs further allege that Meisels concealed that Sandy Hutchens was a career criminal; that the name he was using with the prospective borrower was an alias; that none of the Hutchens entities was a bona fide lender or had closed any loans of any significance; and that none of the entities had the capacity to close the loan commitments they had made.  Complaint at ¶¶ 41-43,45-46,80,97-103; (Doc. #5-5;75-1;75-5).

Plaintiffs have amplified their claims regarding Meisels in affidavits.  One affidavit is that of Jill Evans, a manager of Paramount Funding, LLC, a Colorado mortgage broker (included in Docket #97).  She states that Paramount obtained 20 loan applications from prospective borrowers in 11 states.  Two of the applications were in relation to Colorado property (CGC and George Browne).  Evans Aff. ¶4.  The applications were forwarded to Franklin International Partners (an entity in California), which she understood to be FCMF's exclusive representative in the United States.  *Id.* ¶5.  FCMF sent loan commitments for each application to Franklin, which forwarded them to Paramount.  *Id.* ¶6.  She was dealing with "Fred Hayes" and "Jennifer Araujo" during the application process.  *Id.* ¶7.

During the application process Ms. Evans was informed that the attorney involved, who was to be paid legal fees by the borrowers, was Alvin Meisels, and that Ms. Evans could speak to Mr. Meisels concerning any difficulties during the process.  *Id.* ¶8.  Mr. Franklin of Franklin International Partners sent her an email from Mr. Meisels dated September 22, 2009 in which Mr. Meisels indicated that he was acting for CFC, FCMF, several related entities and their principals, whom he had represented for more than four years.  He stated that the principals guard their privacy strictly, and that neither he nor they would disclose their identities or confidential financial information, but that his clients "policies and practices in respect to mortgage applications are patently fair and reasonable."  *Id.* ¶10.

An another affidavit included in Docket #97, Mr. Franklin states that he was co-brokering the loan applications with Paramount Funding, and that during the process of pursuing the applications, he received information indicating that FCMF was not as represented, and that the person behind FCMF was Sandy Hutchens operating through a number of aliases.  Franklin Aff. ¶¶2, 11.  He called "Fred Hayes," who denied he was "Moishe Alexander" and indicated that

16

Moishe Alexander was known to Hayes but was not associated with FCMF.  *Id.* ¶12.  Mr.

Franklin then received an email from Mr. Meisels who vouched for the bona fides of FCMF.  *Id.*

¶14.

Another affidavit is that of David Isbell, CGC's Colorado attorney (included in Docket

#97).  He states that he and Mr. Bainbridge of CGC had several conversations with Mr. Meisels,

and that several emails were exchanged between Mr. Bainbridge and Mr. Meisels.  *Id.* ¶4.  In a

telephone conversation Mr. Meisels assured them that "Moshe Ben Avrahams" was a legitimate

business man, that FCH was a legitimate company, and that if they were not, he would not be

representing them.  *Ibid.*  Also, in a December 7, 2009 email to Mr. Bainbridge, Mr. Meisels

indicated that FCH was prepared to proceed with the loan and had retained Denver counsel to

handle the transaction.  *Id.* ¶4 (second ¶4).

Plaintiffs have also submitted an affidavit of Mr. Bainbridge of CGC (submitted as part

of Docket #5) who states that he contacted Mr. Meisels by telephone after receiving a newspaper

article that raised concerns about Sandy Hutchens and identified Alvin Meisels as Mr. Hutchens'

attorney.  He relates that Mr. Meisels confirmed that "Moshe Ben Avraham" was Sandy

Hutchens but denied ( implicitly falsely) that "Fred Hayes" was Sandy Hutchens and represented

(implicitly falsely) that Sandy Hutchens was a "changed man" and had "found religion."

Bainbridge Aff. ¶4.

The Meisels defendants have cited *Trierweiler v. Croxton and Trench Holding Corp.,* 90

F.3d 1523 (10th Cir. 1996) as dispositive on their jurisdictional motion.  I disagree.  *Trierweiler*

held that an attorney's knowledge that his opinion letter would be sent into Michigan was

insufficient to establish that he "purposefully availed" himself of the privilege of doing business

in Michigan.  *Id.* at 1534.  The record before this Court, particularly when inferences are drawn

in plaintiffs' favor, indicates a much more substantial connection between Mr. Meisels and Colorado than existed in *Trierweiler*. Based upon plaintiffs' complaint and affidavits, Mr. Meisels affirmatively and, to use Ms. Evans' word, "aggressively" injected himself into the loan application process. Both in communications initiated by him and communications to him initiated by others, he vouched for Mr. Hutchens (via aliases), vouched for companies associated with Mr. Hutchens, and promoted the application process. The Court finds that he is alleged to have purposefully availed himself of the privilege of doing business in Colorado vis-à-vis the Colorado loan applicants, and that he is alleged to have been a participant in tortious conduct that was directed at Colorado among other states. I conclude that the Meisels defendants are subject to personal jurisdiction in Colorado under the Colorado long arm statute.

### 6.  Docket # 74 (Barry Poulson and Arsenau, Poulson): GRANTED.

Mr. Poulson's involvement in the alleged scheme primarily revolves around a letter he drafted and distributed to unknown parties on March 24, 2008 regarding loans involving 308 Elgin Street, Inc., CFC, and other entities. In that letter he stated, "we have acted for the above corporations . . . for the past 3 years. I can advise that over the course of the last 3 years we have completed numerous mortgage transactions and substantial asset purchases in excess of 80 transactions all funded by the above noted clients." The letter further stated, "I am confident in writing that these clients have the ability to fund large mortgage transactions provided that the terms and conditions of the commitment are met in a timely fashion." Mr. Poulson volunteered to respond to any related questions. Complaint at ¶44.

The Court finds that the Poulson defendants do not have sufficient contacts with Colorado so that jurisdiction lies under the long arm statute. The facts are more nearly akin to those in *Trierweiler, supra*. Plaintiffs do not contend otherwise. The Poulson defendants were

not served with process in the United States and therefore do not come within RICO's nationwide service of process provision.  Again, plaintiffs do not contend otherwise.

The question is whether there is personal jurisdiction under Rule 4(k)(2).  There is no indication that he is subject to personal jurisdiction in any state court.  For reasons discussed above, I am satisfied that the exercise of jurisdiction would be consistent with RICO.  However, I conclude, after applying the five *Peay* factors, that the exercise of jurisdiction by this Court would not be consistent with the due process requirements of the Fifth Amendment.

1.  <u>Defendant's contacts with the forum state</u>.  These defendants have no contacts with the forum state.

2.  <u>Inconvenience to the defendant</u>.  It will be inconvenient, but no more so than for the other Canadian defendants, to defend litigation in Colorado.

3.   <u>Judicial economy</u>.  Judicial economy is best served by having all related disputes resolved in one case, particularly where a conspiracy is alleged.

4.  <u>Probable situs of discovery proceedings</u>.  Discovery will occur in Canada, Colorado and elsewhere.

5.  <u>Nature of the regulated activity</u>.  This is what distinguishes these defendants from others.  It is naïve to suggest that Mr. Poulson did not know and expect that his clients would use the letter to promote their business.  However, there is no allegation or evidence that he sent the letter to any prospective borrower in Colorado or elsewhere in the United States or that he knew that the letter would be used to generate business in Colorado or elsewhere in the United States.  For all that the Court knows from the record presented, Mr. Poulson provided essentially a "blank check" form of opinion letter to some client without knowing, or placing any restriction on, where, when or how it would be used.

In those circumstances, the Court finds that the burden of defending the case in Colorado is undue and unreasonable. Accordingly, the motion to dismiss for lack of personal jurisdiction is granted as to Mr. Poulson and his law firm.

**7. Docket #72 (Ronald Gaché, Broad and Cassel): DENIED.**

At the time in question Mr. Gaché was a partner in the Florida law firm Broad and Cassel. He is alleged to have provided substantial assistance to Sandy Hutchens in collecting fees on loans supposedly to be made by 308 Elgin. Plaintiffs allege that he represented that Mr. Alexander (a Sandy Hutchens alias) is very private; that he does his business by word of mouth; that he was just now reaching out into the United States; that he was a reputable businessman and a viable source of substantial lending capital and lower than market rates; that he had the financial capacity and wherewithal to fund large-scale transactions; that he had an ongoing joint venture with TD Canada Bank, a major source of his funding; that Broad and Cassel were then involved in other similar financings with Mr. Alexander. Complaint ¶48. Allegedly, he and others at Broad and Cassel failed to disclose (but, implicitly, knew) that Alexander was a career criminal whose true identity was Sandy Hutchens. *Ibid.* It is further alleged that "the acts and failures to act by Gaché were within the scope of his agency and employment by Broad and Cassel, and consequently, all such acts and failures to act are imputed" to Broad and Cassel. Complaint at ¶51.

These defendants are not alleged to have had and contacts in Colorado. Their role in the alleged scheme appears to have been limited to Florida. Accordingly, the Colorado long arm statute does not provide a basis for personal jurisdiction as to them. Jurisdiction exists, if at all, only pursuant to the federal claim. As indicated above, under Tenth Circuit law, whether a federal court can assert personal jurisdiction in a federal question case turns on (1) 'whether the

applicable statute potentially confers jurisdiction' by authorizing service of process on the

defendant and (2) 'whether the exercise of jurisdiction comports with due process.'" *Peay*, 205

F.2d at 1209.

Because RICO provides for nationwide service of process, the first requirement is met.

The due process issue must be resolved by applying the five *Peay* factors to the alleged facts

concerning the Gaché defendants.

1. Defendant's contacts with the forum state.  None shown.

2. Inconvenience to the defendant.  As with the other non-Colorado defendants, it will be
   inconvenient, and expensive for Florida-based defendants to defend complex litigation in
   Colorado.  However, in addition to modern day travel and communications, these
   defendants have competent Florida and Colorado counsel fully capable of litigating in
   Colorado if necessary.

3. Judicial economy.  Judicial economy is best served by having all related disputes
   resolved in one case, particularly where a conspiracy is alleged.

4. Probable situs of discovery proceedings.  As previously indicated, discovery in this case
   will likely occur in Canada, Florida, Colorado and other states.  This militates against
   Colorado jurisdiction but can be mitigated by the use of technology.

5. Nature of the regulated activity.  Defendants are alleged to have participated in a broad
   reaching enterprise, regulated by RICO, designed to defraud plaintiffs out of advanced
   fees.

The constitutional issue is whether defendants have shown that defending the case in

Colorado would impose a grave or undue burden on them.  *Peay* court quoted *Republic of*

*Panama, supra,* for proposition that "it is only in highly unusual cases that inconvenience will

rise to a level of constitutional concern." *Id.* at 1213.  The Court finds, based on the factors

listed above, that this is not the "highly unusual" case contemplated by the Tenth Circuit in *Peay*.

Their motion to dismiss for lack of personal jurisdiction is denied.

### III.    DEFENDANT ALVIN MEISELS' AND BLANEY MCMURTRY LLP'S MOTION TO DISMISS[1] (DOCKET #86): DENIED.

Defendants Alvin Meisels and Blaney McMurtry LLP move to dismiss the claims against

them for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  The thrust of the motion is

that RICO does not apply to extraterritorial racketeering conspiracies.

In *Morrison v. Australian Nat'l Bank*, 130 S. Ct. 2869 (2010), the Court considered

whether section 10(b) of the Securities Exchange Act of 1934 applied to alleged fraud in the sale

of securities on a foreign stock exchange.  Citing prior decisions that had established a

presumption that legislation of Congress is meant to apply only within the United States unless a

contrary intent appears, the Court stated, "when a statute gives no clear indication of an

extraterritorial application, it has none." *Id.* at 2878.  Finding that there was no indication of

Congressional intent that section 10(b) applies abroad, the Court held that the statute applies only

to the purchase or sale of securities listed on an American stock exchange or otherwise sold in

the United States. *Id.* at 2888.  Applied to the facts of that case, the Court held that plaintiff's

complaint failed to state a claim on which relief could be granted. *Ibid.*

Courts have subsequently agreed that RICO provides no indication of an extraterritorial

application. *See, e.g.*, *Norex Petroleum Limited v. Access Industries Inc.*, 631 F.3d 29, 32 (2d

Cir. 2010; *U.S. v. Phillip Morris USA, Inc.,* 783 F. Supp. 2d 23 (D. D.C. 2011; *Cedeno v. Intech

Group, Inc.* 733 F.Supp.2d 471 (S.D.N.Y. 2010).

---

[1] Defendants Reznick, Parsons, Meisels are also named on this motion. These Defendants have subsequently been dismissed.

However, while these cases establish a clear rule of law, the question remains whether the present case involves an extraterritorial application of RICO.  It is useful in that regard to consider the facts on which the foregoing cases found the federal statutes to be inapplicable.

In *Morrison* the plaintiffs, all Australians, purchased stock of an Australian bank on the Australian stock exchange.  They complained that officers of a U.S. subsidiary, with the knowledge of the Australian bank, had manipulated certain information in order to artificially inflate the subsidiary's assets.  The Court found that the focus of section 10(b) of the Exchange Act was on purchases and sales of securities in the United States, not on where the deception originated, and that there was no indication that Congress intended otherwise.  130 S. Ct. at 2884.

In *Norex,* a Canadian-based shareholder in a Russian oil company alleged that defendants conspired to take control of the company and ultimately seized control over most of the Russian oil industry through a series of actions that included bribery of Russian governmental authorities and corrupt Russian bankruptcy proceedings.  631 F.3d at 31.

In *Phillip Morris* an English cigarette manufacturer, "BATco," was accused of participating in a conspiracy to deceive the American public about the health effects of smoking and second hand smoke.  In a pre-*Morrison* opinion, the district court found that RICO was applicable because, while many of BATco's activities and statements took place outside the United States, they "furthered the Enterprise's overall scheme to defraud, which had a tremendous impact on the United States."  *U.S. v. Phillip Morris,* 449 F. Supp. 2d 1, 872-73 (D. D.C. 2006).  After *Morrison* discredited this impact or "effects" test, the district court dismissed the claims against BATco.  The court rejected the contention that BATco's RICO liability could be based on its conduct within the United States, stating, "[t]he problem with the Government's

argument is that BATco's domestic conduct was not the basis for its RICO liability in this case.
. . . Further, isolated domestic conduct does not permit RICO to apply to what is essentially foreign activity."  U.S. v. Phillip Morris, 783 F.Supp. 2d at 29.

In *Cedeno,* a Venezuelan citizen alleged that various individuals and entities, many of whom were associated with the Chavez regime in Venezuela, had conspired in violation of RICO to have him imprisoned in Venezuela and to damage his business, which was incorporated in the British Virgin Islands.  The scheme's contacts with the United States were limited to the movement of funds in and out of U.S. bank accounts.  As the court put it, RICO is presumed not to apply to "claims that are essentially extraterritorial in focus."  733 F.Supp. 2d at 473.

These cases do not indicate that RICO is inapplicable merely because some of the participants in the enterprise reside outside the United States.  As relevant to the allegations in the present case, RICO makes it unlawful for "any person" associated with "any enterprise" engaged in interstate commerce to participate in the conduct of the enterprise's affairs through pattern of racketeering activity.  *See* 18 U.S.C. § 1962 (c).  The focus of the statute is the racketeering activity, i.e., to render unlawful a pattern of *domestic* racketeering activity perpetrated by an enterprise.  *See U.S. v. Phillip Morris,* 783 F. Supp. 2d at 29.

In the present case most of the participants in the activities that are the subject of the RICO claim, including the Meisels defendants, reside in Canada.  However, the racketeering activity of the enterprise with which the Meisels defendants allegedly were associated, was directed at and largely occurred within the United States.  The goal of the enterprise, according to plaintiffs' allegations, was to extract money from CGC and the other plaintiffs through a phony loan scheme.  Defendants, including the Meisels defendants, allegedly used telephone, mail, and email communications directed to potential borrowers in the United States.  An agent

of the Hutchens and participant in the alleged scheme, Mr. Luistermans, was dispatched to Colorado to inspect property that was to be used as collateral for the loans.  A Colorado lawyer was engaged to assist with the loan process.  Similar conduct was directed at plaintiffs in Florida and Illinois.

These facts are a far cry from those of *Norex* and *Cedeno,* where the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental.  *Phillip Morris* is a closer case, but again, the court found that the English company's conduct in the U.S. was not the basis for the alleged RICO liability.  In the present case, the conduct of the enterprise within the United States was a key to its success.

Accordingly, while I agree that RICO does not apply extraterritorially, I do not agree that this case, as alleged, involves an extraterritorial application of the statute.  Therefore, the motion to dismiss for failure to state a claim is denied.

## IV. DEFENDANTS BROAD AND CASSEL'S AND RONALD GACHÉ'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR PARTIAL ABSTENTION (DOCKET #75): GRANTED.

The Gaché defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and, alternatively, asks the Court to abstain from proceedings related to the Oxley Companies.

These defendants contend, in a lengthy motion supplemented by five attached exhibits, that the complaint fails to state a claim on which relief could be granted.  In a supplement they add that they do not wish for their motion to be converted to a motion for summary judgment.  Meanwhile, plaintiffs defend against the motion by referring to the affidavit of Michael Buono.  I decline to accept either party's invitation to consider matters outside the four corners of the complaint for this purpose.

The general standard of review for such a motion was aptly described by Judge Babcock as follows:

> When deciding a motion to dismiss under Rule 12(b)(6), the court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.  _Alvarado v. KOB-TV, L.L. C.,_ 493 F.3d 1210, 1215 (10th Cir. 2007); _David v. City & County of Denver,_ 101 F.3d 1344, 1352 (10th Cir. 1996).  "In doing so, we ask whether there is plausibility in the complaint.  The complaint does not need detailed factual allegations, but the factual allegations must be enough to raise a right to relief above the speculative level." _Hall v. Witteman,_ 584 F.3d 859, 863 (10th Cir.2009)( _citing Christy Sports, LLC v. Deer Valley Resort Co.,_ 555 F.3d 1188, 1191 (10th Cir. 2009)).
>
> "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Ashcroft v. Iqbal,_ ---U.S.----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  It is not enough for the plaintiff to plead facts "merely consistent" with the defendant's liability and, likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." _Id._  Thus, in evaluating a dismissal under Fed. R. Civ. P. 12(b)(6), the court first "identif [ies] the [conclusory] allegations in the complaint that are not entitled to the assumption of truth," and then "consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." _Id._ at 1951; _Hall v. Witteman, supra._

In short, the Court will grant or deny a motion to dismiss under Rule 12(b)(6) based on the allegations in the Complaint, which if not merely conclusory will be construed in the plaintiff's favor.  However, when a party brings a RICO claim more particularity is required. The "threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts."  _Cayman Exploration Corp. v. United Gas Pipe Line Company,_ 873 F.2d 1357, 1362 (10th Cir. 1989).  The requirement of Fed. R. Civ. P. 9(b) that fraud must be pled with particularity applies to RICO claims.  _Ibid._  This means that the complaint "must set forth the time, place and contents of the false representations,

the identity of the party making the false statements, and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991).

As indicated elsewhere in this order, the gist of the complaint in this case is that Sandy Hutchens, assisted by family members, alter ego companies, a realtor, and three law firms, duped prospective borrowers in the United States into believing that he was a legitimate businessman, and that the alter ego companies were legitimate lenders who were experienced and capable of making significant commercial loans, all of which was false. The enterprise comprised of the four alter ego companies, managed by the Hutchens family members, and associated with the professional defendants, engaged in predicate acts of mail and wire fraud to induce prospective borrowers into depositing advance fees supposedly required to process loan applications. However, the enterprise had neither the intent nor the ability to fund loans. Instead, its goal, successfully though unlawfully achieved, was to obtain and retain the advanced loan processing fees.

With respect to the Gaché defendants, plaintiffs allege that they:

1. Made representations regarding Sandy Hutchens and Jennifer Hutchens. It is not stated to whom the representations were made other than to "Plaintiffs and members of the Class."

2. Knew that "Plaintiffs and members of the Class did not know of Sandy Hutchens' background."

3. Knew that Sandy Hutchens and Jennifer Hutchens were not using their true names and that the use of various aliases would hinder the ability of the Plaintiffs and members of the Class in conducting due diligence on either Sandy Hutchens or Jennifer Hutchens.

4. Knew "or were willfully ignorant of the fact that" neither CFC, nor FCMF, nor 308 Elgin had the capacity to make the loans which had been committed.

5. Knew or were willfully indifferent to the truth that neither CFC, nor FCMF, nor 308 Elgin, or even a combination of the three entities, had closed "hundreds of loans" as had been represented."

6. Did not disclose that Moishe Alexander's real name was Sandy Hutchens.

7. Represented that Moishe Alexander was a reputable businessman and a viable source of substantial lending capital at lower than market rates.

8. Represented that Moishe Alexander had the financial capability to fund large-scale transactions like those to which 308 Elgin had committed.

9. Represented that Moishe Alexander had an ongoing joint venture with TD Canada Bank, which was a major source of his funding.

10. Failed to disclose that Moishe Alexander was a career criminal whose true identity was Sandy Hutchens.

Complaint ¶¶43, 48.

I agree with the Gaché defendants that this is not good enough in the context of a RICO claim. Plaintiffs do not allege with particularity to whom the representations were made. Were they made only to the Florida-based named plaintiff or to all of the "Plaintiffs and member of the Class" as the Complaint suggests. They do not allege with particularity when the misrepresentations were made or how they constituted mail or wire fraud. Although in one instance there was a reference to a loan commitment by 308 Elgin, it is elsewhere implied that these defendants concealed facts about CFC, FCMF in addition to 308 Elgin. There is an

implication that facts about Sandy Hutchens and Jennifer Hutchens were concealed, but when, where, how and from whom?

I realize that it is a lot to ask of the alleged victims of an allegedly broad and complex fraudulent scheme. However, as indicated in *Cayman Exploration,* the mere accusation of a RICO violation has a serious taint to it, certainly for a lawyer and law firm. There presumably was at least one specific victim of the alleged misrepresentations and omissions of these defendants. Presumably that victim can enlighten counsel as to sufficient specifics to state a particularized claim. We are already dealing with a 33-page complaint. However, that is the price one must pay successfully to launch a RICO claim.

Accordingly, the motion to dismiss for failure to state a claim is granted, without prejudice. In view of the ruling on the motion to dismiss, the Court need not reach or decide the abstention issue.

### V.      MOTION TO DISMISS THE COMPLAINT OF PLAINTIFFS CGC HOLDING COMPANY LLC, CRESCENT SOUND YACHT CLUB LLC, AND JAMES T. MEDIC, OR IN THE ALTERNATIVE STAY THE PROCEEDINGS (DOCKET #82): DENIED.

The Hutchens defendants, including the four "alter ego" companies, ask the Court either to dismiss or to stay this case in favor of proceedings pending in Ontario, Canada. Those proceedings are (1) *Maesbury Homes, Inc. et al v. 1539006 Ontario Inc., et al.,* No. CV-11-421871, and (2) *CGC Holding Company et al v. Sandy Hutchens et al.*, CV-11-428713. The *Maesbury* case, brought by three Florida corporations owned by Paul Oxley, seeks damages and injunctive relief against the Hutchens family members and related entities arising from the advance fee loan scheme that is the focus of the present case. *See* Ex. 1 to the pending motion. The *CGC Holdings* case, brought by the same plaintiffs as the present case, seeks to freeze assets in the possession of the Hutchens related defendants. Ex. 2 to motion.

This Court has the "inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *National Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 115 F. Supp.2d 1243, 1246 (D. Colo.2000). This power is balanced against federal courts' "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.* 517 U.S. 706, 716 (1996). However, the existence of parallel proceedings in an international forum will not, alone, constitute an "exceptional circumstance" which justifies the abdication of federal jurisdiction. *National Union Fire*, 115 F. Supp.2d at 1246-47.

This Court will apply the six factors considered by the court in *National Fire,* as follows:

1. <u>Similarity of the Two Actions</u>. The CGC Holdings action in Ontario seeks to freeze assets in aid of the monetary relief sought in the present case. *See* Ex. 2 to the pending motion. It is not otherwise similar. The plaintiffs in *Maesbury* are not parties in the present case, nor are the plaintiffs in the present case parties in *Maesbury*. The *Maesbury* plaintiffs presumably are members of the putative class in the present case, but no class has been certified, and even if certified, it is unknown whether they would opt out. Some defendants in *Maesbury* are not named in the present case and vice versa. The plaintiffs here assert a violation of RICO, which is not and cannot be a claim brought in *Maesbury*. In short, there certainly are similarities but by no means an identity of parties or claims.

2. <u>Promotion of Judicial Efficiency</u>. In the abstract, having all claims adjudicated in a single action would "promote judicial efficiency by placing the parties and claims before a single tribunal, thereby reducing duplicative discovery and litigation." *National Union Fire*, 115 F.Supp.2d at 1247. However, the *CGC Holdings* case could actually streamline the present case by dealing with the preservation of assets.

Given the differences between the *Maesbury* case and this case, it is not clear that judicial economy would be achieved by staying this case. I request to be kept informed of developments in *Maesbury* that might cause this Court, or the Canadian court, to take another look at this issue if appropriate in the future.

3. <u>Adequacy of Relief Available in the Alternative Forum</u>. Plaintiffs suggest that the applicable statute of limitation might have passed in Canada. If so, that is a problem of plaintiffs' own making. However, plaintiffs cannot seek relief under RICO in Canada.

4. <u>Fairness and Convenience of Parties, Counsel, and Witnesses</u>. For the most part I have addressed these issues in resolving the personal jurisdiction motions. There will be a certain amount of inconvenience to some individuals whether the cases proceeds in Canada or the United States or both. This is balanced by the size of the litigation, the sophistication of the parties and their lawyers, the use of modern transportation and electronic communication, and the inclination of courts to respect a plaintiff's choice of the forum in which to bring his claim.

5. <u>Prejudice to the Parties</u>. There is the potential for prejudice to defendants if they have to defend similar actions in two different locations under two different sets of laws. That is a reason for both courts to keep an eye on developments in the other court and to keep an open mind about means of avoiding duplication and prejudice. The inability of plaintiffs to have potential rights under RICO adjudicated is a source of potential prejudice if the present action were stayed or dismissed.

6. <u>Temporal Sequence of Filing Actions</u>. The *Maesbury* case was filed approximately one month before the present case. If the *Maesbury* case were identical to the present

case, I would defer to the earlier filed case. However, it is not. The *CGC Holdings* case

in Ontario was filed approximately two months after the present case.

Based on the factors outlined above, the weight of the argument is against a dismissal or

stay of the proceeding in favor of the litigation in Ontario.

**VI.  MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO QUASH SERVICE OF PROCESS ON DEFENDANTS DOE LIMITED 1-100 PURSUANT TO FRCP 12(B)(5) (DOCKET #84): GRANTED.**

Plaintiffs through counsel confessed this motion at the October 12, 2011 hearing.

**VII.  MOTION FOR AN ORDER FREEZING CERTAIN ASSETS HELD BY DEFENDANTS SANDY HUTCHENS, TANYA HUTCHENS, JENNIFER HUTCHENS, CANADIAN FUNDING CORPORATION, 308 ELGIN STREET INC., FRIST CENTRAL MORTGAGE FUNDING INC., FIRST CENTRAL HOLDING INC., AND DOE LIMITED 1-100 (DOCKET #5): SEE BELOW**

Chief Judge Daniels denied this motion, insofar as it sought a temporary restraining

order, on May 12, 2011. During the October 12, 2011 hearing, plaintiffs' counsel indicated that

he wished to obtain a preliminary injunction preventing the transfer of certain assets. Counsel

for the Hutchens defendants declined to stipulate to the requested relief, indicating only that the

defendants would stipulate that they would obey whatever orders are issued by the Canadian

court on the subject.

Apparently an order freezing certain assets has been issued in the *Maesbury* case in

Ontario. Also, a hearing in the *CGC Holdings* Ontario case is set for November 25, 2011.

Suffice it to say that, even if the Canadian orders do not moot this issue here, the Court would

not consider entering a preliminary injunction without an evidentiary hearing. Subject to what

develops in Canada, such a hearing will have to be set here.

DATED this 1st day of November, 2011.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge