IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 11-cv-01012-RBJ-KLM

**CGC HOLDING COMPANY, LLC**, a Colorado limited liability company;
**CRESCENT SOUND YACHT CLUB, LLC**, a Florida limited liability company;
**HARLEM ALGONQUIN LLC**, an Illinois limited liability company; and
**JAMES T. MEDICK**; on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**TANYA HUTCHENS**; **JENNIFER HUTCHENS**, a/k/a Jennifer Araujo; **CANADIAN FUNDING CORPORATION**; an Ontario corporation; **308 ELGIN STREET INC.**, an Ontario corporation; **FIRST CENTRAL MORTGAGE FUNDING INC.**, an Ontario corporation; **FIRST CENTRAL HOLDINGS INC.**, an Ontario corporation; **BARRY J. POULSON**; **ARSENAU POULSON**, a partnership; **ALVIN MEISELS**; **BLANEY McMURTRY LLP**, an Ontario limited liability partnership; **REZNICK, PARSONS, MEISELS, TABERNER**, a partnership; **RONALD GACHÉ** ; **BROAD AND CASSEL**, a partnership
**H. JAN LUISTERMANS**, a/k/a Herman Luisterman; **REALTY 1 REAL ESTATE SERVICES LTD**, an Ontario corporation; and **DOE LIMITED 1 – 100**,

Defendants.

**ORDER on PENDING MOTIONS –No. 2**

This order addresses six pending motions.

**Facts**

Briefly, plaintiffs allege that defendant Sandy Hutchens was the mastermind of a loan fraud scheme designed to extract monies from victims in the United States. The other defendants are alleged to have been participants in the implementation of the scheme. Plaintiffs, who applied for loans that were never made, allege that they were duped into advancing substantial loan processing fees which were not refunded when the scheme was discovered. Plaintiffs

1

initially asserted five claims for relief: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; (2) conversion; (3) negligent misrepresentation; (4) constructive trust; and (5) unjust enrichment.

In an order issued November 1, 2011 the Court resolved a number of motions then pending.

**Defendants H. Jan Luistermans' and Reality 1 Real Estate Services LTD.'s Motion to Dismiss Plaintiffs' First, Second and Fourth Claims for Relief for Failure to State a Claim Upon Which Relief May Be Granted [#153]: DENIED AS MOOT.**

This motion was rendered moot by the filing of plaintiffs' Amended Complaint [#175].

**Defendants Alvin Meisels' and Blaney McMurtry LLP's Motion for Certification of Order of Interlocutory Review [#161]: DENIED.**

A district court may state in writing that it is "of the opinion that [an order] involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). If this is done, then the Court of Appeals may, in its discretion, permit an appeal from the order to be taken. *Id.*

These defendants argue that "extraterritorial application of RICO is a controlling question of law that will materially advance the termination of this litigation." Motion [#161] at 4. This Court did not conclude that RICO applies extraterritorially. Rather, after considering *Morrison* and the other cases on which defendants rely, the Court agreed that RICO does not apply extraterritorially. November 1, 2011 order [#149] at 25. However, the Court found that the facts alleged in this case do not involve an extraterritorial application of RICO, even though the defendants reside in Canada. *Id.* at 22-25. In the process of reaching that result I considered, discussed, and distinguished the cases on which defendants rely, i.e., *Morrison v. Nat'l*

*Australian Bank Ltd,* 130 S. Ct. 2869 (2010), *Norex Petroleum Limited v. Access Industries, Inc.,* 631 F.3d 29 (2d Cir. 2010) and *United States v. Philip Morris USA, Inc.,* 79 Fed. R. Serv. 3d 144 (D.D.C. 2011). *Id.* In a recent telephone hearing counsel indicated that they were aware of no new relevant decisions that have come down after my order was issued.

The Tenth Circuit could reasonably disagree with my application of the alleged facts to the undisputed law. I also agree that if the Tenth Circuit were to conclude that these facts do involve an extraterritorial application of RICO, then the RICO claim (but not all claims) against these defendants would be dismissed. However, I am sufficiently comfortable with my decision that I do not believe this is the exception to the proposition that appeals should be taken from final judgments, not piecemeal.

**Defendants Alvin Meisels' and Blaney McMurtry LLP's Motion to Dismiss [#181]: DENIED.**

These defendants previously filed [#86], and the Court denied, a motion to dismiss for failure to state a claim upon which relief could be granted under Fed. R. Civ. P. 12(b)(6). That motion was based on the extraterritorial application of RICO. These defendants purported to "reserve the right" to file another rule 12(b)(6) motion "addressing deficiencies in the Complaint" if the first motion failed. *Id.* at 2. This Court does not entertain multiple Rule 12(b)(6) motions filed seriatim.

**Defendant Carl Romano's Motion to Dismiss for Lack of Personal Jurisdiction [#186]: DENIED.**

Mr. Romano was added to the case in plaintiff's Amended Complaint [#175]. He, like defendant Gaché, is a partner in defendant Broad and Cassel, a Florida law firm. Plaintiffs allege that Mr. Romano, Mr. Gaché and defendant Meisels, a Canadian lawyer, made false and misleading representations regarding the bona fides of Sandy Hutchens and his entities. They

3

knew, but knew that plaintiffs did not know, about Mr. Hutchens' background. They knew that Mr. Hutchens and Jennifer Hutchens were not using their true names, and that their use of aliases would hinder plaintiffs' ability to conduct due diligence on them. They allegedly knew or were willfully ignorant of the fact that Hutchens' entities CFC, FCMF and 308 Elgin lacked the capacity to make the loans to which they had committed. They allegedly knew or were recklessly indifferent to the fact that the three entities had not, as had been represented, closed "hundreds of loans." *Id.* ¶¶51-52. Plaintiffs set forth additional allegations concerning only the Florida lawyers in 11 paragraphs quoted verbatim below in the Court's discussion of motion #187.

The Court addressed the Mr. Gaché and his law firm's jurisdictional motion in its November 1, 2011 order [#149]. The jurisdictional question when a federal statute conveys nationwide service therefore is whether the exercise of jurisdiction comports with due process. *Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206, 1209 (10th Cir. 2000). RICO conveys nationwide service of process. "When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice." *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1231 (10th Cir. 2006). Here, per the Court's previous order, personal jurisdiction can be established over several other defendants.

With respect to due process, "[t]he burden is on the defendant to show that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'" *Id.* at 1212. The court listed five factors to be considered regarding the level

of inconvenience, adding that inconvenience would rise to a level of constitutional concern "only in highly unusual cases." *Id.*

This Court applied the five factors to the facts concerning Mr. Gaché and Broad and Cassel and denied the motion for the reasons there stated. *Id.* at 20-22. Mr. Romano acknowledges that his jurisdictional arguments are similar. However, he argues that there are facts peculiar to him that warrant a different result for him. I disagree.

There is no difference at all with respect to the application of factors one and two. Mr. Romano adds more discussion of factor number three (judicial economy). However, the bottom line remains that multiple actions asserting similar claims against similar defendants do not serve judicial economy. With respect to factor number four (situs of discovery) Mr. Romano states that "[a]ll of the discovery pertinent to Romano, Broad and Cassel, and Gaché will take place in Florida, with some discovery in Canada." Motion [#186] at 6. Setting aside the internal inconsistency, these facts do not indicate inconvenience to a Florida-based defendant. Regarding factor five (nature of the regulated activity) he argues that all of the activity concerning him occurred in Florida. That presumably is also true of his partner and law firm. Mr. Romano provides affidavits and deposition testimony that essentially argue the merits of plaintiffs' claim. To any extent they are relevant to the jurisdictional issue, the Court must construe them in plaintiffs' favor.

The Court concludes that nationwide service applies, that the ends of justice will be served by resolving all related claims in one forum, and that the assertion of personal jurisdiction over Mr. Romano does not create such a grave inconvenience as to violated his right to due process.

**Defendants Broad and Cassel's, Ronald Gaché's and Carl Romano's Motion to Dismiss the Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted [#187]: GRANTED IN PART and DENIED IN PART.**

In considering Mr. Gaché's and Broad and Cassel's motion to dismiss the original complaint, the Court applied the following standard:

> In short, the Court will grant or deny a motion to dismiss under Rule 12(b)(6) based on the allegations in the Complaint, which if not merely conclusory will be construed in the plaintiff's favor. However, when a party brings a RICO claim more particularity is required. The "threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts." *Cayman Exploration Corp. v. United Gas Pipe Line Company,* 873 F.2d 1357, 1362 (10th Cir. 1989). The requirement of Fed. R. Civ. P. 9(b) that fraud must be pled with particularity applies to RICO claims. *Ibid.* This means that the complaint "must set forth the time, place and contents of the false representations, the identity of the party making the false statements, and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991).

November 1, 2012 order [#149] at 26-27. The Court concluded that the allegations against those defendants did not allege fraud with sufficient particularity to state a RICO claim. *Id.* at 27-29. The motion was granted without prejudice.

The Amended Complaint provides significantly more by way of particulars. *Compare* Complaint [#1] ¶¶43, 48 *with* Amended Complaint [#175] at 51-52, 62-74. Paragraphs 51, 52, 62 and 63 of the Amended Complaint are roughly comparable to the allegations in the original complaint. However, plaintiffs have now added the following:

> 64. Specifically, it was the following representations and failures to disclose by Romano and Gache that caused damage to Crescent Sound as well as several other members of the Class:
>
> (a) In May 2008, Gary Fioretti, a loan broker with an office in Boca Raton, Florida, was approached by Gache who stated that he – Gache – had a Canadian client, Moishe Alexander, who had a great deal of money to loan on real estate. Gache further stated that he was aware that Fioretti was attempting to find financing for a developer of a large project in Orlando. Gache went on to state that he had six similar transactions pending with Alexander. Gache provided

Fioretti with Alexander's telephone number and recommended that he be contacted.

(b)  Fioretti called Moishe Alexander.  Upon receiving a positive response from Alexander, Fioretti began assembling a loan package [for] one of his large real estate developer clients, Paul Oxley, to submit to Alexander.

(c)  Fioretti submitted the first loan package for one of Oxley's companies to Alexander and, on June 2, 2008, 308 Elgin Street responded with a loan commitment.

(d)  Upon receiving this first loan commitment for Oxley, Fioretti searched the internet for information on Moishe Alexander but found virtually nothing and so informed Gache.  In explaining the lack of information regarding Moishe Alexander, Gache represented that "Mr. Alexander is a very private person and does his business by word of mouth" and that he "was just now reaching out into the United States."  Gache went on to say that they – Broad and Cassel – had performed their due diligence on him prior to being engaged for the aforementioned six real estate transactions, and that he had access to a lot of money in Canada and Israel.  In this representation, Gache did not disclose that Moishe Alexander's true name was Sandy Hutchens or that Sandy Hutchens had a criminal history.

(e)  Unbeknownst to Fioretti, prior to June 2, 2008, another Florida loan broker, Ron Schmitz, had learned that Moishe Alexander's true name was Sandy Hutchens and that he had an extensive criminal history.  After learning this information and in a discussion with Romano about several pending loan commitments which 308 Elgin had made to Schmitz's clients, Schmitz asked Romano if he – Romano – wanted to hear what Schmitz had learned about Alexander.  Romano's response was, "I don't want to hear it.  I represent Moishe Alexander, not you."  Over Romano's objection that he did not want to hear what Schmitz had learned, Schmitz proceeded to tell him, whether or not he wanted to hear it, that he had learned that there was no such person as Moishe Alexander but that he was Sandy Hutchens, that Sandy Hutchens was a career criminal, and that Sandy Hutchens had been convicted of fraud.  Carl Romano's response was that he knew about all of that but that Sandy Hutchens had found religion, that he was a changed man; that they (Broad and Cassel) had run a background check on Moishe Alexander and that he checked out; that without doubt Alexander and his company were 100% legitimate and that they had millions of dollars to fund the pending transactions.  Romano went on to say that Schmitz had absolutely nothing to worry about.

(f)  After receiving the aforesaid assurances from Gache, Oxley or entities under his control wired, or paid by check, monies as follows:

7

[there follows an Excel spreadsheet with information concerning 14 fee or legal retainer payments]

65. Between June 2, 2008 and July 18, 2008, Fioretti had virtually daily conversations by telephone with Gache and his partner, Carl Romano, regarding the loans which 308 Elgin had committed to make.  In none of these contacts was there any disclosure that Hutchens had a criminal background, was using assumed names, that the prior six loans which Gache referred to at the outset had failed to fund or otherwise correcting the express representations made by Gache in May.

66. In the midst of the series of loan commitments to Oxley's companies, Fioretti referred Crescent Sound to Broad & Cassel.  At some point between June 17, 2008 and June 20, 2008, Crescent Sound's loan application and MAI appraisal was (sic) sent to Alexander and, just as in the case of Oxley, 308 Elgin issued a loan commitment which called for certain fees to be paid.

67. Prior to the acceptance of the commitment, Crescent Sound's attorney, Harold Bofshever, called Romano in an effort to confirm that Alexander and 308 Elgin were legitimate.  Romano responded by stating that indeed Alexander had the ability to make the loan which had been committed.  The information imparted by Romano in this call, which occurred sometime between June 26, 2008 and July 11, 2008, was relayed by Bofshever to Crescent Sound's principal, Michael Buono.  Bofshever, based upon his discussion with Romano, advised that the commitment was OK to accept and that the required fees should be paid.

68. On July 11, 2008, Buono received wiring instructions from Romano for the following funds to be wired:

(a) $15,000 wired to Broad and Cassel "as the legal retainer under the Commitment."

(b) $50,000 wired to Broad and Cassel "as a deposit on the Lender's Admin Fee which shall be held pending Lender's receipt of a satisfactory inspection report from the Lender's inspector."

(c) [Y]ou are to wire the initial $50K deposit on the lender's Admin Fee directly to Lender in accordance withe (sic) Lender's wire instructions attached hereto."

69. On July 11, 2008, Crescent Sound wired the sum of $150,000 to Broad and Cassel.

70. In July 2008, Luistermans personally inspected Crescent Sound's properties and, while in Florida, was given a check by Buono in the amount of $3,500 payable to Realty 1 Real Estate Services.

71. On July 18, 2008, Fioretti learned that the Moishe Alexander he thought he was dealing with was actually Sandy Hutchens, a 20-year career criminal in Canada. In the information received, Fioretti was referred to the "Jewishwhistleblower" website for further confirmation that Hutchens had a history of financial frauds and drug offenses. And Fioretti further discovered that Hutchens was at the time on supervised probation for drug trafficking and defrauding elderly and illiterate individuals.

72. Fioretti's partner thereupon called Gache with this newly discovered information. Gache stated that he knew of Hutchens' past but that it was confirmed by Rabbi Kaplan and others that Hutchens had found religion and was a changed man.

73. On July 29, 2008, Buono was informed that Alexander had a criminal background. Bofshever thereupon called Romano and Gache, confronting them with the recently obtained information that Alexander had a criminal background. Gache angry retort was that Alexander had found religion and had changed his ways.

74. The acts and failures to act by Gache and Romano were within the scope of their agency and employment by Broad and Cassel, and consequently, all such acts and failures to act are imputed thereto.

Accordingly, plaintiffs have now alleged that Gaché and Romano either made misrepresentations or concealed material information from loan broker Fioretti concerning "Moishe Alexander." In May 2008 Mr. Gaché allegedly told Mr. Fioretti that "Moishe Alexander" had a great deal of money to lend on real estate, and that he had six transactions pending with him. Mr. Fioretti called "Moishe Alexander," received positive response, and put together a loan package for client Paul Oxley. However, Mr. Fioretti was unable to find information on "Moishe Alexander." He contacted Mr. Gaché who indicated that "Moishe Alexander" was a very private person but that Broad and Cassel had performed due diligence on him and learned that he had a lot of money available in Canada and Israel. Mr. Gaché knew, but did not disclose, that "Moishe Alexander" was actually Sandy Hutchens, who had a criminal history.

Meanwhile, another loan broker learned "Moishe Alexander's identity and history and confronted Mr. Romano with the information. Mr. Romano admitted that he was aware of the information, but that the firm had checked him out and determined that he was "100% legitimate" and had "millions of dollars to fund pending transactions."

Plaintiffs allege that Mr. Fioretti continued to have "virtually daily" telephone conversations with Mr. Gaché and Mr. Romano in June and July 2008 regarding loans to which a Hutchens entity, 308 Elgin, had committed. They still did not disclose "Moishe Alexander's" identity or background to Mr. Fioretti, nor did they disclose that the prior six loans had not been funded.

In mid-June 2008 Mr. Fioretti referred the Crescent Sound Yacht Club, LLC, one of the named plaintiffs in this case, to Broad and Cassel. Crescent Sound provided a loan application and appraisal, which were sent to "Moishe Alexander." The same Hutchens entity, 308 Elgin, issued a loan commitment to Crescent Sound. Between June 26 and July 11, 2008 Mr. Romano confirmed to Crescent Sound's lawyer by telephone that Mr. "Alexander" and 308 Elgin were legitimate and had the ability to fund the loan. Based on that information Crescent Sound on July 11, 2008 wired $150,000 to Broad and Cassel for legal fees and loan administrative fees.

On July 18, 2008 Mr. Fioretti learned about "Moishe Alexander's" true identity and criminal history, including financial frauds. Mr. Fioretti's partner telephoned Mr. Gaché. Mr. Gaché admitted that he knew this information but that, per a rabbi and others, Mr. Hutchens was a changed man. Crescent Sound's principal, Mr. Buono, was informed of the truth concerning "Moishe Alexander" on July 29, 2008, and his lawyer called and confronted Mr. Gaché and Mr. Romano. Mr. Gaché said that "Mr. Alexander" was a changed man.

In their motion to dismiss the Amended Complaint for failure to state a claim, these defendants assert that plaintiffs relies on statements purportedly directed by Mr. "Moishe Alexander" to a non-party, Paul Oxley, and by Mr. Romano to a loan broker, Ronald Schmitz, who had nothing to do with Crescent Sound. Motion [#187] at 2. That significantly understates the combination of allegations quoted and discussed above. Plaintiffs have alleged that Crescent Sound was induced to pay Broad and Cassel $150,000 based on misrepresentations to, and concealment of information from, Mr. Fioretti by Mr. Gaché and Mr. Romano. Crescent Sound is not pleading a claim solely on behalf of Mr. Oxley. It is pleading that misrepresentations and omissions to Crescent Sound indirectly through Mr. Fioretti and to Crescent Sound's own lawyer caused it to sustain a monetary loss.

In its earlier order the Court noted the absence of particulars concerning to whom Mr. Gaché's alleged misrepresentations were made, when they were made, and how they constituted mail or wire fraud. November 1, 2011 order [#149] at 28. The foregoing allegations, accepted as true for this purpose, provide the "who," the "when" and the "how" that were previously missing. They accuse these defendants of knowingly supporting the unlawful acts of the Hutchens defendants. That can support a RICO claim. *Cf. Salinas v. U.S.,* 533 U.S. 52, 63 (1997). The Court does not, of course, express any opinion regarding the truth of these allegations. However, for purposes of a motion to dismiss for failure to state a claim these allegations, which are not merely conclusory or implausible on their face, must be construed in plaintiffs' favor.

Finally, assuming that Florida substantive law applies to the state law claims, but construing the allegations of the Amended Complaint liberally in plaintiffs' favor, the Court is satisfied at this point that plaintiffs have stated a claim for negligent misrepresentation against

11

these defendants. Plaintiffs have not responded in any substantive way to the motion regarding the conversion and unjust enrichment claims. The Court concludes that they do not state a claim against these defendants upon which relief could be granted.

**[Defendants Broad and Cassel's] Unopposed Motion for Hearing on Outstanding Motions [#202]: GRANTED IN PART, DENIED IN PART.**

This order resolved all pending motions except plaintiffs' motion to certify a class [#6], filed April 21, 2011. The Hutchens defendants filed a response on May 2, 2011. Please set a hearing on that motion.

### Order

1. Motion #153 is denied as moot.
2. Motion #161 is denied.
3. Motion #181 is denied.
4. Motion #186 is denied.
5. Motion #187 is granted in part and denied in part. It is granted to the extent that the Court dismisses the conversion and unjust enrichment claims against defendants Gaché, Romano and Broad and Cassel. It is otherwise denied.
6. Motion #202 is granted in part and denied in part. The Court requests that counsel set a hearing on motion #6 but otherwise denies this motion.

DATED this 3rd day of July, 2011.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge