IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No.  11-cv-01012-RBJ-KLM

CGC HOLDING COMPANY, LLC, a Colorado limited liability company;
CRESCENT SOUND YACHT CLUB, LLC, a Florida limited liability company;
HARLEM ALGONQUIN LLC, an Illinois limited liability company; and
JAMES T. MEDICK; on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

SANDY HUTCHENS, a/k/a Fred Hayes, a/k/a Moishe Alexander,
a/k/a Moshe Ben Avraham, et al,

      Defendants.

---

## ORDER on PENDING MOTIONS –No. 3

---

      This Court is again called upon to resolve numerous motions in this case.  Oral argument has been presented on the motion for class certification and, to some extent, on discovery motions.  To the extent oral argument has not been presented or requested, the Court dispenses with argument and resolves the motions on the papers.

**I.**     **Facts.**

      Plaintiffs contend that they were swindled by Sandy Hutchens and related individuals and entities, with the assistance of Canadian and American lawyers and a Canadian realtor.  The gist of it is that Hutchens and his associates falsely represented that he was able and willing to make numerous, large commercial loans to more than 100 borrowers in the United States; that they were able to bilk prospective borrowers who thought they were dealing with legitimate lenders out of something in the range of eight million dollars of loan application or "advance fees;" and

1

that in support of the scheme they failed to disclose Hutchens' identity and his criminal history but instead perpetrated the fraud by disguising Hutchens through a number of different aliases and the use of corporations that were mere shells.

With perhaps one or two exceptions, loan commitments were not filled. That, however, is not the focus of the case. Plaintiffs have stipulated for purposes of this case that there were legitimate reasons on which a bona fide lender could have declined the loans. Plaintiffs focus is on the advance fees that were paid on allegedly false pretenses but never returned. They assert claims based upon RICO as well as state common law theories.

## II.    Case History.

The case has been a virtual nightmare of motion practice. The Court issued its first order on pending motions on November 1, 2011. [docket #149]. Order number 2 on pending motions, was issued July 3, 2012. [#209]. The Court has resolved many other motions along the way. As of this date 18 unresolved motions are pending. The case is set for trial commencing April 7, 2013.

## III.    Pending Motions.

I will address the motions in three groups: (A) dispositive motions; (B) the class certification motion; and (C) other motions.

### A.  Dispositive Motions.

**The Entity Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim Upon Which Relief Can Be Granted, and Improper Venue [#235]: DENIED.**

This Court fully addressed the personal jurisdiction issues concerning the Hutchens defendants in its order of November 1, 2011. [#149]. The Court discussed applicable jurisdictional law, both state and federal. To the extent personal jurisdiction was based upon

RICO or Fed. R. Civ. P. 4(k)(2), the Court discussed the applicable law as applied both to domestic and non-domestic defendants. *Id.* at 2-7. The Court then discussed the application of the law to the personal jurisdiction motions filed by Sandy Hutchens, Jennifer Hutchens, Tanya Hutchens, and the four alleged "alter ego companies." *Id.* at 7-15.

Defendants acknowledge that what they now call the "Entity Defendants" were entities owned by Sandy or Tanya Hutchens. Plaintiffs have alleged that the "Entity Defendants" were participants in the alleged Hutchens scheme by receiving, investing and retaining the proceeds of the wrongfully obtained advance fees. Based on the allegations in the plaintiffs' Amended Complaint, and the discussion in the Court's November 1, 2011 order, the Court finds that plaintiffs have established a prima facie basis for the assertion of personal jurisdiction over the Entity Defendants without the need for an evidentiary hearing or further discussion. For similar reasons, the Court is not persuaded by these defendants' venue arguments.

As for the part of the motion that seeks dismissal for failure to state a claim under Rule 12(b)(6), the Court addresses the motion without considering matters outside the four corners of the Amended Complaint. The Court construes all well-pleaded factual allegations in plaintiffs' favor for that purpose. At a minimum plaintiffs have alleged that the Entity Defendants were participants in the scheme by harboring the ill-gotten funds. Plaintiffs seek the imposition of a constructive trust on the assets of the Entity Defendants in order to satisfy a judgment if obtained. The Court finds that, having construed plaintiffs' allegations in their favor, the precise roles of the various Hutchens individuals and entities cannot be sorted out on a motion to dismiss for failure to state a claim.

**Broad Defendants' Motion for Summary Judgment on the RICO Claim [#322]:
DENIED (but with conditional leave to renew)**

The "Broad Defendants" consist of a Florida law firm, Broad and Cassel, and two of its

partners, Ronald Gaché and Carl Romano.  In the Court's November 1, 2011 order it granted

these defendants' (which did not yet include Mr. Romano and to which I referred in that order as

the "Gaché defendants") motion to dismiss for failure to state a claim, without prejudice.  *Id.* at

25-29.  Thereafter, plaintiffs amended their complaint and provided significantly more by way of

particulars as to the actions of attorneys Romano and Gaché.  The Broad defendants again moved

to dismiss under Rule 12(b)(6).  In an order issued July 3, 2012 (misdated July 3, 2011) [#209],

the Court found that the Amended Complaint stated a claim upon which relief could be granted

under RICO and common law negligent misrepresentation but dismissed plaintiffs' conversion

and unjust enrichment claims against these defendants.  *Id.* at 11-12.

The pending motion [#322] seeks summary judgment dismissing only the RICO claim

against the Broad defendants.  The motions states, "[t]here is no evidence whatsoever that the

Broad Defendants knowingly participated in a pattern of criminal racketeering activity as alleged

in the Amended Complaint."  *Id.* at 1.  This is supported by a list of 22 "undisputed facts," *id.* at

3-14, and the declaration of Mr. Romano attesting to the authenticity of 76 pages of attached

documents.  [#322-1].

The Broad defendants claim that it is undisputed that (1) in March 2008 Moishe

Alexander and 308 Elgin were referred to the Broad and Cassel law firm by Canadian attorney

Barry Poulson; (2) the firm was provided letters from Poulson and others attesting to

Alexander's financial wherewithal and large transactions that had been funded by 308 Elgin and

other companies affiliated with him; (3) on May 20, 2008, the Broad defendants were alerted to a

"Jewish Whistleblower" website and thereby to the fact that Moishe Alexander was Sandy

4

Hutchens, a man who had committed crimes of fraud in 2000 and drug trafficking in 2001;[1] (4) the Broad defendants were thereafter provided additional information about Alexander by attorney Daniel Rose (who had informed them of the website); attorney Poulson (originally named a defendant in this case but dismissed by the Court on jurisdictional grounds); Alexander himself; Martin Lapedus, the accountant for Alexander's companies; Alvin Meisels, another of Alexander's attorneys (and defendant in this case); Rabbi Mendel Kaplan (referred to in the website materials as a character witness for Hutchens at his sentencing hearing in 2005); a bereavement consultant; and a doctor; (5) these materials collectively indicated that Alexander had changed his ways; that he was now a respected businessman of honesty and high character; and that he did have the ability to fund loans, including a contemplated loan to the Crescent Sound Yacht Club (a Florida entity and one of the named plaintiffs in this case); (6) before accepting a loan commitment and wiring money, Crescent Sound through its principal Michael Buono had its attorney, Harold Bofshever, "check out" Alexander; (7) the Broad defendants provided Bofshever with the same letters and information they had received from Alexander's Canadian lawyers and accountant (apparently including the same 76 pages of documents that the Broad defendants have submitted in support of this motion); (8) accountant Lapedus has admitted in an affidavit that he at the time believed that "Moishe Alexander" had changed his ways, and only later did he conclude that he had been duped and that Alexander/Hutchens was perpetrating a fraud; (9) an affidavit of Florida mortgage broker Ronald Schmitz shows that he

---

[1] The website is in the record as Exhibit G to plaintiffs' response. [#361-7]. It indicates that the court sentenced Hutchens to four years of supervision rather than jail, based on evidence that he had gone through a religious conversion, was devoted to his community, and had made full restitution to the victim of the fraud. However, it also indicates that the fraud victim's widow was not happy and believed that Hutchens is a "consummate actor." The site states that Hutchens admitted that, while working as a paralegal, he had defrauded three clients. The Toronto Morning Star is quoted as referring to Hutchens as a con man and a drug peddler. A great deal of information and opinion is included in this website posting. It probably is inadmissible if offered to prove the truth of the various negative comments about Hutchens. Here, however, it is offered to prove the Broad defendants' state of mind, i.e., notice to them that Moishe Alexander was not what they might have thought or assumed.

too learned that Alexander was Hutchens and had a criminal record, but after being reassured by Alexander, Poulson and others, he developed the impression that he was a changed man and could perform on the loan commitments that had been issued; (10) an affidavit of a loan consultant, Gary Fioretti, on which plaintiffs rely, does not indicate that the Broad defendants knew of or intentionally participated in the alleged advance fee scam that is the subject of this case; (11) the Broad defendants represented 308 Elgin in regard to a loan to Thomas Mahoney, which did close on July 18, 2008, which further corroborates that they did not knowingly advance any criminal scheme; and (12) the only time the Broad defendants met with Alexander in person was a meeting in attorney Meisels' office on September 14, 2008, and soon thereafter, the Broad and Cassel law firm terminated its representation of Alexander and 308 Elgin.

In response, plaintiffs provide evidence that in several respects is the same as the Broad defendants' evidence. Their evidence indicates that the Broad defendants received information in April and early May 2008 raising concerns about 308 Elgin. [#361-2, -3]. Then, on May 20, 2008, they were alerted to the Jewish Whistleblower website. [#361-5, -6, -7]. On June 20, 2008, 308 Elgin issued a loan commitment to Crescent Sound for a $44.8 million loan, which required advance or commitment fees totaling $265,000. Prior to accepting the commitment and paying the advance fees, Crescent Sound's principal Michael Buono directed Crescent Sound's lawyer Harold Bofshever to confirm the legitimacy of Alexander and 308 Elgin. [#5-2] ¶8. Broad attorney Carl Romano responded with assurances that Alexander had the ability to go forward and sent Bofshever the same package of reference letters from Poulson, Spiro, Lapedus and others that has been submitted in support of the pending motion. [#322-1]. However, Romano did not inform Bofshever that Alexander was actually Hutchens or that he was a convicted criminal. He has testified in a deposition that he did not provide that information

because he believed that it would violate professional conduct rules to divulge negative information about a client. [#339-1] at 50-51, 58. Crescent Sound wired advance fees on July 11, 2008, based on the information received from Romano. [#5-2] ¶¶9-11. Buono learned of Alexander's criminal record on July 29, 2008, but when Bofshever confronted Romano and Gaché about this, "Gaché's angry retort was that Alexander had found religion and had changed his ways." [#363] ¶26(b).

The Broad defendants are not seeking dismissal of the negligent misrepresentation claim against them. Without commenting on the merits of that specific claim, I will say only that their decision to provide Crescent Sound's attorney Harold Bofshever with the "good stuff," meaning all the accolades and reassurances that the Broad defendants received, while omitting the negative facts that "Moishe Alexander" was actually Sandy Hutchens and had a criminal record, including a fraud conviction, exposes them to liability on that claim. It is difficult for this Court to conceive that a prospective borrower would not consider that to be important information that the borrower would want to have before committing to do business and to advance substantial advance fees to Alexander or associated individuals or entities. If the Broad defendants truly felt that their hands were tied by the professional conduct rules, they had the option of withdrawing from the representation rather than providing Bofshever with materially incomplete information.

The issue before the Court, however, is whether plaintiffs have come forward with enough evidence to send the RICO claim against the Broad defendants to a jury, that is, whether there is a genuine dispute of material fact as to whether the Broad defendants committed a violation of RICO. That is a very serious charge and must be considered with a degree of caution and circumspection. As this Court recognized in its November 1, 2011 order in this case, the "threat of treble damages and injury to reputation which attend RICO actions justify

requiring plaintiff to frame its pleadings in such a way that will give the defendant, and the trial court, clear notice of the factual basis of the predicate acts." *Cayman Exploration Corp. v. United Gas Pipe Line Company*, 873 F.2d 1357, 1362 (10th Cir. 1989).  That admonition certainly applies to RICO claims against attorneys, as against others, and I continue to take it very seriously as I consider the summary judgment motions.

Plaintiffs assert that the defendants in this case violated RICO either by violating 18 U.S.C. § 1962(c) or (d).  Amended Complaint [#175] ¶¶ 95-111.  To prove a violation of 18 U.S. C. § 1962(c), plaintiffs must prove that these defendants (1) conducted or participated, directly or indirectly, in the conduct (2) of an "enterprise" (3) through a "pattern" (4) of "racketeering activity." *See, e.g.*, *Tal v. Hogan*, 453 F.3d 1244, 1269 (10th Cir. 2006).  Section 1962(d), as applied to this case, requires proof of a conspiracy to violate § 1962(c).

An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or groups of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  A "pattern" involves two or more acts, sometimes called "predicate acts," of racketeering activity.  *Id.* § 1961(5).  "Racketeering activity," as relevant in this case, includes any act which is indictable for wire fraud.  *Id*. § 1961(1).  Wire fraud occurs when a person uses interstate wire, radio, or television communications in furtherance of a scheme to defraud.  18 U.S.C. § 1343.  *See Tal*, 453 F.3d at 1263.  A scheme to defraud "'connotes a plan or pattern of conduct which is intended or is reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  *U.S. v. Stewart*, 872 F.2d 957, (10th Cir. 1989)(citation omitted).

A person can be a conspirator under subsection (d) by "'adopting the goal of furthering or facilitating the criminal endeavor without committing or agreeing to commit two or more of the predicate acts."  *U.S. v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) (criminal RICO case)

(internal quotation marks and citation omitted).  In other words, to prove a RICO conspiracy claim against the Broad defendants, plaintiffs would have to prove that they intended to further an endeavor that, if completed, would be a violation of 18 U.S.C. § 1962(c).  *Gen. Steel Domestic Sales, LLC v. Denver Better Bus. Bureau*, No. 07-cv-1145, 2009 WL 535780, at *23 (D. Colo. March 2, 2009) (Ebel, J).  "In order to state a viable claim under the conspiracy provision of RICO, a plaintiff must allege (1) that the defendant agreed to participate in the operation or management of the enterprise itself, and (2) that the defendant further agreed that someone would commit at least two predicate acts."  *Id.*  A conspirator need not himself have agreed to commit the two or more predicate acts required.  Rather, he violates § 1962(d) if he has adopted the goal of furthering or facilitating the unlawful endeavor.  *Cf. Randall*, 661 F.3d at 1297 (criminal RICO case).  Mere association with co-conspirators is not enough.  *See, e.g.*, *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1479 (D. Colo. 1995).  In order to survive the pending motion, plaintiffs must come forward with evidence establishing the existence of a genuine issue of material fact that, if resolved in their favor, would support the elements of a RICO conspiracy claim.

The essence of the RICO violation alleged in this case is that Hutchens created a scheme to extract advance fees from prospective borrowers in the United States by committing to loans that he had no ability or intention to fund.  Plaintiffs allege that as part of this scheme he attempted to hide his identity and his criminal history both by failing to disclose those facts and by the use of aliases.  As indicated above, plaintiffs are not contending that the loans for which they applied should have been funded.  If Hutchens did mastermind a scheme as plaintiffs have alleged, then prospective borrowers who did not qualify for the loans they were seeking might be ideal targets.  Plaintiffs allege, however, that Hutchens knew that he had no ability to fund the

loans, either individually in most cases or, at a minimum, collectively in the amounts to which his companies "committed."  Their evidence of this appears to rest heavily, at least at this point, on the shoulders of Martin Lapedus, although they refer to certain other evidence such as communications from TD Canada Trust and Paul Riley.

The Broad defendants were originally accused of aiding and abetting this scheme, and thus aiding and abetting the RICO violation, but plaintiffs have abandoned that claim.  Instead, they assert that the Broad defendants conspired to violate RICO.  It is undisputed that from and after May 20, 2008, the Broad defendants knew that Moishe Alexander was actually Sandy Hutchens and that Hutchens had a criminal history, including one for fraud, but the Broad defendants did not disclose that information to attorney Bofshever when he was doing his due diligence investigation on behalf of Crescent Sound.  In that sense they did assist Hutchens in the perpetration of his alleged RICO violation upon Crescent Sound.  If they concealed these facts from other prospective borrowers (they have indicated that there were only a handful of prospective borrowers with whom they had contact after being informed of the Jewish Whistleblower website), then they assisted Hutchens to that extent as well.  Their actions expose them to possible liability on the negligent misrepresentation claim.

Plaintiffs, however have not come forward with evidence, direct or circumstantial, that creates a genuine dispute of fact as to whether the Broad defendants knew or believed that Hutchens and his companies did not have the ability and the intention to fund loans to Crescent Sound and other prospective borrowers in Florida.  The Broad defendants did not have a history with these clients.  They were showered with references, before and after the discovery of the Jewish Whistleblower website.  Those included a reference letter from Mr. Meisels dated August 13, 2008, discussed later in this order.  They withdrew from the representation after six months

and, in particular, after whatever occurred during the September 14, 2008 meeting in Mr. Meisels' office.

I would grant this motion but for the fact that plaintiffs have not been provided the opportunity to obtain documents that may bear on what the Broad defendants knew and when they knew it. I will address that issue in ruling on discovery disputes later in this order. As to the Broad defendants only, I grant leave to renew their motion if discovery provides plaintiffs with nothing more than what plaintiffs have shown to date. If plaintiffs do not have the goods after further discovery is provided, I will not permit them to drag the Broad defendants through a RICO trial.

**The Hutchens Defendants' Motion for Summary Judgment Pursuant to F.R.C.P. 56 Re: The Expiration of the Applicable Statues of Limitations [#323]: DENIED.**

The Hutchens defendants essentially are asking for a determination of law regarding the periods of limitation applicable to plaintiffs' RICO and conversion claims. A civil RICO claim is barred if it is not commenced within four years after the cause of action accrued. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 152 (1987). The cause of action accrues when the plaintiff knew or should have known of his injury. *Rotella v. Wood*, 528 U.S. 549, 553-559 (2000). The period of limitation applicable to a common law conversion claim is two years after the cause of action accrues. C.R.S. § 13-80-102(1)(a); *McGee v. Hardina*, 140 P.3d 165, 167 (Colo. App. 2005). *But see Curtis v. Counce*, 32 P.3d 585, 588 (Colo. App. 2001) (three years). The cause of action accrues when the wrongful possession is discovered or should have been discovered by the exercise of reasonable diligence. C.R.S. § 13-80-108(7); *McGee*, 140 P.3d at 167.

The motion asserts that the causes of action under RICO and for common law conversion accrued when the particular plaintiff's loan commitment was terminated. By that theory, a

particular plaintiff's RICO claim would be barred if the commitment was terminated on or before April 15, 2007 (the complaint in this case having been filed on April 15, 2011); a conversion claim would be barred if the commitment was terminated on or before April 15, 2009.  As for specific plaintiffs, the motion states only that Crescent Sound's conversion claim should be deemed barred because the loan commitment was terminated on or before August 5, 2008, when Alexander (Hutchens) sent a letter to Gary Fioretti and Walter St. Surin that strongly implies— but does not appear to state directly—that the loan would not be funded.  [#276] at 62-78.

Plaintiffs respond that the Hutchens defendants have not come forward with any evidence regarding the application of the four-year RICO statute to any plaintiff, and that when Crescent Sound discovered that it had a claim for conversion is a matter of speculation.  In reply, the Hutchens defendants return to the theme that these causes of action accrued when each particular plaintiff's loan commitment was terminated.

I get the impression that neither party's heart was in this motion, which perhaps is understandable given the number of motions and the enormous volume of briefing and exhibits that they have been filing.  The defendants assert, but do not attempt to explain, that plaintiffs' causes of action must have accrued when their various loan commitments were denied.  Plaintiffs ignore that and simply assert that defendants have not presented facts showing that it is beyond genuine dispute that they discovered their injuries before April 15, 2007 or April 15, 2009 as the case might be.  Suffice it to say that the Court is not satisfied that the Hutchens defendants have established a basis for summary judgment based upon the statute of limitations as to any plaintiff.

**Defendant Tanya Hutchens and the Tanya Hutchens Entity Defendants' Motion for Summary Judgment Pursuant to F.R.C.P. 56 [#324]: DENIED.**

Based upon my review of the motion [#324], the response [#368], the reply [#378], and their respective exhibits, as well as my knowledge of the allegations and evidence presented throughout the voluminous motion history of this case, it is evident that there are genuine disputes of material fact regarding the role that Mrs. Hutchens and the "Entity Defendants" played in the alleged scheme.

**Defendants Alvin Meisels' and Blaney McMurtry LLP's Motion for Summary Judgment [#325]: DENIED.**

Because of the tentative settlement of plaintiffs' claims against Blaney McMurtry LLP, *see* Notice [#375], I consider this motion only as it relates to Alvin Meisels individually.  Mr. Meisels indicates that he is a barrister, and that his practice focuses on commercial litigation. Meisels Affidavit [#325-1] ¶2.  His lawyer stated during the January 4, 2013 hearing that his involvement was simply as litigation counsel.  According to Mr. Meisels' affidavit, he undertook that representation after being provided with references from another attorney for Mr. Hutchens, Michael Spiro; from an acquaintance and client, Heshi Kuhnreich; and from two rabbis, Mendel Kaplan and Shlomo Eliyahu Miller.  *Id.* ¶4.  He acknowledges that Mssrs. Spiro and Kuhnreich told him about Hutchens' criminal record.  All four gentlemen assured him, however, that Hutchens and his wife had turned their lives around.  *Id.*  As the representation developed, Hutchens provided him with financial information.  Attorneys Poulson and Spiro said that they had represented Hutchens in closing numerous transactions, and that he and his companies had the ability to fund large mortgage transactions.  Mr. Meisels states that accountants Lapedus and Chuck Lilly confirmed assets, as did information he was provided from TD Canada Trust.  *Id.* ¶¶6-7.  A letter from accountant Lapedus dated August 12, 2008 and attached to the Meisels

affidavit as Exhibit A, [#325-1] at 10, states that there were sufficient funds as of that date in the accounts of companies related to "Moishe Alexander" to finance a $2.8 million project.

Mr. Meisels represented Sandy Hutchens and related entities (defendants Canadian Funding Corporation; First Central Mortgage Funding, Inc.; First Central Holdings, Inc.) from approximately 2004 to March 2010. *Id.* ¶3.[2] It does not, however, support the proposition that he served solely as litigation counsel. For example, according to a January 26, 2010 letter to J.C. Hearne, II, a North Carolina attorney, Mr. Meisels served as General Counsel to First Central Mortgage Funding, Inc. and its principals. [#359-6].

In a letter to Carl Romano of Broad & Cassel dated August 13, 2008 (alluded to in regard to the Broad defendants' motion; attached as Exhibit B to the Meisels affidavit, [#325-1] at 12), Mr. Meisels states that he acts for "Moishe Alexander and the corporation through which he transacts business as a private mortgage lender and financier." He advises Romano that, based on his review of the net worth statements of Mr. Alexander and his corporations and information provided by accountants Lapedus and Lilly, "I hereby verify that our client and his corporations have assets well in excess of what is required to fund this transaction . . . ." He adds: "If you have any questions relating to this matter, I will be please [sic] to assist you, subject to the constraints of solicitor-client privilege and the consent of my clients. You may provide a copy of this letter to the attorney for the borrower." *Id.* This letter implies that Mr. Meisels was acting as a "solicitor;" it plainly indicates that he was providing information and assurances to Florida counsel regarding his clients' assets and ability to fund a substantial project.

Mr. Meisels states in his affidavit that "[t]he purpose of this correspondence was not for the guidance of others in their business transactions, nor did I have any knowledge or expectation

---

[2] In their amended and supplemental motion for class certification, plaintiffs have added Northern Capital Investments Ltd. and Great Eastern Investment Fund, LLC to their list of Hutchens entities that issued loan commitments. [#363].

that the representations made therein would be forwarded to and relied upon by unknown third parties." [#325-1] ¶7.  This legalistic sentence baffles me.  What conceivable reason could there be for providing this information to Broad and Cassel if not to guide others in their business transactions?

A loan broker named Leon Franklin claims that he was looking for real estate loans on behalf of several clients when he came across a website for First Central Mortgage Funding Inc. Franklin Affidavit [#97-10] ¶3.  After contacting First Central and speaking to "Fred Hayes," he asked for references, and was told that First Central's lawyer (apparently referring to Mr. Meisels) could provide verification.  *Id.* ¶4.  After submitting loan packages to First Central, Franklin was informed that First Central was not what it was represented to be, and that the person behind it was Sandy Hutchens who was using a number of aliases.  *Id.* ¶11.  Franklin called Fred Hayes, who denied he was Moishe Alexander, although he said that he knew Alexander, and that Alexander was not associated with First Central.  *Id.* ¶13.  Mr. Franklin then received an email from Mr. Meisels "vouching for the bona fides of FCMF" according to Franklin.  *Id.* ¶14.  There is evidence in this case that Fred Hayes was another alias of Sandy Hutchens.[3]

On September 22, 2009 Mr. Meisels sent an email to Leon Franklin, whom he describes in his Affidavit as a "purported loan broker."  I do not know whether this is the email to which Franklin referred in his affidavit, although by its content it could be.  Mr. Meisels confirmed that he was acting for Canadian Funding Corporation, First Central Mortgage Funding, Inc., several related companies, and their respective directors.  Ex. C to the Meisels Affidavit.  He criticizes

---

[3] In their amended and supplemental motion for class certification [#363] plaintiffs add "Alexander MacDonald" and "Mathew Kovce" to the list of aliases that they allege Sandy Hutchens used in carrying out his scheme.

Mr. Franklin for, among other things, encouraging loan applicants to question his clients' bona

fides.  He states:

> I have acted for CFC, First Central and their principals for over four years.  They
> operate legally and have funded hundreds of mortgage loans.  The directors of
> these companies guard their privacy very strictly and neither I nor their other
> lawyers will disclose their identities or confidential financial information.  If this
> type of background information was a precondition for doing business with my
> clients, you should have made that clear at the outset before proceeding to invite
> and submit numerous mortgage applications.

The remainder of the email defends his clients' practices with respect to loan advance

fees and threatens legal action against Mr. Franklin's firm and him personally if loan applicants

who have forfeited their advance fees due to non-compliance or inaccurate disclosures pursue

legal action or complaints to regulatory authorities.  *Id.*  In his affidavit Mr. Meisels states that

this email was "not for the guidance of others in their business transactions, nor did I have any

knowledge or expectation that the representations made therein would be forwarded to and relied

upon unknown third parties." [#325-1] ¶9.  Again, that statement is incredible on its face.  The

threat of litigation does, however, sound like litigation counsel.

On October 7, 2009, Mr. Meisels sent an email to Dwight Bainbridge.  Ex. D to Meisels

Aff. [#325-1 at 19-20].  This apparently was his first direct communication with the Colorado

Golf Club or CGC Holding Company, Inc.  Affidavit ¶11.  In the letter he states, "I expect to

become more involved as this matter moves toward closing."  Unless Mr. Meisels was

contemplating litigation then, before the loan was even set to close, then in what capacity was he

planning to become more involved?  Mr. Bainbridge has indicated that during a telephone

conversation among Mr. Meisels, CGC Holding's lawyer David Isbell, and himself that took

place before CGC Holdings submitted advance fees, Mr. Meisels indicated that he had

represented First Central Mortgage in many closings, and that he could personally vouch for its

16

legitimacy as well as the legitimacy of Fred Hayes. According to Mr. Bainbridge, Mr. Meisels

did not tell him about Fred Hayes' identity or criminal record. The statements concerning the

phone call are disputed.

> Mr. Meisels' Affidavit closes with the following paragraph:

> I specifically deny having any obligation in law or otherwise to have
> communicated with Plaintiffs in this proceeding regarding the criminal history of
> Sandy Hutchens, as alleged in the Complaint. In any event, the transaction and
> conduct complained of by Plaintiffs had already taken place before my
> involvement. Furthermore, I specifically deny having *"vouched for the bona fides*
> *of Sandy Hutchens, Jennifer Hutchens and the entities under which Sandy*
> *Hutchens conducted an advance fee loan fraud: CFC, FCMF and 308 Elgin . . ."*
> as alleged in the Complaint. Not only did I have no such communications with
> Mr. Bainbridge, but, in fact, I had no involvement in the matter regarding this
> proceeding until early October 2009, well after Colorado Golf Club had
> completed its loan application, tendered fees and the loan commitment had issued,
> and even then, only in my capacity as lawyer for First Central and/or its principals
> and employees. I deny having conspired or aided and abetted the other
> Defendants in this proceeding as alleged.

*Id.* ¶13 (emphasis in original). I am somewhat surprised that Mr. Meisels takes the position, or at

least subscribed to an affidavit asserting the position, that he had no obligation in law or

otherwise to reveal what he knew about Sandy Hutchens when he was plainly vouching for his

bona fides. There may be some fine parsing of words in this paragraph. To some extent it reads

more like an answer to a complaint than a sworn statement of facts.

In their response to the pending motion, plaintiffs offer evidence that Mr. Meisels was

called for references on Moishe Alexander and Moshe ben Avraham, both being aliases of Sandy

Hutchens. [#5-1] ¶4. They have produced an article dated October 26, 2010 in the Toronto Sun

by a Mark Bonokoski entitled "Under yet another name . . . Sandy Hutchens is back in business

with a new company," in which the author reports that after Hutchens' conviction and sentence,

he had "morphed into Moishe Hutchens," and that in business he operated as Moishe Alexander.

[#5-1] at 8. The author attempted to contact Hutchens, who referred all comments to his

lawyers, Lou Strezos and Alvin Meisels.  Mr. Meisels is quoted as saying, "He's gone a long way to rehabilitate himself and, contrary to suspicions (anyone) might have, I am satisfied myself that the fellow is genuine.  He's closed a multitude of financial deals (since being convicted of fraud)—certainly more than 15, certainly more than a score—and I am satisfied that they are all legitimate.  And those (financial deals) that did not close, did not close for legitimate reasons."  *Id.* at 8-9 (parentheticals apparently were inserted by the author).  However, this article states that another Toronto lawyer, Ian Stuart Hennessey, had been disbarred this year "for his past involvement in assisting Sandy Hutchens, through 'knowingly (being) involved in fraudulent mortgage transaction.'"  *Id.* at 9.

Plaintiffs claim that Mr. Meisels confirmed to at least 25 potential borrowers that the Hutchens defendants were legitimate lenders.  In support of that claim they provide (1) Mr. Meisels' letter to Romano dated August 13, 2008; (2) an affidavit from Mr. Bainbridge dated April 8, 2011 [#5-1]; and (3) the affidavit of Leon Franklin (who accounts for approximately 20 of the alleged 25 prospective borrowers).  The Bainbridge affidavit states that after learning of a Toronto Sun article around the beginning of 2010 about Sandy Hutchens and his aliases, including Moshe Ben Avraham with whom Bainbridge had dealt, Bainbridge telephoned Mr. Meisels for an explanation.  Meisels confirmed that Hutchens was Avraham but denied that Fred Hayes was a Hutchens alias.  He said Hutchens had found religion and was a changed man.  *Id.* ¶4.  Bainbridge also states that prior to September 14, 2009, when Colorado Golf Company wired advance fees to First Central, he had a telephone conference with Mr. Meisels, who said (1) that he was well acquainted with FCMF and the principals thereof, (2) had represented them since the formation of FCMF, (3) had presided over many closings, and (4) could personally vouch for their legitimacy and performance.  *Id.* ¶6.  This is contrary to Mr. Meisels' affidavit.

Bainbridge also states that in approximately mid-December 2009 Meisels called and stated that the loan had been approved, and that he had been authorized to engage local counsel to prepare closing documents.  On December 23, 2009, Colorado Golf paid $9,000 to an appraiser for an appraisal required by First Central.  *Id.* ¶¶15, 16.

Plaintiffs also refer to discovery responses in this case in which Mr. Meisels has declined to identify the closings over which he allegedly presided, the lenders with whom he dealt on behalf of the Hutchens defendants, the "hundreds of loans" to which he referred in the email to Franklin, or the "multi-million dollar loans" to which he referred in his letter to J.C. Hearne. [#359-6].

Plaintiffs also provide the affidavit of Martin Lapedus, former accountant for Hutchens and his companies.  [#5-5].  Lapedus is, of course, one of the individuals assuring people that Hutchens and his businesses were capable of funding the loans.  As his affidavit acknowledges, he has his own past.  *Id.* ¶2.  In any event, in his affidavit, dated April 21, 2011, he states that he now believes that "Hutchens would provide the loan commitment, receive the advance fee and then find a reason to blame the borrower for refusing to close the transaction," and that "Hutchens never had any intention to fund the transactions and that his plan was to simply keep the advance fee and cancel the commitment."  *Id.* ¶10.  A Canadian businessman who did business with Hutchens has provided an affidavit [#359-7] in which he states that Hutchens closed only one of 89 loan commitments issued to him but kept the advance fees in all 89 cases. *Id.* ¶32.  An affidavit from Brent Hillier [#359-8] indicates that the addresses used by Hutchens for Canadian Funding Corporation and 308 Elgin were a UPS store with rental boxes; the address for First Central was also a UPS store with a rental mailbox.  None of these addresses had suites or unit numbers as the addresses indicated.  *Id.*

Plaintiffs also cite Mr. Meisels' representation of Hutchens in a suit by golf course developers who sued him because of a $2.85 million loan commitment by the Estate of Judith Hutchens for which the developers paid advance fees but received no loan.  Lapedus states that the estate had no assets as its tax returns showed.  Plaintiffs infer that Hutchens' statements that the Estate had $50 million to lend had to have been known by Mr. Meisels to be false.  [#363 at 23-24].

In his motion Mr. Meisels argues that he cannot be found to be a conspirator in violation of RICO, because he was acting strictly within the scope of the attorney-client relationship and had no role in the operation, control or management of a conspiracy.  Further, he claims that there is no evidence of any agreement or meeting of the minds between the Hutchens defendants and Meisels.  With respect to both the RICO and the negligent misrepresentation claims, he argues that he reasonably relied on information about the Hutchens defendants' ability to fund loan transactions that had been provided by professionals and other sources.  There was no reason, he argues, that he should have known of any advance-fee loan fraud.  Finally, he argues that the negligent misrepresentation claim fails because plaintiffs have no expert testimony about his professional negligence.

The latter argument begs the question of whether professional negligence is the claim.  Plaintiffs argue that they are not claiming that he committed malpractice as an attorney; rather, they argue that he was acting outside the scope of the legal services he was providing when he was vouching for the bona fides of his clients.  As such, plaintiffs argue, he can be liable for participating with his clients in a conspiracy in violation of RICO, and indeed, they say, they have provided evidence of such participation.  Much of what Meisels represented to prospective borrowers, concerning his presiding over many closings and reference to hundreds of loans, was

untrue.  He concealed information he had regarding Hutchens' aliases and Hutchens' criminal

history.  He was not, plaintiffs argue, opining on legal matters.  Rather, he was providing

statements and opinions concerning facts, and the facts were not accurate.

There is no need for the Court to repeat its analysis of RICO and conspiracy to violate

RICO, as set forth in its discussion of the summary judgment motion of the Broad defendants.  In

reviewing the Meisels motion I have attempted to apply the same standards, and the same

concerns about the seriousness of a RICO claim asserted against a lawyer or law firm, that I

applied to the Broad defendants.  However, there are potentially significant factual differences.

Mr. Meisels represented Hutchens and his companies for years.  He represented them as

litigation counsel and as general counsel.  He seems to deny that he vouched for Sandy

Hutchens' bona fides, but there is evidence in the record that he did attest to Hutchens' character

and to the financial wherewithal of the Hutchens entities on multiple occasions—attestations

that, according to plaintiffs' evidence, were false.  His denial that he did this to guide others in

their business transactions is incredible on the face of his letter to Romano.  He continued to

represent Hutchens and his companies long after the September 14, 2008 meeting and the

withdrawal of the Broad and Cassel law firm.

There might be good explanations for all these things.  Plaintiffs' claim that Mr. Meisels

conspired with Hutchens in his violation of RICO is far from proven at this point.  However,

plaintiffs have come forward with evidence that raises questions.  I also bear in mind that

plaintiffs have not received all of the discovery to which they are entitled.  I am satisfied that

plaintiffs have come forward with enough to create a genuine issue of fact concerning the actions

and role of Mr. Meisels such that summary judgment is inappropriate.  The Court can, of course,

revisit the issue if plaintiffs do not present a prima facie case of conspiracy to violate RICO at trial.

### Plaintiffs' Motion to Certify Class and Appoint Class Counsel [#6] GRANTED; Plaintiffs' Amended and Supplementary Motion to Certify Class [#363]: GRANTED.

The motion to certify the class has been pending since it was filed on April 21, 2011, shortly after the original Complaint was filed. The initial round of responses were filed in October 2012 by Broad [#278]; Luistermans [#283]; Hutchens [#284]; and Meisels [#286]; followed by plaintiffs' reply in mid-November 2012 [#302]. The Court held oral argument on January 4, 2013. Plaintiffs then filed an amended and supplemental motion for class certification on January 22, 2013. [#363]. Responses were filed by Hutchens [#399] and Meisels [#401] in mid-February. As of this writing the plaintiffs have not filed a reply to the latest round of responses. The Court has reviewed all these briefs.

Plaintiffs initially proposed a class of "all US residents or domiciled entities to whom were issued loan commitments by Canadian Funding Corporation, First Central Mortgage Funding, Inc., and 308 Elgin Street Inc. and who advanced money to [the defendants initially named] or to an account at the direction of any one of the Defendants." Motion [#6] at 2. In the more recent amended and supplemental motion [#363] plaintiffs ask that the class be broadened and that a subclass be created solely for the Broad defendants.

For the reasons set forth below, the Court will certify this case as a class action. The Court tentatively defines the class pursuant to Rule 23(c)(B)as follows:

> All US residents or domiciled entities (1) who were issued loan commitments between January 1, 2005, and April 7, 2013, (2) by Canadian Funding Corporation, First Central Mortgage Funding, Inc., 308 Elgin Street Inc., Northern Capital Investment Ltd., Great Eastern Investments, LLC, or any other entity controlled by Sandy Hutchens, (3) whose loan commitments were not funded (4)

but who paid money to any defendant (5) without having been informed that Moishe Alexander, Moshe Ben Avraham, Fred Haynes, Alexander MacDonald, Mathew Kovce, Fred Merchant, or other aliases, as the case might be, were names used by Sandy Hutchens, and that that individual had a criminal history including a conviction for fraud.

The precise definition of the class may be discussed and any appropriate modifications made at the status conference scheduled for March 7, 2013. The Court tentatively defines the class claims to include the RICO claim and the constructive trust claim. Plaintiffs' counsel expressed misgivings during the class certification hearing as to whether the negligent misrepresentation claim was suitable for a class action, and the Court requests that counsel clarify which claims he wishes to pursue on behalf of the class at the status conference. The Court appoints John F. Head as class counsel.

**Basis for Class Certification.**

A class may certified if all four "prerequisites" listed in Rule 23(a) and at least one of the additional factors set forth in Rule 23(b) have been met.

**<u>Prerequisites – Rule 23(a)</u>**

(1) <u>Numerosity</u>. The Court must find that the class is so numerous that joinder of all members is impractical. The number of class members has not been determined. Plaintiffs complain that they have not been provided necessary information in discovery. However, counsel represents that the number exceeds 100. As such, the numerosity requirement is satisfied.

(2) <u>Common Questions</u>. The Court must find that there are questions of law or fact common to the class. Rule 23(a)(2) "requires only a single question of law or fact common to the entire class." *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010). Whether the "Hutchens Defendants" failed to inform prospective borrowers of the true identity

of the person with whom or with whose companies they were dealing, and in particular Sandy

Hutchens' fraud history, is a question of fact common to all members of the class.  Whether the

several entities used to issue loan commitments and to receive advance fees were actual funded

entities or were essentially shell companies is a common issue of fact.  Whether the Hutchens

Defendants had the ability or intention to fund the loans for which advance fees were obtained

and commitments were issued is a common question of fact.  Whether materiality and the related

issue of reliance must be demonstrated on a borrower by borrower basis or can instead be

determined on the basis of what a reasonable borrower would consider to be material and would

rely upon is a common question of law.

Although unnecessary for this purpose, the Court finds that at least the issues listed by

plaintiffs in paragraphs i through vii, ix, xi, xii and xv of their motion [#6] are also common

questions of fact or law.  *Id.* at 8-10.

(3) Typicality.  The Court must find that the claims or defenses of the representative

parties are typical of the claims or defenses of the class.  "[T]ypicality exists where, as here, all

class members are at risk of being subjected to the same harmful practices, regardless of any

class member's individual circumstances."  *Stricklin*, 594 F.3d at 1199.  In this instance, the

liability claims of the class representatives are identical to those of the class members: they all

advanced fees without being informed of Hutchens' involvement or his criminal record.

(4) Representative.  The Court must find that the representative parties will fairly and

adequately protect the interests of the class.  This means, "(1) do the named plaintiffs and their

counsel have any conflicts of interest with other class members and (2) will the named plaintiffs

and their counsel prosecute the action vigorously on behalf of the class?"  *Rutter & Willbanks*

*Corp. v. Shell Oil Co.*, 314 F.3d 1189, 1187-88 (10th Cir. 2002).

Defendants have noted some concerns about Crescent Sound.  Those concerns are discussed to some extent in respect to motion #329.  In any event, during the January 4, 2013 hearing plaintiffs' counsel indicated that he wished to replace Crescent Sound as one of the class representatives.  Transcript, Jan. 4, 2013, at 241.  He suggested that another class representative that dealt with Broad and Cassel, either Atlas Cellars or Tim Green, might be substituted as a class representative in place of Crescent Sound.  That has not occurred as yet.  In light of the Court's designation of the class representatives, that issue is now moot.

Defendants also raised concerns about each of the other representative plaintiffs as well: (1) the Colorado Golf Club is insolvent, and Mr. Bainbridge has no knowledge of the class or the status of the case and has not taken independent steps to govern costs; (2) Harlem-Algonquin was involuntarily dissolved and exists in name only; and (3) Mr. Medick's wife owns the property that would have secured the loan, and he, like Mr. Bainbridge, was unable to answer substantive questions about the case posed by defense counsel during his deposition.

Plaintiffs' counsel responded that the only claims of CGC Holding Company, LLC and Harlem-Algonquin LLC are their claims for reimbursement of the advance fees they paid, i.e., their claims in this case.  The principals of each of the three representative plaintiffs have submitted affidavits attesting to their willingness and ability to see this case through on a classwide basis.  [#6-2, -4 and -5].  Mr. Bainbridge (CGC Holdings), Mr. Margolis (Harlem-Algonquin) and Mr. Medick attended the class certification hearing.  Mr. Medick, the only individual plaintiff, was represented to be financially sound.  It is not necessary that Mr. Bainbridge, Mr. Margolis or Mr. Medick, none of whom is a lawyer to my understanding, be able to discuss the applicable law, nor is it necessary that they have absorbed and can repeat during depositions all of the voluminous facts of the case.  The basic core facts are not

complex—with whom they were dealing, the loan commitment, the payment of advance fees, and what was or was not disclosed about Mr. Hutchens' involvement and background.  As for their willingness and ability properly to represent the class, the proof of the pudding is the vigor with which plaintiffs have pursued this case for two years against very zealous opposition, and the interest that they have shown in the progress of the case.  I am satisfied that the three plaintiffs are adequate class representatives.

Defendants also raised some questions about plaintiffs' counsel arising from his former representation of an entity named Paramount Funding.  Mr. Head explained his engagement and ultimate withdrawal from that representation in detail, and I am fully satisfied with his explanation.  The Court finds that he has no conflict of interest.  The Court has considered the factors listed in Rule 23(g), and in that regard, has reviewed Mr. Head's affidavit that describes his experience representing plaintiffs in complex commercial class action litigation.  [#6-1].  I note that one of the cases described in the affidavit was a case over which I presided in the Jefferson County District Court.  *Id.* at 4.  The Court finds that Mr. Head is likely to continue to represent the class with the high degree of skill and vigor that he has demonstrated throughout the history of this case.

### Types of Class Actions – Rule 23(b)

In their original motion [#6] plaintiffs argued that all three subsections of Rule 23(b) are met here.  The Blaney/Meisels response [#286] argues, albeit in a footnote, that Rules 23(b)(1) and 23(b)(2) are inapplicable.  *Id.* at 7 n.2.  Plaintiffs did not reply to that argument, either in their initial reply [#308] or in their amended and supplemental motion for class certification [#363].  Although I am inclined to believe that an argument can be made under the plain language of both Rule 23(b)(1) and (2) that the factors can be met here, I need not decide those

issues and I elect not to do so without more complete briefing on the plaintiffs' side.  Rather, I decide only that the requirements of Rule 23(b)(3) have been met, and that is sufficient to comply with Rule 23(b).

Rule 23(b)(3) is met if the court finds that

questions of fact or law common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members interest in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

The defendants have vigorously argued that there are a myriad of questions that must be addressed and resolved on an individual basis.  Mr. Meisels' counsel called as an expert witness Roger Thomasch, a Colorado attorney who is experienced and highly regarded in commercial litigation, including class action practice.  Mr. Thomasch was engaged as a standard of care expert and to provide opinions as to whether the law firm of Blaney McMurtry (which has since settled) and, in particular, Mr. Meisels met the applicable standard of care.  His opinions are set forth in a written report dated November 30, 2012.  However, Mr. Thomasch was also asked to discuss items on a chart prepared by counsel, hearing exhibit 101, for Blaney McMurtry and Mr. Meisels that purports to show individualized determinations that will need to be made to each class representative and, presumably, each member of the class.

For example, two of the four named plaintiffs (Harlem Algonquin and James Medick) had no apparent contact with Mr. Meisels, and therefore, could not have relied on anything he said.  Mr. Meisels had contact with the Broad and Cassel firm, but, to Mr. Thomasch's

understanding, the information was passed on to Crescent Sound's counsel after the advance fees had been paid (as discussed earlier, this is, at a minimum, a disputed fact).  Mr. Meisels' contact with CGC Holding before the fees were submitted, if any, is a disputed matter, per Mr. Thomasch's understanding.  Mr. Thomasch indicated that he would have to evaluate the conduct of Mr. Meisels on a class member by class member basis to evaluate or defend his conduct as well as to determine causation—whether the class member relied on Mr. Meisels' conduct.

I respectfully disagree that that type of analysis is necessary, or in any event, that it supports an argument that questions affecting individual class members predominate over common questions.  The class consists of loan applicants who paid advance fees without being informed that the individual with whom they were dealing was Sandy Hutchens, who had a criminal record including for fraud.  As indicated above, plaintiffs also have evidence and expect to prove that Hutchens did not intend, and certainly did not have the ability, to fund the collection of loans to which he and his various entities committed.  Plaintiffs have evidence and expect to prove that these entities were essentially shell corporations that, like Hutchens himself, had no ability to fund the large loans, let alone the collection of loans to which they committed.  The point of the case is that all of this was a giant ruse to scam applicants possibly desperate for loan funds out of the advance fees that were demanded of them.  Those questions are common to all members of the class.

If these facts are established, then I am inclined towards the view that proof of actual reliance on an individual basis is not necessary.  *Cf. Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-55 (1972).  It is difficult to conceive that any individual or entity contemplating a substantial payment of advance fees in support of a loan application would not consider those facts to be important in the making of their decision.

Whether that concept applies outside the securities law context, and in particular, whether it applies to a civil RICO claim, has not been decided by the Tenth Circuit. The law in other jurisdictions is mixed. C*ompare Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 505 (S. D. Fla. 1996) (allowing *Affiliated Ute* presumption in civil RICO case and reasoning that "the policies underlying RICO and the securities acts of protecting investors and other victims of fraud support the use of a presumption here") *with Walco Invs. v. Thenen*, 168 F.R.D. 315, 335 (S.D. Fla. 1996) ("Since the Defendants . . . are not being sued for securities laws violations, the fraud-on-the market and *Affiliated Ute* presumptions of reliance are not available to Plaintiffs here with regard to the RICO and common law claims.") The Fifth and Eleventh Circuits appear to support the latter view. *See Gyarmathy & Assoc., Inc. v. TIG Ins. Co.,* No. 3-02-1245-N, 2003 WL 21339279, at *3 n.6 (rejecting application to civil RICO cases based on Fifth Circuit cases that declined to extend *Affiliated Ute* beyond securities fraud: *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 549 (5th Cir. 2003); *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000)); *Buford v. H&R Block, Inc.*, 168 F.R.D. 340, 359 (S.D. Ga. 1996), *aff'd, Jones v. H&R Block Tax Servs.*, 117 F.3d 1433 (11th Cir. 1997).

*Waters* is the only case of which I am aware that specifically extends the *Affiliated Ute* presumption to a RICO case. However, there are cases that have extended it outside the securities context. *See Edens v. Goodyear Tire & Rubber Co.,* 858 F.2d 198, 207 (4th Cir. 1988) (extending *Affiliated Ute* to an action for fraudulent breach of contract); *In re Tyco Int'l, Ltd.,* No. MD-02-1335-PB, 2006 WL 2349338, at *6 (D.N.H. Aug. 15, 2006) (extending *Affiliated Ute* to ERISA breach of fiduciary duty action). This case might have to be the case that leads to the establishment of law in the Tenth Circuit.

The Court again notes that, as to Mr. Meisels, plaintiffs are not claiming professional malpractice in the usual sense, nor are they claiming that he communicated with every class member. Rather, they are claiming that Mr. Meisels' acted outside the scope of the legal representation that he claims to have been engaged for and conspired to violate RICO within the meaning of the statute and case law discussed elsewhere in this order. Those are not claims that require evaluation on a class member by class member basis.

There are individual issues, to be sure. If liability is established, each class member's damages will have to be determined individually. However, the baseline of any damages award will be the amount of fees advanced, a number that can presumably be determined by looking at accounting records. The dates on which class members advanced fees should also be determinable from records. Any additions such as interest would be a matter of mathematics. If, contrary to my present inclination, reliance on the alleged omissions must be established on an individualized basis, then the Court would likely establish a hearings process to deal with it. The Court will not, on these facts, force each of more than 100 loan applicants to reprove the entire liability case from scratch. There would be no justice in doing that. The Court finds that the common questions plainly dominate over individual issues that can, if necessary, be addressed in a post-trial hearing process.

**B.  Other Motions.**

**Plaintiffs' Motion to Compel Discovery by Defendants Ronald Gaché, Carl Romano and Broad and Cassel [#233]: GRANTED.**

**Broad Defendants' Amended Motion to Use Otherwise Privileged Documents in Support of Its Defenses [#320]: GRANTED.**

Plaintiffs' motion #233 is granted. To any extent the Broad and Cassel defendants still are pressing attorney-client privilege (or the protection of work product), they are ordered to

produce the withheld documents at the status conference scheduled for March 7, 2013, so that they can be inspected *in camera*.

The Broad Defendants' motion #320 is granted.  The Court agrees that attorneys who are accused of wrongdoing must be permitted to reveal client conferences, but only to the extent, that such disclosure is reasonably necessary to defend themselves.  Any documents withheld on the basis of attorney-client privilege or work product protection that the Broad defendants do not reasonably believe are necessary to defend themselves against plaintiffs' claims should be submitted to the Court for *in camera* review per the Court's order on motion #233.  The Court has considered the Hutchens' defendants' response [#331] and is not persuaded.  The Court makes no ruling as to whether any such documents may be used for any other purpose, or whether they are admissible at trial.

### Plaintiffs' Motion to Compel Discovery by Defendants Blaney McMurtry and Alvin Meisels [#250]: GRANTED.

The Court has considered the motion; the responses of both Blaney/Meisels [#268] and the Hutchens Defendants [#273]; plaintiffs' reply [#277]; and the arguments of counsel on October 24, 2012.  To any extent that the law firm or Mr. Meisels continue to stand on the attorney-client privilege or the protection of work product, then they are ordered to provide full and complete answers to the interrogatories to which they object on that ground as well as the documents that they have withheld on those grounds to the Court at the March 7, 2013 status conference, unless it is impossible to do so on short notice.  The Court will review the documents *in camera*.  The Court specifically overrules any objection the law firm or Mr. Meisels might be asserting on any ground other than attorney-client privilege or work product, including relevance.

The Court will, of course, extend the same right to Mr. Meisels that it has extended to the Broad Defendants in terms of production of otherwise privileged information that are reasonably necessary to defend himself.  The Court will consider the possible application of the "crime-fraud" exception during its *in camera* inspection.

With specific reference to the meeting held in Mr. Meisels' office on September 14, 2008, plaintiffs' counsel informed the Court during the October 24, 2012 hearing that a loan broker from Canada by the name of Bryce Coates attended the meeting.  Transcript, Oct. 24, 2012, at 70.  If that is correct, then it would appear that any privilege or protection from disclosure of the substance of that meeting and documents discussing the communications that occurred during the meeting or the substance of the communications was waived, at least while the third person was present.  During the October 24, 2012 hearing, counsel for the Blaney firm and Mr. Meisels stated that "we have not identified any documents to be at issue with respect to that [September 14, 2008] meeting."  Transcript, at 98.  I am not sure what that means.  If there are any notes or memos or other documents relating that meeting, the Court expects them to be produced, unless a valid argument can be made as to why they are privileged or otherwise protected.  Please explain your position at the status conference.

**Plaintiffs' Motion to Compel Discovery by Hutchens [#255]: GRANTED.**

This motion is excessively lengthy.  It does, however, create the impression that the Hutchens Defendants have been less than forthcoming in responding to discovery.  The Court has considered the responses to the motion [#274 and #279] and has not been dissuaded from that impression.

The Court issues the same orders as it has with respect to the other defendants.  The objections to the discovery are denied, except to the extent that there might be legitimate

protections to specific interrogatories, requests for admission, and requests for production of documents on the basis of attorney-client privilege or work product.  To some extent the Court cannot make judgments on the legitimacy or application of privileges without seeing the documents.  Accordingly, to the extent information has been withheld on those grounds, the Hutchens Defendants are ordered to bring answers to the questions and to bring the withheld documents to the March 7, 2013 status conference, unless it is <u>impossible</u> to do so on short notice.

That exception does not apply to the loan files, which are discussed under a different motion.  They are to be produced forthwith.  It does not apply to information or documents concerning the September 14, 2008 meeting in Mr. Meisels' office, unless the Hutchens Defendants can provide a valid response to the waiver argument based on the alleged presence at the meeting of loan broker Bryce Coates.

If the amount of material that is withheld by the Hutchens Defendants on claims of privilege or work product is voluminous, the Court will consider the possibility of engaging a special master, at the parties' initial expense (the ultimate burden to be determined as part of any award of costs).  The possible application of the crime-fraud exception would be considered during an *in camera* review by either the Court or a special master.

### Hutchens Defendants' Motion for Protective Order [#292]: GRANTED IN PART and DENIED IN PART.

It is ironic that the Hutchens Defendants are asserting privacy rights on behalf of the prospective borrowers whose loans were not funded and whose advance fees have not been refunded.  However, the Court does agree that certain private information that is likely contained in loan files deserves protection, at least if the borrower wants the protection.  Accordingly, the Court orders that the plaintiffs must limit their use of information in the loan files to that which is

necessary for the prosecution of this case, unless they receive express consent from the Court to disseminate the information beyond what is needed to prosecute this case. The Court further orders that class members' Social Security numbers and credit histories be redacted by plaintiffs' counsel before documents containing that information are filed in the court files, unless permission not to redact the information is obtained from the class member.

The Court finds that the expressed concerns about intimidation by Brent Hillier do not warrant a protective order. The Court will not gag Mr. Hillier. The Court does expect that neither Mr. Hillier nor anyone else will harass or intimidate any party, counsel or prospective witness in this case. If plaintiffs' counsel has a continuing relationship with Mr. Hillier, whether as a process server, investigator or otherwise, the Court expects counsel to communicate the Court's expectation to him if he has not previously done so. If there is evidence that Mr. Hillier has acted contrary to that expectation, it should be brought to the Court's attention. However, the facts that Mr. Hillier admitted in a deposition that he would like to see Mr. Hutchens arrested and put in jail, and the document showing that he has solicited people who have been "scammed" by Mr. Hutchens to join the class action suit, do not amount to the type of "intimidation" that would support a protective order.

### Broad Defendants' Motion in Limine as to the Damages Claimed by Plaintiff Crescent Sound Yacht Club, LLC and/or to Dismiss Plaintiff Crescent Sound Yacht Club, LLC's Claims for Bankruptcy Fraud [#329]: DENIED

It appears that December 14, 2012, was a busy day insofar as Crescent Sound's claims are concerned. On that day the Broad Defendants filed what they call a "motion in limine." They assert that Crescent Sound is a "defunct, dissolved Florida limited liability company" whose only purpose is to serve as the titular representative of its principals, Michael Buono and Perry Sanders, who hope to split whatever recovery Crescent Sound might obtain in this case on

34

a 50/50 basis. That, by itself, might not be so offensive, but there is more. On June 1, 2012, Buono filed a Chapter 7 personal bankruptcy case in the United States Bankruptcy Court for the Southern District of Florida. In that case he did not disclose his interest in Crescent Sound or his indirect interest in a potential judgment in this case as an asset. He did, however, disclose liabilities arising from his interest in Crescent Sound.

The Broad Defendants put these facts together: Because Crescent Sound was dissolved, its assets passed to Buono and Sanders; because Buono implicitly took the position in the bankruptcy court that his interest in Crescent Sound was valueless, he should be bound by judicial estoppel not to take a different position here; because he was speaking for Crescent Sound in his Rule 30(b)(6) deposition, his testimony is imputed to Crescent Sound, and implicitly to Sanders, apparently; and therefore, the Court should "grant this motion in limine, or dismiss Crescent Sound's claims." [#329] at 21.

In response, plaintiffs first cite a Florida statute, Fla. Stat. § 608.4481(3) which provides, "[a] limited liability company administratively dissolved continues its existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under s. 608.4431 and notify claimants under s. 6-08.4421." Plaintiffs do not attempt to defend Buono's failure to disclose Crescent Sound's interest in this lawsuit or to claim his interest in Crescent Sound and therefore in this lawsuit as an asset. Rather, on the same day that the motion was filed, December 14, 2012, the bankruptcy trustee filed a motion and obtained an order to reopen the case in order to administer additional assets. A week later Buono filed an amended personal property schedule. On January 17, 2012, the trustee applied for the appointment of an attorney for the trustee. In short, there was quite a scramble to unscramble the eggs. Buono no

longer stands to benefit from the case, plaintiffs say, because his interest now belongs to the trustee.

The Broad defendants reply that plaintiffs' assertion that Crescent Sound can proceed with the lawsuit as part of winding up its affairs and paying off its creditors lacks any "factual support." I am not sure what that means. The statutes do state, as the reply acknowledges, that winding up and liquidating the business and affairs of a dissolved LLC includes the collection of its assets, and the distribution of its assets to creditors, including several levels of possible payments to members. In any event, the reply argues, plaintiffs did not respond to the argument that Crescent Sound is bound by Buono's testimony.

In the end, it might not matter much. Although the Court today has denied the Broad defendants' motion for summary judgment on the RICO claim, it has indicated that it will reconsider that matter if the plaintiffs do not come forward with more evidence, after obtaining additional discovery, than they have offered to date. Crescent Sound has not been designated as a class representative. Whether plaintiffs' counsel would pursue a negligent representation claim against the Broad defendants on Crescent Sound's behalf is unknown.

In any event, the motion is denied. To the extent the motion truly is a "motion in limine," the Court exercises its discretion to decline to rule in limine. To the extent it is a motion to dismiss or for summary judgment in disguise, it is denied as untimely. Moreover, I am not convinced that Mr. Buono's testimony binds the Trustee or Mr. Sanders in the circumstances.

**Plaintiffs' Motion for Extension of Discovery Cut-off and Related Relief [#371]: GRANTED IN PART and DENIED IN PART.**

Consistent with the Court's discovery orders, the discovery cutoff is extended to March 25, 2013.

**Defendant Sandy Hutchens' Motion to Compel Production of Documents from CGC Holding Company, LLC Pursuant to F.R.C.P. 37 [#384]: GRANTED IN PART and DENIED IN PART.**

**Defendant Sandy Hutchens' Motion to Compel Production of Documents from Crescent Sound Yacht Club LLC Pursuant to F.R.C.P. 37 [#385]: DENIED.**

**Defendant Sandy Hutchens' Motion to Compel Production of Documents from Harlem Algonquin LLC Pursuant to F.R.C.P. 37 [#386]: DENIED.**

**Defendant Sandy Hutchens' Motion to Compel Production of Documents from James T. Medick Pursuant to F.R.C.P. 37 [#387]: DENIED.**

The Court has considered Hutchens' motions and plaintiffs' composite response [#405]. Each of the motions is denied with respect to Request for Production No. 4.  The Court has been provided with no authority holding that drafts of affidavits are discoverable and, absent such authority, does not expect either party to produce such drafts.  Rather, the Court holds that drafts of affidavits and communications between the affiant and counsel during the "evolution of an affidavit" are protected as work product.  *See Tuttle v. Tyco Elecs. Installation Servs., Inc.*, No. 2:06-cv-581, 2007 WL 4561530, at *2 (S.D. Ohio Dec. 21, 2007).

Motion #384 is granted with respect to Request for Production No. 5.

**Order**
1. **Motion #6 is GRANTED.  A class is certified as defined in this order.**

2. **Motion #233 is GRANTED**

3. **Motion #235 is DENIED.**

4. **Motion #250 is GRANTED.**

5. **Motion #255 is GRANTED.**

6. **Motion #292 is GRANTED IN PART and DENIED IN PART.**

7. **Motion #320 is GRANTED.**

8. **Motion #322 is DENIED (with conditional leave to renew).**

9.  **Motion #323 is DENIED.**

10.  **Motion #324 is DENIED.**

11.  **Motion #325 is DENIED.**

12.  **Motion #329 is DENIED.**

13.  **Motion #363 is GRANTED.  A class is certified as defined in this order.**

14.  **Motion #371 is GRANTED in part and DENIED IN PART.**

15.  **Motion #384 is GRANTED in part and DENIED IN PART.**

16.  **Motion #385 is DENIED.**

17.  **Motion #386 is DENIED.**

18.  **Motion #387 is DENIED.**

DATED this 4th day of March, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge