IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01012-RBJ-KLM

CGC HOLDING COMPANY, LLC, a Colorado limited liability company;
CRESCENT SOUND YACHT CLUB, LLC, a Florida limited liability
company; HARLEM ALGONQUIN LLC, an Illinois limited liability
company; and JAMES T. MEDICK; on behalf of themselves and all
others similarly situated,

    Plaintiffs,

vs.

SANDY HUTCHENS, et al.,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Fairness Hearing

_____

        Proceedings before the HONORABLE R. BROOKE

JACKSON, Judge, United States District Court for the District

of Colorado, commencing at 9:01 a.m., on the 23d day of April,

2015, in Courtroom A902, Alfred A. Arraj United States

Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

1                              APPEARANCES

2            KEVIN RODDY,  Wilentz Goldman & Spitzer PA, 90

3 Woodbridge Center Drive, Suite 900, Woodbridge, NJ 07095; SCOTT

4 SHEPHERD,  Shepherd, Finkelman, Miller & Shah, LLP, 35 East

5 State Street, Media, PA 19063, for plaintiffs.

6            STEVEN KLENDA, Adroit Advocates, LLC, 1600 Broadway,

7 Suite 1600, Denver, CO 80202, for Hutchens and entity

8 defendants.

9            JOHN PALMERI, HEATHER KELLY, and EDWARD HAFER, Gordon

10 & Rees, LLP, 555 17th Street, Suite 3400, Denver, CO 80202, for

11 defendant Meisels.

12                 P R O C E E D I N G S

13     (In open court at 9:01 a.m.)

14            THE COURT:  Good morning.

15            MR. RODDY:  Good morning, Your Honor.

16            THE COURT:  Well, you're getting two for the price of

17 one today.

18            11-cv-1012.  CGC*, et al.* vs. Hutchens, *et al.*

19            Let me have your appearances, first.

20            MR. RODDY:  Good morning, Your Honor.  Kevin Roddy,

21 Wilentz Goldman & Spitzer, Woodbridge, New Jersey.

22            MR. SHEPHERD:  Good morning, Your Honor.  Also for

23 plaintiffs, Scott Shepherd, Shepherd, Finkelman, Miller & Shah,

24 Media, Pennsylvania.

25            THE COURT:  All right.

1           MR. KLENDA:  Good morning.  Steven Klenda on behalf of

2     the Hutchens defendants and Jan Luistermans.

3           MR. PALMERI:  Good morning.  John Palmeri, Heather

4     Kelly, and Ed Hafer appearing on behalf of Alvin Meisels.

5           THE COURT:  All right.

6           Thank you.  And I asked Magistrate Judge Mix to join

7     me this morning because one of the issues that we're going to

8     be discussing affects her.

9           All right.  Just by way of background.  This is the

10    oldest case I have.  In fact, it was filed in April of 2011,

11    four years ago, and that was seven months before I was even

12    appointed to the court.  This has been a case that has consumed

13    a huge amount of my time as well as your time.

14          We got one major delay while this case was up on

15    appeal.  Now it's back.  In the meantime, the plaintiff counsel

16    has been suspended, and we have new plaintiffs' counsel.  One

17    of my objectives this morning is to create a schedule that will

18    bring this case to conclusion.

19          So let's start there.  Then we can deal with the other

20    issues in that context.

21          This case was set for a two-week trial.  I'm going to

22    reset it.  I'll give you folks four alternatives and let you

23    tell me which one you want.  They're all in the year 2016

24    because I'm assuming that nobody amongst you would wish to set

25    it this year, and even if I'm wrong, we don't really have a

4

1   readily available two-week block for you.

2         January 4, January 11, April 11, and May, I think it

3   says 21.

4         No, May 2.  It's hard for me to read.

5         Let me double-check that last one.

6         That's right.  So January 4, January 11, May 11,

7   May 2.

8         Plaintiff counsel, what's your preference?

9         MR. RODDY:  Good morning, again, Your Honor.

10        Our preference is May 2, 2016, and I would be happy to

11  explain why.

12        THE COURT:  Well, let me ask the defendant counsel.

13        What's your preference?

14        MR. RODDY:  Thank you, Your Honor.

15        MR. KLENDA:  Your Honor, what was the last date, May?

16        THE COURT:  May 2.

17        MR. KLENDA:  May 2.

18        Your Honor, for the Hutchens defendants, we prefer

19  May 2.

20        MR. PALMERI:  Your Honor, we have setting conflicts on

21  January 4 in front of Judge Martinez and on May 2 in front of

22  Judge Blackburn, so we have conflicts on both those dates.

23        THE COURT:  Well, what's your conflict with

24  Judge Blackburn?

25        MR. PALMERI:  It's a trial beginning May 2.  It's a

1    bankruptcy referral matter from bankruptcy court.  There's

2    bankruptcy trustee.  Has filed a lawsuit.  We're representing

3    the lawyer in defense of that.  It's set in front of

4    Judge Blackburn for a three-week jury trial beginning May 2.

5              THE COURT:  Mr. Palmeri, I know you fairly well, I

6    know you won't answer any of my questions other than totally

7    candidly.  Is that case going to trial?

8              MR. PALMERI:  We've been to one mediation on that

9    already.  I think my client would appreciate an opportunity to

10   settle.  It's a bankruptcy trustee.  It's a business dispute.

11   I think there's reasonable likelihood it would settle, Your

12   Honor.

13             THE COURT:  Let me go back to the plaintiff counsel.

14             Could you do April 11?

15             MR. RODDY:  Absolutely, Your Honor.  We can do May 2.

16   We can make April 11 work.

17             THE COURT:  Does that work for the Hutchens lawyers?

18             MR. KLENDA:  Yes, Your Honor.

19             THE COURT:  Mr. Palmeri, is that your preference?

20             MR. PALMERI:  Let me check with my cocounsel, Your

21   Honor.

22             So it would be a two-week trial beginning April 11,

23   Your Honor?

24             THE COURT:  Yes, sir.

25             MR. PALMERI:  That would be preferable, if the Court

1  could accommodate that.

2         THE COURT:  Everybody okay with that?

3         MR. RODDY:  Yes, Your Honor.  Thank you.

4         THE COURT:  So we have a trial essentially a year from

5  today.

6         We'll consider that date to be set in concrete.

7         We're going to need a trial-preparation conference,

8  maybe two.  Trial-preparation conferences are where we go over

9  problems with exhibits, problems with witnesses, problems with

10  jury instructions, in *limine* issues, things like that.  I

11  suggest that we set a relatively early one, and then we can set

12  another one, if need be.

13         How about either the afternoon of December 10 or

14  December 11.

15         Would those work?

16         MR. RODDY:  Your Honor, either one of those dates

17  works for plaintiffs.

18         THE COURT:  How about for the collection of defendant

19  lawyers?

20         MR. PALMERI:  Either date works for counsel for

21  Meisels, Your Honor.

22         MR. KLENDA:  And for Hutchens as well, Your Honor.

23         THE COURT:  Julie, are those both equally good for us?

24         THE COURTROOM DEPUTY:  They are, Your Honor.

25         THE COURT:  Let's do December 11 at one-thirty?

1      MR. RODDY:  I'm sorry, Your Honor, what time?

2      THE COURT:  December 11.

3      MR. RODDY:  What time, Your Honor?

4      THE COURT:  One-thirty.

5      MR. RODDY:  Thank you.

6      THE COURT:  For travel purposes, does Friday work as

7  well for you as Thursday?

8      MR. RODDY:  Your Honor, the last flight that gets us

9  out of here that gets us back to the East Coast before midnight

10  is at 4 p.m.

11      THE COURT:  That's going to be true on Thursday or

12  Friday.

13      MR. RODDY:  Yes, Your Honor.

14      THE COURT:  Which do you prefer, Thursday or Friday?

15      MR. RODDY:  Thursday would be better, Your Honor;

16  thank you kindly.

17      THE COURT:  Let's make it December 10 at one-thirty.

18      In fact, if you've got a four o'clock flight.

19      What else do we have, if anything, on December 10?

20      THE COURTROOM DEPUTY:  We have nothing right now, Your

21  Honor.

22      THE COURT:  What about in the morning?

23      THE COURTROOM DEPUTY:  Not a thing.

24      THE COURT:  What if we started at ten in the morning?

25      MR. RODDY:  That would be fine, Your Honor, thank you.

8

 1          THE COURT:  Is that okay with you fellows and lady?

 2          MR. PALMERI:  Yes, Your Honor.  Happy to accommodate.

 3          THE COURT:  Let's say December 10, Thursday, at

 4   10 a.m.

 5          In fact, we could make it 9 a.m., if you want.

 6          9 a.m.

 7          MR. SHEPHERD:  That would be even better.

 8          THE COURT:  Why don't we say 9 a.m.  That gives us a

 9   little more time to get you to the airport.

10          MR. SHEPHERD:  Thank you, Your Honor.

11          THE COURT:  December 10 at 9 a.m. for a

12   trial-preparation conference.

13          Okay.

14          There's one other matter that's on our agenda that I

15   think is relatively easy.  And that is the matter of the

16   letters rogatory.  As I understand it, there were letters

17   rogatory prepared by plaintiff counsel and circulated.  They

18   were agreed as to form.  They were submitted to the Court with

19   a representation that they were agreed as to form.

20          Chances are, given that they were agreed as to form, I

21   signed them without careful examination.  It turns out that

22   what was agreed as to form and what was submitted to the Court

23   and signed by the Court were two different documents.

24   Apparently by accident.  No one's accusing anybody of trying to

25   slip one over on anybody, but that happened.

1          Correct so far?

2          MR. RODDY:  Correct so far, Your Honor.

3          MS. KELLY:  That's correct, Your Honor.

4          THE COURT:  And so you want me to vacate the approval

5     of those letters rogatory, which I now do.  They are now void.

6          Now, are you going to submit something else for me to

7     sign?  Such as the form that everybody agreed upon?

8          MR. RODDY:  Your Honor, we will do that.

9          THE COURT:  Okay.

10         MR. RODDY:  Our concern, however, is that, as we tried

11    to explain in our status-conference statement, the letters

12    rogatory are tied in a sense to the in camera review.

13         THE COURT:  They are.

14         MR. RODDY:  And the purpose of the letters rogatory,

15    obviously, is so that we all can go off to Ontario, Canada, and

16    take depositions of fact witnesses without unnecessary delay or

17    argument about privilege issues.  And we're going to be far

18    away in a foreign country.  So that is why we suggested, in our

19    status-conference statement, that whatever the resolution of

20    the in camera review may be, there needs to be some language

21    embedded in the letters rogatory to avoid these kinds of

22    disputes.  We can't litigate one thing here and then go off to

23    Ontario and act as if it never happened or that's still an open

24    issue.

25         But with regard to the letters rogatory, we consider

1    them vacated.  We will do whatever is appropriate so that those

2    fact-witness depositions can be taken in Ontario.  All of us

3    also realize that once the letters rogatory are entered, the

4    new letters rogatory, we still have to go through proceedings

5    in the Ontario court before the depositions may actually begin.

6              THE COURT:  Right.

7              MR. RODDY:  Thank you.

8              THE COURT:  Well, maybe you noticed I put off

9    discussion of that sticky issue.  Unfortunately we'll have to

10   get to it in due course.

11             All right.  The next issue is the plaintiffs'

12   notification that they wish to amend the complaint.

13             Mr. Palmeri, of course, has already objected to that.

14   But neither he nor I know what it is you have in mind.

15             So maybe you'll tell us what you want to do and why.

16             MR. SHEPHERD:  Your Honor, the amended complaint, we

17   would, we would seek to add additional defendants and an

18   additional representative plaintiff.

19             THE COURT:  That's what you already said.  Who?

20             MR. SHEPHERD:  The additional representative plaintiff

21   is David Antonio Investments, LLC, a Houston, Texas-based

22   entity that was -- its unpleasant experience with Mr. Hutchens

23   concluded in January of 2014.

24             THE COURT:  And why is it that you want another

25   representative plaintiff?

1    MR. SHEPHERD:  Well, he has claims against yet another

2    Hutchens entity, Great Eastern Investments, LLC, that seems to

3    have been created, in fact, during the pendency of this case,

4    because the word was out that the existing entities were

5    corrupt.  So this was a new name to use in the same scheme.

6        It appears that Mr. Hutchens also, when, after Broad

7    and Cassels withdrew from the conspiracy or stopped working for

8    Mr. Hutchens, he hired a new Florida law firm, law offices of

9    Manny Singh, to carry out the same function, to assure

10   investors that they would be able to obtain financing.

11       So we would seek to add Great Eastern as a defendant,

12   Manny Singh, the law offices of Manny Singh, and then

13   Mr. Antonio and his firm.

14       THE COURT:  Well, adding Great Eastern doesn't really

15   add much of anything.

16       MR. SHEPHERD:  It doesn't add any work.

17       THE COURT:  But adding another law firm is going to

18   put a whole new set of complications into the case.

19   Mr. Palmeri is exactly right.  They'll get counsel, just like

20   the Broad defendants got counsel, and they'll fight like

21   beavers to get dismissed, just like the Broad defendants did,

22   and we're going to go through a whole new round of dispositive

23   motions.

24       MR. SHEPHERD:  I would expect that that would be true,

25   that they would file dispositive motions.

1        THE COURT:  All right.

2        MR. SHEPHERD:  It seems -- the alternative, of course,

3   is to bring a case against that law firm --

4        THE COURT:  That's right.

5        MR. SHEPHERD:  -- either in Texas or in Florida.

6        THE COURT:  That's right.

7        MR. SHEPHERD:  It seems to me that the odds are that

8   would just end up getting transferred here.

9        THE COURT:  Might.

10        MR. SHEPHERD:  Which is the reason to attempt to do it

11   in the current context.

12        THE COURT:  What you want to do is to add another deep

13   pocket.  That's what you want.

14        All right.  What is the defendants' position on all of

15   this?

16        MR. KLENDA:  Your Honor, it's a bit late in the game.

17   And it would unnecessarily and unduly complicate the resolution

18   of this matter.  That's the bottom line.  You're quite right.

19   We'd be essentially starting back from ground zero.

20        THE COURT:  Well, not with this, whatever the name of

21   that Hutchens company is.  That's just one more Hutchens

22   company that you would represent.  That's not a big deal.

23        MR. KLENDA:  No, you're right, I agree with that.  But

24   with respect to the new law firm, I think the Court's concerns

25   are well-founded.  We'd be essentially delaying this case by

 1    another six months for briefing, dispositive motions, getting

 2    up to speed on the extensive factual record for another party.

 3    And given that, I don't think there's any possible way we could

 4    make the trial date the Court set.

 5              THE COURT:  Well, we're going to make the trial

 6    court -- date the Court set no matter what I do on this matter.

 7              MR. KLENDA:  Okay.

 8              THE COURT:  You can take that to the bank.

 9              MR. KLENDA:  And if Mr. Palmeri has anything else to

10    add.

11              THE COURT:  He always has something to add.

12              MR. PALMERI:  I'll try to be brief.

13              I'll be brief.  It's redefining the class; Meisels is

14    out by then.  So if we have a redefined subclass of Meisels or

15    address it some other way, we would object to expanding the

16    class through 2014 and adding the additional time frame beyond

17    that definition.

18              THE COURT:  All right.  Response.

19              MR. SHEPHERD:  It does extend the class period out.

20    It is the result of, you know, frankly, the shockingly brazen

21    actions of a scheme by Mr. Hutchens that continued, even as

22    this case was getting litigated in this court.

23              But the alternative is quite unattractive because we

24    would be suing the same enterprise, just in a different place.

25    Which doesn't seem very efficient.  It would add some time for

 1    the motions, but we submit that discovery can still proceed at

 2    the regular pace.

 3              THE COURT:  All right.  The Court denies the request

 4    to amend the complaint to add the additional Florida law firm.

 5    The Court finds that that would unduly delay the proceedings,

 6    which are already unduly delayed, with prejudice to other

 7    defendants.  That would put a whole new level of expense on

 8    defendants to deal with a new round of motions and discovery

 9    issues and so forth.

10              I think the fact that we have new counsel is

11    insufficient to warrant a major departure such as that.

12              All right.  Now, we get to the --

13              MR. RODDY:  Your Honor, excuse me for standing.  May

14    we have the amendment as to the new plaintiff?

15              THE COURT:  Yes.  Yes.

16              MR. RODDY:  Thank you.

17              THE COURT:  The new plaintiff is okay, the new

18    Hutchens entity is okay.  It's adding this new completely

19    different defendant that's the problem.

20              MR. RODDY:  Thank you, Your Honor.

21              THE COURT:  Agreed?

22              MR. PALMERI:  Just so I understand, the same, we're

23    using the same time frame for the class?

24              THE COURT:  Yes.  Nothing is going to change that way.

25    They're adding one more person to the list of representative

1   plaintiffs.  They're adding one more Hutchens entity to the

2   list of Hutchens entity defendants, but nothing else changes.

3           MR. PALMERI:  The class definition is the same.  With

4   that understanding, we're fine, Your Honor.

5           THE COURT:  The class definition is the same.

6           MR. SHEPHERD:  Your Honor, if I may.

7           The events as to Mr. Antonio and presumably others

8   occurred after the end of the current class definition.  He was

9   victimized in December of 2013, in January of 2014, to the tune

10  of about $600,000.

11          THE COURT:  Oh.  Then he's not a member of the class.

12  Then he can't be added.  He'll have to do his own thing.  I'm

13  sorry, I didn't understand that before.

14          No, this class has already gone up to the Tenth

15  Circuit.  I'm not going to mess with that.

16          All right.  Now, let's talk -- so I stand corrected.

17  We're going to add the one defendant.

18          But is that even relevant if you can't add the

19  plaintiff?

20          MR. SHEPHERD:  No, Your Honor, without the plaintiff,

21  I don't think that defendant makes any difference.

22          THE COURT:  All right.  That is not to say that you

23  can't, potentially, present evidence concerning the ongoing

24  nature of the alleged fraud.  It's just that I'm not going to

25  upset the apple cart now after the Tenth Circuit has already

1    said that the apples look okay.

2              All right.

3              Does anybody have any issue to discuss other than the

4    one that I've postponed, and that is this whole attorney/client

5    privilege, in camera review set of issues?

6              MR. SHEPHERD:  Yes, Your Honor.  As we noted in our

7    papers, plaintiffs have reached a settlement with the Broad and

8    Cassel defendants.

9              THE COURT:  I thought I dismissed them.

10             MR. SHEPHERD:  You dismissed them without prejudice,

11   and the parties, Broad and Cassel wanted peace, and we wanted

12   to enter into a settlement with them, so we have done that.

13             We would propose to get preliminary approval papers in

14   by May 29.  It's a little bit complicated logistically because

15   they have been dismissed without prejudice, but that is our

16   proposed plan of action.

17             THE COURT:  Why do I have to even approve it?

18             MR. SHEPHERD:  Because it would be a classwide

19   settlement.  They would want a release as part of their

20   settlement from the entire class.

21             THE COURT:  Even though he's not a defendant with

22   respect to this class anymore.

23             MR. SHEPHERD:  Any of them can still sue him, though.

24   They, for obvious reasons, want that release.

25             THE COURT:  All right.  Well, I don't know why the

 1    time frame for that really matters, to me.

 2              Does it?

 3              MR. SHEPHERD:  It won't interrupt anything else with

 4    the case.

 5              THE COURT:  Doesn't matter to you guys, either, does

 6    it?

 7              MR. PALMERI:  No, Your Honor.  It would make sense to

 8    have the classwide approval and we would be curious as to the

 9    amount, because we might be entitled to a setoff.  The timing

10    as to May or June doesn't matter.  I know Mr. Kilroy is

11    present.

12              THE COURT:  Yes, I saw him back there.

13              MR. KILROY:  And only didn't enter an appearance

14    because I didn't want to in light of the fact that my clients

15    aren't in.  But what's been represented to the Court is

16    correct.  And there are some issues in terms of jurisdiction

17    are generally correct.

18              THE COURT:  Mr. Kilroy, as long as you're still there.

19              MR. KILROY:  That's why I didn't want to.

20              THE COURT:  When we turned to this sticky issue of

21    privilege and so forth, some of the documents probably involve

22    your clients.

23              MR. KILROY:  Right.

24              THE COURT:  So I take it your position, probably, is

25    that as long as Hutchens is asserting the privilege and

1   insisting that you -- not you, but your clients -- honor the

2   privilege and not produce the documents, that's what they're

3   going to do.

4        MR. KILROY:  Yes.  And with the understanding -- and

5   let me back up.

6        I had to remind myself of where we were.  We actually,

7   as I recall, submitted those, and that's the position we

8   obviously will live with, with whatever either the Hutchens

9   group decides, it's their privilege, or obviously what the

10  Court decides.  But the fact that we're out of the case, I

11  think you're right, doesn't impact that at all.

12       THE COURT:  Okay.

13       MR. KILROY:  Thank you.

14       THE COURT:  Well, just one more thing.

15       MR. KILROY:  Yeah.

16       THE COURT:  Where we were before, when the appeal put

17  the brakes on everything, was that we had had a discussion

18  about how, regardless of the privilege, the lawyers who are

19  being sued have a right to produce documents that they feel are

20  necessary for them to defend themselves, right?

21       MR. KILROY:  Correct.

22       THE COURT:  And you were going to -- in fact, you

23  might have been, as I recall, the prime speaker on that topic,

24  wanting to make sure that the Broad defendants can fully defend

25  themselves.  But you were going to produce the documents that

1    fell into that group and Mr. Meisels' counsel was going to

2    produce the documents that fell into the group of documents his

3    client needed to defend himself.

4         Were those documents ever assembled and produced to

5    the plaintiff?

6         MR. KILROY:  Mr. Palmeri may have better recollection,

7    but my recollection was this was frustrating because we

8    reviewed the documents; and from our standpoint, there weren't

9    documents that would help in that defense.  What we saw were

10   normal loan documents, normal documents between attorney and

11   client, which on the one hand I suppose could, could confirm

12   our belief that at least we didn't know that there was any

13   fraud going on.

14        So conceptually, I think we could have just produced

15   everything, saying, these look like normal documents that don't

16   have any red flags, that wouldn't show the lawyer that there

17   was a problem.  We didn't think from an ethnic standpoint that

18   we were permitted just to give them all up because there wasn't

19   anything there.

20        So the long answer to the short question was I believe

21   we went through that process, didn't come up with any subset of

22   documents that we felt we could produce, and instead submitted

23   in our CD to the Court that I think went to Magistrate

24   Judge Mix the documents that we were advised by the Hutchens

25   group to, to withhold on the basis of privilege.

1           That's my recollection.

2           THE COURT:  Yeah.

3           Okay.

4           Right, Judge Mix points out that there is a letter of

5    March 13, 2013, from you.

6           MR. KILROY:  Right.

7           THE COURT:  Addressed to me, attaching three CDs.

8           MR. KILROY:  Right.  And I think, while you're looking

9    at that, my recollection is that the first two fell into the

10   category we just discussed, and the final one, we viewed as of

11   a different nature because the final CD, no. 3, were documents

12   that we felt were protected for a different reason,

13   anticipation of litigation, on the other end, attorney/client

14   privilege, as to my client and outside counsel to my counsel,

15   so we felt strongly that we did make the effort to parse; and

16   CD 3 is the one we feel not only strongly, but it's the only

17   one we care about.  The other two would fall into that category

18   of if, if, we don't take the position in terms of discovery, we

19   just don't want to tread on the attorney/client privilege that

20   we think belongs to the Hutchens group.

21          THE COURT:  Well, your category 3 states, a CD

22   containing documents beginning in September of 2008.

23          MR. KILROY:  Right.

24          THE COURT:  For which Broad and Cassel asserted its

25   attorney/client, work product privilege.

 1            MR. KILROY:  Right.

 2            THE COURT:  Please note, this is not the privilege

 3    between Broad and Cassel as attorney and Mr. Hutchens and his

 4    company as client.  This is Broad and Cassel assertion of

 5    privilege as to its anticipation of litigation against Broad

 6    and Cassel, which we have identified as CD 3.

 7            MR. KILROY:  That is what I was trying to say.

 8            THE COURT:  So is that really attorney/client

 9    privilege, or is that work product?

10            MR. KILROY:  I think it's both because what happened,

11    the law firm, the lawyers, identified the potential for the

12    lawsuit, they hired their own outside lawyers.  So I'm trying

13    to say the same thing --

14            THE COURT:  Broad and Cassel figured out in September

15    of 2008 that they were probably going to get sued, so they went

16    and got counsel.

17            MR. KILROY:  Right, to get guidance on how to deal

18    with this.

19            THE COURT:  All right.  Thank you.

20            MR. KILROY:  Yes.

21            THE COURT:  Yes.

22            MS. KELLY:  I think Mr. Kilroy summarized that the

23    process for Mr. Meisels was fairly similar.  We conferred with

24    Mr. Hutchens and really had two classes of documents.  The

25    largest volume are sort of normal course of business, you know,

 1    email correspondence between Mr. Hutchens and Mr. Meisels and

 2    loan applicants potentially.  Those did not, from our review,

 3    under the rule of professional conduct, 1.6, we didn't believe

 4    we could turn over all of them as these are showing normal

 5    scope.

 6           We did have a small set of documents that we did

 7    produce as relevant to our defense.  We provided that in a

 8    sub-folder to Judge Mix to show these are documents that are

 9    privileged but we're going to use in our defense and we're

10    going to produce to the parties, and then the larger subsection

11    of documents are documents that the Hutchens defendants have

12    requested that we maintain the privilege on.

13           THE COURT:  Okay.

14           And as to that, we need these in our defense

15    documents, did you actually turn those over to the plaintiff?

16           MS. KELLY:  We did.  And going back through the disk,

17    I believe we came across one or two that the redaction wasn't

18    removed in that supplemental production, and we've conferred

19    with plaintiff and codefendants on that and we'll supplement if

20    that proves accurate.  I just need to confirm.  But the vast

21    majority of it has all been produced.

22           THE COURT:  Okay.

23           So let's see if we all are thinking the same about

24    this issue of these documents.

25           The client, setting aside the fact that, for example,

1   as Mr. Kilroy said, the law firms themselves became clients,

2   eventually; but the client here is Hutchens.  And Hutchens,

3   Mr. Hutchens, his wife, his daughter, his companies, that whole

4   group that we've called Hutchens defendants, everybody calls

5   them that, from time to time, I don't know if Luistermans, he's

6   not really in that group.  He's a separate defendant.  Same

7   counsel, different defendant.

8          The Hutchens defendants have documents, lots of

9   documents, that they are asserting the privilege as to and

10  don't want to produce to the plaintiffs.

11         So, Mr. Klenda, is that still the case, Hutchens is

12  going to stand on the attorney/client privilege as long as he

13  can?

14         MR. KLENDA:  Your Honor, my current instructions from

15  the Hutchens defendants are to continue to assert the

16  privilege.  Yes.

17         THE COURT:  All right.  So it's not going to go away

18  as moot.

19         In addition to the Hutchens documents, the lawyers

20  have documents, obviously, that were generated during the time

21  they were representing Hutchens.  And Hutchens wants the

22  lawyers to honor its claim of privilege as to those documents.

23         Right?

24         MR. KLENDA:  Yes, Your Honor.

25         THE COURT:  And those documents undoubtedly will

1  duplicate Hutchens' documents to some extent.

2          MR. KLENDA:  Yes, Your Honor.

3          THE COURT:  Maybe very substantial extent.

4          But there may be documents that aren't duplicated that

5  Hutchens wants to say have privileged information, and he wants

6  the lawyers to honor, right?

7          MR. KLENDA:  Those are my instructions.

8          THE COURT:  And the lawyers, whether it's the Broad

9  and Cassel lawyers, Mr. Kilroy; or whether it's Meisels'

10  lawyers, Mr. Palmeri and his colleagues, will honor that demand

11  for privilege, unless the Court instructs otherwise.

12          And that doesn't necessarily mean that the lawyers,

13  whether it's the Florida lawyers, or Mr. Meisels, necessarily

14  would prefer not to produce the documents, all other things

15  being equal; they might think that if all the documents are

16  turned over and they're inspected, they will come out smelling

17  like a rose.  But they don't have that choice.  Except to the

18  extent that we talked about before.  Documents that they

19  absolutely feel they critically need to defend themselves are

20  in a different category.

21          Still everybody agree?

22          MS. KELLY:  Agree, Your Honor.

23          THE COURT:  All right.

24          So we've been talking about 10,000 documents.  Are

25  there 10,000 documents that, as to which there's been a claim

1    of privilege?  And whose documents are they?  Where do these

2    10,000 documents come from?

3            Mr. Klenda, how many documents are you claiming

4    privilege on, that are Hutchens documents?

5            MR. KLENDA:  Your Honor, I don't know off the top of

6    my head.  As the privilege production was conducted under the

7    auspices of prior counsel.

8            THE COURT:  Yes, Mr. Hutchens has gone through several

9    iterations of counsel.  You just happen to be the latest one.

10            MR. KLENDA:  Yes.  I am, Your Honor.

11            But I don't have that, I don't know specifically what

12    portion of the documents belong specifically to Hutchens as

13    opposed to belong to counsel.

14            THE COURT:  Hutchens -- Judge Mix has pointed out that

15    Hutchens has produced a privilege log of its documents.

16            I don't even know how many separate entries there are

17    here and Judge Mix says that it's not clear whether some of

18    these Bates numbers are just the first page or not; but the

19    list goes on for over 20 pages with a lot of individual entries

20    on each page.  It's a lot of documents.

21            MR. KLENDA:  I believe, Your Honor, that we can narrow

22    the scope of those documents.  While Mr. Head was still

23    involved, we had discussed eliminating some documents that he

24    thought were overproduced, that he didn't think needed to be

25    reviewed by Magistrate Mix; and my recollection is that's a

 1   good, significant portion of those documents.  So I'd be happy

 2   to submit a revised list to the court that eliminates those

 3   documents that Mr. Head previously said he had no interest in.

 4   And therefore Magistrate Mix would not need to review.

 5           THE COURT:  Right.  Okay.  That's potentially very

 6   helpful.

 7           And Mr. -- well, I shouldn't say Mr. Palmeri --

 8   Ms. Kelly.

 9           Give me a sense, if you can, of how many documents

10   that you're holding as privileged.

11           MS. KELLY:  Your Honor, I apologize.  I don't have a

12   firm handle on the number of documents.  We had five bankers'

13   boxes of documents, and of that -- so I think 10,000, certainly

14   we're not at 10,000.  My sense is we were in -- what we did is

15   we did several different privilege logs so we could produce

16   them to the Hutchens --

17           THE COURT:  We've got them.

18           MS. KELLY:  Okay.  So I think there's several pages,

19   but we're well below, in the thousand range.

20           THE COURT:  Okay.

21           And then the Broad people have some, too, but there

22   are not as many.

23           All right.  Analytically, plaintiff lawyers are

24   probably right, but in terms of the case history, defendant

25   lawyers are probably right.  But let's just take it a step at a

1    time.

2           The first step is to identify documents that are

3    claimed to be privileged.  Your people have done that, but

4    apparently have identified or maybe have identified more

5    documents than really you still want to say are privileged.

6           Then the Court has to confront the question, has

7    plaintiff made a *prima facie* showing that the crime/fraud

8    exception to the attorney/client privilege applies.

9           Right so far?

10          MR. RODDY:  Yes, Your Honor.

11          THE COURT:  And the Palmeri reply, the Kelly reply,

12   that was filed at 11:19 last night, I think at least implicitly

13   says the Court has done that.  Has gone that far.

14          Does anybody disagree with that?

15          MR. RODDY:  We thought you, when we got involved, Your

16   Honor, we thought you had as well.  When we read your March 4,

17   2013 hearing, because the centerpiece of the motion to, motions

18   to compel discovery was the crime/fraud exception.

19          THE COURT:  Okay.  So you're saying, yes, you agree,

20   the Court has made that finding.

21          MR. RODDY:  Yes.  And made that finding in March of

22   2013.

23          THE COURT:  And Meisels' lawyers agree.

24          MS. KELLY:  Your Honor, I believe that in the order,

25   and the analysis is that, I mean, I would say the first step

1  was, is there a sufficient showing to warrant the in camera

2  review.  We agree the Court made that finding.  That's why we

3  went to the second phase, which is to submit the documents to

4  Your Honor for an in camera review.

5          THE COURT:  Mr. Klenda, do you disagree with these

6  other people?

7          MR. KLENDA:  Your Honor, my recollection of the

8  transcript of that hearing, which I don't think I was involved,

9  was that the Court said that it needed to actually review the

10 documents before it could determine whether the crime/fraud

11 exception applied.

12         THE COURT:  Okay.

13         I haven't -- so you kind of disagree with the other

14 folks.

15         MR. RODDY:  Your Honor, respectfully, I think they

16 have it backwards.

17         THE COURT:  Well, they might.  I'm not worried about

18 it.  I haven't reread the transcript.  And they might have it

19 backwards.

20         But at least with respect to three lawyers, I don't

21 think it matters whether I explicitly made that finding or not

22 because I've reviewed my order of March 4, 2013, which is

23 document no. 406, and that was a long order that addressed a

24 number of different motions.  But when I review the Broad

25 defendants', the portion of that order that had to do with the

1    Broad defendants' motion for summary judgment -- and that's at

2    pages 4 through 11.

3              And then when I reviewed the portion of that order

4    that had to do with the Meisels motion for summary judgment,

5    that starts on page 13, and it goes on all the way to page 21

6    or so.  Maybe not quite that far.

7              It's relatively clear to me that at least implicitly,

8    if not explicitly in that order, I made the findings that

9    constituted *prima facie* case for the application of the

10   crime/fraud exception with respect to three lawyers.  And those

11   three lawyers are Barry Poulson, and Mr. Meisels, and

12   Mr. Romano.

13             And the reason I say that is because what the

14   crime/fraud exception is is an exception that says if the

15   client used the services of counsel to assist in the client's

16   perpetration of a fraud, then the client is not entitled to

17   assert the privilege.

18             In the context of this case, that means if Hutchens

19   used the services of counsel to perpetrate what the plaintiffs

20   allege was a fraud, then he is no longer entitled to claim

21   privilege as to documents that show that.

22             Now, you have to remember what the fraud is.  The

23   ultimate fraud that the plaintiffs claim occurred, and this is

24   what a jury is going to have to decide, is did Hutchens

25   conceive of and implement a fraud whereby he extracted

1    loan-application fees from the members of the class with no

2    intent or ability to actually make loans or to refund their

3    application fees.  That ultimately is the fraud.

4         Isn't it?

5         MR. RODDY:  Yes, Your Honor.

6         THE COURT:  Now, part and parcel of that fraud or to

7    assist in carrying it out, the plaintiff claims that he

8    concealed his identity and his criminal history.

9         MR. RODDY:  Yes, Your Honor.

10        THE COURT:  He concealed his identity by using various

11   aliases, Moishe Alexander and Fred Hayes and there were a whole

12   bunch of them.  Seemed like every hearing, Mr. Head would come

13   up with a new one.

14        And by that means, he concealed his past, which

15   included two criminal convictions, one of which was for fraud.

16        Right?

17        MR. RODDY:  Yes, Your Honor.

18        THE COURT:  And in that order of March 4, 2013 --

19   well, first of all, it's undisputed or at least beyond genuine

20   dispute that Mr. Hutchens did use other names besides his own,

21   and he did not disclose to the applicants that he had been

22   convicted of fraud, right, I don't think anybody disputes that.

23        Do they?

24        I don't hear anybody disputing that.

25        So if you look at my March 4, 2013 order, just the

1   findings that I make in that order show that -- I'll take

2   Mr. Meisels, for example, that he, through meetings and

3   correspondence, represented that the person who was the

4   potential source of the loans was Moishe Alexander, was Fred

5   Hayes, that those were his names, and he did not disclose,

6   although he knew, that he had a prior fraud conviction.

7          Now, his answer to that, or at least one of his

8   answers to that, is I knew all about that, but I thought

9   Mr. Hutchens was a changed man, he had gotten religion,

10  literally, he was now fair and square and honorable and all

11  those things, and therefore I felt comfortable representing

12  him.

13         But the truth is that he did go along with portraying

14  the individual as Moishe Alexander and not disclosing that he

15  had a prior fraud conviction.  And that, to me, is -- it's

16  spelled out in more detail in my order -- is enough to be a

17  *prima facie* case of the fraud/crime exception that Hutchens

18  used Meisels to communicate his identity and to not communicate

19  his past to assist him in perpetrating what plaintiffs claim

20  was a fraud.

21         As for Romano, in the order I found that the Broad

22  defendants may not have known initially that Moishe Alexander

23  was anything other than what he claimed to be, but they were

24  informed of this so-called Jewish whistle-blower website and

25  educated themselves about Hutchens' past; but according to the

1   plaintiffs' anyway, notwithstanding all of that, now that they

2   were aware of these facts, Romano was contacted by the attorney

3   Bofshever, representing the Crescent hound, Crescent Sound

4   plaintiff, who was doing due diligence on behalf of Crescent

5   Sound's principal, Michael Buono, but did not inform Bofshever

6   that Alexander was actually Hutchens or that he was a convicted

7   criminal.  I wrote that right in the order.  To me, that was

8   enough with respect to Romano to trigger a -- to support a

9   *prima facie* holding that the crime/fraud exception applies.

10          And Poulson, who is not a defendant because the Court

11  dismissed him, for procedural reasons I think, but he was the

12  Hutchens lawyer sort of back at the beginning, or one of them,

13  and appears to have been involved with Hutchens from the

14  beginning.

15          There are three other lawyers whose names come up from

16  time to time and as to whom I'm not sure there's been any

17  showing that would enable the Court to make a *prima facie*

18  finding.  And maybe the plaintiffs don't even care about them.

19  I don't know.  And those lawyers are named Spiro, Strezos, and

20  Hennessey.  Whether the plaintiffs care about those three, I

21  don't know.  Suffice it to say they haven't made enough of a

22  showing about their participation --

23          MR. RODDY:  We don't think we need to tarry over those

24  three defendants -- lawyers, excuse me.

25          THE COURT:  So we have the *prima facie* as to the

1    three, Poulson, Meisels, and Romano.  I guess you're disputing

2    what happens next.

3                THE RODDY:  Uh-huh.

4                THE COURT:  The defendants are saying, well, Judge,

5    you ordered us to turn over these documents for in camera

6    inspection, we did, that's where we are, inspect them; you're

7    saying --

8                MR. RODDY:  I'll tell you why that's wrong, Your

9    Honor.

10               THE COURT:  -- you're saying that's wrong --

11               MR. RODDY:  This is where I read the briefs, the

12   transcript, and the Tenth Circuit cases that control, because

13   this is a federal claim, this is where the train went off the

14   tracks.

15               If Your Honor could imagine that the documents in

16   question and the attorney/client privilege are one large file

17   cabinet, the *prima facie* showing is an artillery shell that

18   destroys that cabinet.  The privilege is gone.

19               What we then have is documents lying around on the

20   ground, and as the Tenth Circuit said In re Grand Jury

21   Subpoenas, 144 F.3d 653 at page 661 -- this is quoted in our

22   status-conference statement -- Once the trial judge has

23   concluded that the privilege does not apply because the

24   government -- here the plaintiffs -- have made such a *prima*

25   *facie* showing, comma, the trial court need only conduct an in

1    camera inspection of the documents if there is a possibility

2    that some of them may fall outside the scope of the exception

3    to the privilege.

4        And then in the Ressler case, which is Judge Boland of

5    this district, what Judge Boland says is that the file cabinet

6    has been destroyed by the artillery shell, the documents that

7    were supposedly privileged are lying on the ground.  It is now

8    the defendants' burden on a document-by-document basis to come

9    forward to the reviewing officer, whether Your Honor or whether

10   it's Magistrate Judge Mix, Judge Boland said that, that the

11   defendants must identify each specific document at issue and

12   provide arguments about each document to persuade the court

13   that it is necessary to perform an in camera review to

14   determine whether it is subject to the claim of privilege.

15   That's page 6 of our status-conference statement.

16       In other words, once the prima facie showing has been

17   made, it is not appropriate to simply dump 10,000 pages of

18   documents on the magistrate judge.  And I use the figure 10,000

19   pages because that is what Your Honor said in August of 2013.

20       THE COURT:  And I've got that number from somebody, I

21   don't know.

22       MR. RODDY:  Yes.  I think it might have been said in

23   open court.  And, Your Honor, you put that number in your stay

24   order, which is docket no. 494.  So that is our position, they

25   have to come forward now on a document-by-document basis with

1    an argument as to each document saying, Your Honor,

2    notwithstanding the *prima facie* showing, we still think it's

3    privileged because of, whatever.

4         But clearly, the, the, the Court is not obligated to

5    start over and conduct an in camera review as to 10,000 pages,

6    given the *prima facie* showing.

7         THE COURT:  All right.

8         MR. RODDY:  Thank you.

9         THE COURT:  Well, I will tell you for sure that you've

10   got one supporter sitting up here because I've discussed this

11   with Judge Mix.  And it's not so much that she doesn't want to

12   do it; it's that she thinks you're right on the law.

13        And I certainly agree, it's not a good use of

14   Magistrate Judge Mix's time to have her review 10,000

15   documents, because, as she pointed out, again, not to try to

16   get out of it, but just to try to get her hands around the

17   realities of it, if she could review each document for only one

18   minute, it would take something like 160 some hours for her to

19   even do the review, and that's assuming one minute per

20   document.

21        And so if we are at the point or get to the point

22   there has got to be an in camera review of that volume, what

23   I'm going to probably do is appoint a special master to do it.

24   At your joint expense.  Let's see where we are first.

25        Other than the fact that you just want to always be a

1    good advocate for what the law is, why is it that you want the

2    process to be this way?  What it means as a practical matter is

3    you're saying, these defendants have to go back to the drawing

4    board and go through the 10,000 documents, themselves, and

5    identify the ones that they think, for some unique reason,

6    aren't covered by the exception and then make a showing on a

7    document-by-document basis as to that.

8            Really?  That's what you want?

9            MR. RODDY:  What we really want, Your Honor, is to

10   start fact-witness depositions.  The parties have met and

11   conferred since early February.  We met yesterday afternoon.

12   At, at, at the Gordon and Rees offices.  We thank them for

13   their hospitality.

14           We, plaintiffs, have identified approximately, at

15   most, 30 fact witnesses who need to be deposed.  We culled this

16   list by going through the initial disclosures, looking at the

17   documents; and we think at the end of the day, there's not

18   going to actually be 30 witnesses because we'll get what we

19   want from witness A and we won't have to do witness B.

20           THE COURT:  Get to the point of the documents.  Tell

21   me why --

22           MR. RODDY:  We can't start the depositions --

23           THE COURT:  In a few minutes, this Court is going to

24   fill up with kids and parents --

25           MR. RODDY:  We can't start the depositions without

1    getting our hands on the documents, there's 10,000 documents in

2    deep freeze; and we believe that if Your Honor follows -- if

3    Your Honors follow the Tenth Circuit law, that's 10,000 pages

4    are going to shrink pretty quickly; and if they have to follow

5    the law and go document by document, I'm going to predict it's

6    going to be less than a hundred.

7              THE COURT:  Fewer than a hundred.

8              MR. RODDY:  Fewer than a hundred.

9              THE COURT:  What do you say, Mr. Klenda?  You're the

10   big obstacle here.

11             MR. KLENDA:  Well, Your Honor, Miss Kelly has been

12   taking the laboring ore with respect to the privilege issues.

13             THE COURT:  I hope you're sharing her fee.

14             But it's your documents, really?

15             MR. KLENDA:  They are, Your Honor.  And as I say --

16             THE COURT:  And it's your claim of privilege.

17             MR. KLENDA:  As I said, my instructions are to assert

18   that privilege to the fullest extent possible.

19             THE REPORTER:  I'm sorry, I'm having trouble hearing

20   you.  Could you go to the microphone, please.

21             MR. KLENDA:  Yes.

22             Your Honor, my instructions continue to be to assert

23   the privilege to the fullest extent possible.

24             THE COURT:  Yeah, I know.

25             MR. KLENDA:  And I believe Miss Kelly has briefed the

38

1    issue of the proper review process and adequately distinguished

2    the cases upon which plaintiff rely.

3         THE COURT:  I think the plaintiffs are right.  I'm now

4    addressing the practicalities of it, to see if there is a

5    better way.  What they're wanting is for you -- and they're

6    saying, Mr. Klenda, it's time for you, because you're now in

7    the hot seat -- to go back and document by document identify

8    the ones that you insist, notwithstanding the explosion of the

9    file cabinet by this missile, still should stay privileged and

10   the crime/fraud exception does not apply and they want

11   Miss Kelly to do the very same thing.  And they want Mr. Kilroy

12   to do the very same thing.

13         Now, why, what's wrong with that?  Other than the fact

14   that it's going to make you do some work.

15         MR. KLENDA:  Well, from the Court's perspective, I can

16   certainly sympathize that it's better to have us do the work

17   than Magistrate Mix do the work or a special master do the

18   work.

19         And frankly, the most of the documents, at least that

20   I've reviewed, are not, to be candid with the Court, terribly

21   damning.  If you picked up all the documents from the ground

22   and examined them, all you'd have a normal stack of normal

23   attorney/client documents.

24         THE COURT:  And that's exactly what plaintiffs'

25   counsel thinks is going to happen.  If you really follow this

1   procedure, you're going to whittle down the number of documents

2   that you're holding back to a very much smaller number, and

3   then if we need to do an in camera review, it will be

4   practicable.

5           MR. KLENDA:  Your Honor, if it's the Court's

6   preference, what the Hutchens defendants would consent to doing

7   is eliminate and produce, if the Court so orders, all of the

8   more routine documents and whittle down the set for the Court's

9   review.  So I understand the Court thinks that Miss Kelly is

10  wrong and that it's --

11          THE COURT:  I didn't put it that way.  I put it that I

12  thought the plaintiff counsel was right.

13          Ms. Kelly has my full respect, for sure.

14          MR. KLENDA:  She has mine as well, Your Honor, but we

15  don't always bat a thousand.  So if it's the Court's

16  preference, we could certainly do that.

17          Given the Court's view of the law, at this point I

18  doubt that we have much choice.

19          THE COURT:  What I'm saying is I think that they're

20  right.

21          Now, the document dump that occurred was at the

22  plaintiffs' instance.  Different lawyer.  And I went along with

23  it, but now the new lawyers have said, you have got to follow

24  the law, and I think they're right on the law.  I think Boland

25  was right.  Magistrate judge thinks they're right, Magistrate

1    Judge Mix thinks they're right.  What I'm asking is, yes, I can

2    order that and order you to roll up your sleeves and do the

3    work that you need to do and the same with Miss Kelly and the

4    same with Mr. Kilroy.

5            Is that what you all want?

6            MR. KLENDA:  Your Honor, if I may --

7            THE COURT:  Because another alternative is to turn

8    these over to a special master and have the special master look

9    at them.

10           MR. KLENDA:  I think --

11           THE COURT:  Which is going to get you the bottom line

12   quicker and easier?

13           MR. KLENDA:  I think that would depend on the subset

14   of documents.  I think if the Court orders us to narrow down

15   the scope of potentially, potential documents that fall outside

16   the scope of the privilege and were to say, cap the number of

17   those documents at a reasonable number, 200, or 250, maybe

18   we'll get it down to a hundred, that would allow Magistrate

19   Judge Mix to conduct her review in an appropriate and

20   reasonable amount of time, without having the parties engage a

21   special master.  The experience with which plaintiffs have

22   described in another case as just an open-ended billing and

23   time-consuming disaster which might not be finished in time for

24   trial.

25           THE COURT:  Judge Mix, do you want to say anything?

1          MAGISTRATE JUDGE MIX:  Well, I mean, I'm curious about

2    the same question Judge Jackson has been asking, and that is

3    assuming that the plaintiffs are right on the law and that the

4    law requires this next step of having the defendants identify

5    specifically the reason why certain documents fall outside of

6    the exception for crime fraud and should still retain a

7    privilege, is there another way to do it that you would prefer

8    that still would result in culling down the documents.

9          And I assume from Mr. Klenda's response that

10   Miss Kelly has taken the lead on these issues, with respect to

11   what the law is, and she may have something to add to this.

12         But I think the heart of the matter is that we have to

13   find a way to make this exercise more manageable.  And I

14   understand the rationale behind the law to be a way to make the

15   exercise more manageable.  Because by forcing the party who is

16   seeking to retain the privilege to go through document by

17   document and identify why the privilege is still retained,

18   despite the *prima facie* showing of the crime/fraud exception,

19   is going to, in my view, result in the documents being culled

20   down dramatically.

21         So that's one way to skin this cat.  And that's what

22   the law seems to require.  There may be another way.  And what

23   I'm interested in knowing, do you think there is another way,

24   and if so, do you want to talk about it.

25         Mr. Klenda or Miss Kelly or both.

1        MS. KELLY:  Your Honor, I've given it some thought,

2   and I think there's really -- candidly, as I view it, only two

3   ways.  One is the special master route, which speaking for

4   Mr. Meisels and I believe I've heard from plaintiffs, we don't

5   want to go that route.  And the second route is let's have the

6   defendants, in particular Mr. Hutchens, take a look at these

7   documents again and can we narrow it down significantly to

8   those he wants to affirmatively put before you and say these

9   are the ones that the crime fraud doesn't apply to.

10       I won't re-argue the law unless you'd like me to

11  address that.

12       Having gone through this process a couple years ago

13  and we're trying to refresh our memory, I believe about

14  95 percent, if not more, that's what's been put in front of

15  you, is sort of normal-course-of-business correspondence.  And

16  the marching orders from the Hutchens folks, when we did the

17  process, we provided the documents to Hutchens counsel first,

18  were instructed on how to assert the privilege and then we

19  provided it to Your Honor.

20       So I think we can go back through and hopefully maybe

21  cull that down and new counsel can take a look and see, given

22  the guidance from the Court in terms of how we're going to be

23  addressing crime fraud, which documents we want to

24  affirmatively assert the privilege to.

25       I believe that the lens counsel was looking at it

1    before that might be helpful was that there was a *prima facie*

2    showing and now the Court needed to decide in a in camera

3    review whether the crime fraud actually applies, and that was

4    the purpose of the review, so that's why the documents are a

5    lot broader.

6         With this perspective and the lens of what the Court

7    is going to be looking at and the showing that needs to be

8    made, I think we could take another look at and reduce the

9    documents, with Mr. Klenda's help.

10        MAGISTRATE JUDGE MIX:  Would it be your suggestion

11   that we require the defendants to provide a new privilege log

12   after your review which you believe still do maintain the

13   applicability of the crime/fraud exception and then submit

14   those privilege logs to the court so the court can have the

15   opportunity to gauge how many documents we're talking about

16   here?

17        MS. KELLY:  Your Honor, I think that's -- reluctantly

18   since we've done that once, I have to give that caveat, but

19   that makes the most sense as opposed to having you or a special

20   master come in and review the volume.

21        So my proposal would be to have a deadline and a

22   submission, and the only request I would have in terms of

23   contemplating that deadline is we'll need to make a review but

24   also get guidance from Hutchens' counsel, so if we could build

25   in that time frame.

1        MR. RODDY:  And I have a time frame to propose.

2        MAGISTRATE JUDGE MIX:  All right.

3        MR. RODDY:  My time frame is that defendants do this

4   work within 30 days, that they submit whatever they're going to

5   submit after the Memorial Day weekend, and that we -- that is,

6   the parties -- have a conference with Your Honor,

7   Magistrate Mix, before -- well, on or about May 29, which I

8   believe is the end of May, a Friday, to see where things stand.

9   Sort of take our temperature, as it were.

10        MAGISTRATE JUDGE MIX:  I will assume that then one of

11   the subjects that might be discussed at the conference is in

12   light of the volume of documents disclosed on the revised

13   privilege log, how long a court review, in camera review, of

14   those documents might take and whether it still might be

15   feasible to appoint a special master instead.  We're just

16   speculating how many documents are going to be on the revised

17   logs, and if the revised logs end up essentially disclosing

18   5,000 documents, it still might be more expedient to get a

19   special master involved.

20        MR. RODDY:  We will cross that bridge, and I will give

21   you my soliloquy about special masters at a later time.

22        MAGISTRATE JUDGE MIX:  All right.

23        I think generally that idea is a good plan.  I'm

24   interested in hearing from the defendants with respect to

25   timing.

1    How much time do you think you will need reasonably,

2  you know, without causing undue delay, given the whole focus of

3  this procedure is to avoid as much delay as possible, to revise

4  the privilege logs, to cull them down as we've suggested.

5    Mr. Klenda, how much time do you think you need.

6    MR. KLENDA:  Your Honor, taking Your Honor's estimate

7  of a minute a document resulting in 160 hours at face value,

8  that would take us, probably -- in excess of 30 days.  40 to

9  45.  If we would have stepped on the gas, because it's unlikely

10  to be just one document per minute to go through and cull all

11  of the remaining documents.  But I think that would be a

12  reasonable time frame.  We could certainly set a conference at

13  the end of the month now where we could report on where we are

14  once we start to get our arms around this, with the

15  understanding that we don't want to impose unnecessary work on

16  either the court or a special master and we want to, you know,

17  get this resolved expeditiously, while preserving my clients'

18  rights.

19    MS. CHENG:  All right.

20    MR. KLENDA:  So that seems to make sense given our new

21  understanding of the Court's understanding of the law.

22    MAGISTRATE JUDGE MIX:  All right.  The plaintiff has

23  bid 30 days; the defendant has countered with 40 to 45.

24    Miss Kelly, what do you think?

25    MS. KELLY:  Your Honor, the only caveat I would have

1    is I think ours is going to need to go in two phases.  Our

2    review and provide that to Mr. Hutchens.  What we're going to

3    do is a huge percentage we believe is in the normal course,

4    please confirm.  But that's going to take a second review

5    process.  What we did before is did it on a rolling basis, we

6    did sort of a box at a time.  But that's, I think, three weeks

7    for us to go through our review and say this is our proposal,

8    and then we need to tack on what Mr. Klenda believes for him to

9    review and then get it to the court.

10           MAGISTRATE JUDGE MIX:  In light of that, I would be

11   inclined to allow the parties to have 45 days to submit revised

12   privilege logs.  I would be inclined to set a status conference

13   before the end of the month and have you appear to discuss the

14   progress.  And once the revised privilege logs are received,

15   the court can make a determination as to whether a further

16   status conference is necessary.  And that will depend largely

17   on the volume of documents that appear to be disclosed in the

18   revised privilege logs.

19           So that's what I'd like to do.  I don't have my

20   calendar available here on Judge Jackson's bench, but I can

21   make a quick call and find out what my availability would be

22   toward the end of the month.

23           With your permission.

24           THE COURT:  Of course.

25           MR. RODDY:  Thank you, Your Honor.

1    MR. PALMERI:  Your Honor, along the same lines, we

2  don't have a scheduling order.  We have that trial date.  I

3  think we would need to get a dispositive motion deadline from

4  you, but maybe we could have a status slash scheduling

5  conference with Judge Mix as well.

6    THE COURT:  You can do that.

7    But what you need to do is first discuss among

8  yourselves potential dates.  I virtually always hold my own

9  scheduling conferences, but I also virtually always do my own

10  discovery disputes.  This is a little unusual.

11    MR. PALMERI:  And we had discussed, I think we can

12  work through most of the dates.  If we get a dispositive motion

13  deadline from you, we might have a couple issues to clarify.

14    THE COURT:  Keeping in mind that I've already denied

15  your summary judgment motion, right?

16    MR. RODDY:  Amen.

17    THE COURT:  I'm not going to revisit those.  What I've

18  said, I've said.

19    MAGISTRATE JUDGE MIX:  Well, let me just say with

20  respect to the status conference, I have the morning of May 29

21  available.  So what suits your preference?  Is ten o'clock a.m.

22  a good time for counsel?

23    MR. RODDY:  That's fine for us.

24    THE COURT:  Do you want them in person or by phone?

25    MAGISTRATE JUDGE MIX:  You can request permission to

1    appear by phone, but I'd like to get a record that you have

2    requested permission and that I have granted permission, in

3    writing.  So if you'd like to appear telephonically, please

4    file a motion requesting to appear telephonically.

5         I'm also mindful of the fact that these revised

6    privilege logs will include Mr. Kilroy's client, despite the

7    fact that the settlement is underway.

8         And, Mr. Kilroy, I haven't heard you from directly, as

9    to whether you feel this 45-day time frame is workable and

10   whether you're available for a status conference on the 29th.

11        MR. KILROY:  Yes and yes.

12        MAGISTRATE JUDGE MIX:  All right.  Fair enough.

13        Thank you.

14        All right.  Is ten o'clock on the 29th acceptable to

15   the defendants?

16        MS. KELLY:  Yes, Your Honor.

17        MAGISTRATE JUDGE MIX:  Mr. Klenda.

18        MR. KLENDA:  Yes, Your Honor.

19        MAGISTRATE JUDGE MIX:  So the status conference, then,

20   will be May 29.  I will order that the parties submit revised

21   privilege logs within 45 days of today's date.  The minutes

22   should reflect an actual date for that, as opposed to just the

23   counting of days.  So if you could calculate what the actual

24   date is, that would be helpful.

25        MR. RODDY:  Your Honor, by my calendar 45 days is

1    Sunday, June 7, so might I suggest that the order reflect

2    Monday, June 8.

3              MAGISTRATE JUDGE MIX:  Monday, June 8, it is; and I

4    will see you either in person or if you receive permission to

5    appear telephonically, I will hear you at a status conference

6    on May 29 for the purpose of discussing preparing the revised

7    privilege logs.

8              Thank you.

9              THE COURT:  While you were on the phone, they were

10   suggesting that they also would like to have an updated

11   scheduling conference to set discovery cutoff.  He couldn't

12   help himself, so he said dispositive motions deadline.

13             I wonder if you folks can confer and then perhaps

14   bring a stipulation on those dates to Judge Mix on the 29th as

15   well.

16             MR. PALMERI:  I'm relatively sure we could do that,

17   Your Honor.  And if we'll have a couple of issues, then we can

18   certainly identify those.  But we've already discussed a lot of

19   the dates, and I think we should work something out.

20             MR. SHEPHERD:  We'll certainly work cooperatively and

21   talked about it at some length yesterday, and we should be

22   fine.

23             THE COURT:  Before we finish here, is there anything

24   else that somebody wants to bring to my attention, or

25   Judge Mix's attention?

1    MR. KLENDA:  There are two things that I have, Your

2 Honor.  One is we'd just like to get clarification that the

3 prior order the Court entered that no one should file, is

4 allowed to file a motion without permission, doesn't apply to

5 dispositive or semidispositive motions that we may wish to

6 file.

7    THE COURT:  I don't even remember that order.

8    MR. KLENDA:  It was after you'd reviewed many, many

9 lengthy motions, Your Honor.

10    THE COURT:  The eleven o'clock filing last night was,

11 I think, no. 525.  So I've lost a little bit of track of what

12 all has happened.

13    You set a schedule, and if that includes a date for

14 dispositive motions, then you may file dispositive motions

15 again.  But what I said to Mr. Palmeri stands, is I'm not going

16 to revisit motions I've already addressed.

17    MR. PALMERI:  Your Honor, I don't know if we address

18 it now or some other time.  I understand we have the trial

19 setting.  We have not discussed what we would try then.  My

20 sense would be we would try a liability case with the four

21 named plaintiffs.  We're not going to have a damages aspect to

22 that.  The two weeks, I think, would be full just with the

23 liability side, but we hadn't specifically addressed that.  And

24 I don't know if we need to do it now, but at some point I think

25 we need to define what we're going to try next April.

1            THE COURT:  Remind me, the class that was certified is

2     a liability class?  Or not.

3            MR. PALMERI:  I believe it was beyond the liability --

4     it wasn't limited to a liability class.

5            THE COURT:  It wasn't defined that way.

6            So you're thinking, what, you want to do damages and

7     liability together?

8            MR. RODDY:  Absolutely, Your Honor.  Why do it twice.

9            THE COURT:  Why wouldn't we do that?

10            MR. PALMERI:  Well, I mean, with each one, the damages

11     is going to be unique, Your Honor, in terms of the fees.  And

12     on a classwide basis, and a part of it is just from a timing

13     standpoint.  I think our preference would be just to do a

14     liability trial in April and then we could address whether we

15     even need a trial on the damages side of it.

16            MR. RODDY:  Your Honor, respectfully, I think this is

17     premature, and this is something we need to meet and confer

18     about.

19            THE COURT:  I think so, too.  My assumption is we'll

20     try all issues and have one trial and be done with this case

21     and let you go on up to the circuit and get me reversed, if you

22     can, on jurisdiction or on standing or one of those various

23     things that you tried to get the circuit to decide last time

24     and they didn't.

25            But, yeah, go ahead and confer, and then you can

1    present your views after you've done that, if you have a

2    dispute.  But unless and until you change my mind, I'm assuming

3    that we'll have one trial.

4         What else.

5         MR. KLENDA:  Your Honor, one more thing.  Your Honor

6    might recall that in response to our motion to reconsider the

7    class-certification motion that you entered, the Court had

8    authorized us to set a hearing for, to present any additional

9    evidence that we would want to with respect to Mr. Luistermans.

10   The Court's order said that Mr. Luistermans kind of got lost in

11   the shuffle of paperwork and the Court wasn't sure whether its

12   lack of findings with respect to Mr. Luistermans being a class

13   defendant was sufficient for any type of review or to support

14   his inclusion as class defendant.

15        So we would be, after conferring with the parties,

16   seeking to set that hearing.

17        THE COURT:  Okay.

18        I take it that Luistermans isn't interested in doing

19   what the Toronto firm and the Florida lawyers did, and that is

20   entering into some sort of a settlement and leaving

21   Mr. Hutchens and Mr. Meisels to defend the case.

22        MR. KLENDA:  Your Honor, Mr. Luistermans is an

23   independent appraiser whose life has basically been destroyed

24   because of being named as a defendant, so rather certain that

25   he doesn't have the type of deep pockets that plaintiffs have

1    looked for.

2         THE COURT:  Maybe if he could convince the plaintiffs

3    of that, they would do some business with you.  You may do what

4    you asked.

5         MR. KLENDA:  Thank you, Your Honor.

6         THE COURT:  Anything else.

7         MR. SHEPHERD:  Just to clarify one point.  There are a

8    number of depositions that don't require the documents, and

9    we're assuming that we may begin noticing those up and taking

10    them in due course.

11         THE COURT:  Sure, but you need to schedule them by

12    mutual convenience.

13         Thank you, folks.

14      (Recess at 10:25 a.m.)

15                REPORTER'S CERTIFICATE

16      I certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled matter.

18    Dated at Denver, Colorado, this 28th day of April, 2015.

19

20                    s/Kara Spitler_____

                            Kara Spitler

21

22

23

24

25