IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01012-RBJ-KLM

CGC HOLDING COMPANY, LLC, a Colorado limited liability company;
CRESCENT SOUND YACHT CLUB, LLC, a Florida limited liability company;
HARLEM ALGONQUIN LLC, an Illinois limited liability company; and
JAMES T. MEDICK; on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

SANDY HUTCHENS, a/k/a Fred Hayes, a/k/a Moishe Alexander, a/k/a Moshe Ben Avraham; et al.,

    Defendants.

_____

**ORDER**

_____

This matter is before the Court on Defendants Broad and Cassel, Carl Romano and Ronald Gaché's (the "Broad Defendants") privilege logs and *in camera* production of documents [#538, #538-3, #538-4, #538-5].[1]   After careful review of the applicable pleadings, privilege logs and  documents, the Court finds and concludes that some of the documents at issue are protected from discovery and others must be produced.  These conclusions are based on the findings set forth below.

## I.  Factual Background

As described by the District Judge, the allegations involved in this case are as follows:

---

[1] [#538] is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Order.

> Plaintiffs contend that they were swindled by Sandy Hutchens and related individuals and entities, with the assistance of Canadian and American lawyers and a Canadian realtor.  The gist of it is that Hutchens and his associates falsely represented that he was able and willing to make numerous, large commercial loans to more than 100 borrowers in the United States; that they were able to bilk prospective borrowers who thought they were dealing with legitimate lenders out of something in the range of eight million dollars of loan application or 'advance fees;' and that in support of the scheme they failed to disclose Hutchens' identity and his criminal history but instead perpetrated the fraud by disguising Hutchens through a number of different aliases and the use of corporations that were mere shells.

> With perhaps one or two exceptions, loan commitments were not filled. That, however, is not the focus of the case.  Plaintiffs have stipulated for purposes of this case that there were legitimate reasons on which a bona fide lender could have declined the loans.  Plaintiffs' focus is on the advance fees that were paid on allegedly false pretenses but never returned.  They assert claims based on RICO as well as state common law theories.

*See Order on Pending Motions - No. 3* [#406] at 1-2.

As mentioned above, the Broad Defendants consist of a Florida law firm, Broad and Cassel, and two of its partners, Ronald Gaché and Carl Romano.  In 2008, the firm represented one of Hutchens' entities known as 308 Elgin Street, Inc. ("308 Elgin").[2]  As part of this representation, the firm was involved in providing assurances that 308 Elgin's principal, Moishe Alexander (one of Hutchens' aliases), "was a respected businessman of honesty and high character" and that he had the ability to make a loan to the Crescent Sound Yacht Club in the amount of $44.8 million.  The borrower accepted 308 Elgin's loan commitment and paid advance fees in the amount of $265,000 after receiving assurances

---

[2] As far as the undersigned has been able to determine, the Broad Defendants represented only 308 Elgin, not Sandy Hutchens. [#260-5].  Broad and Cassel is located in Florida. Under Florida law, "[a]s an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers." *Rogan v. Oliver*, 110 So.3d 980, 983 (Fla. App. 2013).  Hence, for the purpose of this Order, the Court considers communications between Gaché and/or Romano and Hutchens in his capacity as an agent of 308 Elgin as potential attorney-client communications.

from Romano that "Alexander" had the ability to make the loan. "However, Romano did not

inform [the borrower's lawyer] that Alexander was actually Hutchens or that he was a

convicted criminal." *Id.* at 4-6. The Broad Defendants withdrew from representing

Hutchens and his entities after six months "and, in particular, after whatever occurred

during the September 14, 2008 meeting" between the Broad Defendants and one of

Hutchens' attorneys. Prior to their testaments to "Alexander's" integrity and their eventual

withdrawal from representing 308 Elgin, the Broad Defendants had been made aware of

a "Jewish Whistleblower" website which exposed "Moishe Alexander" as Sandy Hutchens,

"a man who had committed crimes of fraud in 2000 and drug trafficking in 2001." *Id.* at 4-5.

Plaintiffs' claims against the Broad Defendants were dismissed without prejudice by

Order [#513] of the Court dated January 27, 2015. Plaintiffs and the Broad Defendants

subsequently entered into a "Stipulation of Settlement," which was approved by the court

on August 5, 2015. *Order* [#560].

## II. Procedural Background

The procedural history of the discovery dispute addressed in this Order is

complicated. In response to Plaintiffs' request for production of documents, the Broad

Defendants asserted various legal bases for protection of certain documents, and

eventually submitted approximately 1500 pages to the Court for *in camera* review.

As outlined by the Broad Defendants, the dispute arose as follows:

During the course of discovery in this case, Plaintiffs demanded documents
from the Broad Defendants, including [alleged] attorney-client privileged
documents. The parties and the Court discussed and dealt with the privilege
concerns more than two years ago, and in March of 2013, the Broad
Defendants served two letters to the Court and parties explaining the Broad
Defendants' position regarding the attorney-client privilege and attorney
work product. At that time, the Broad Defendants also provided the Court

with four CD's that contained documents . . . to review on an *in camera* basis . . . . In this same March of 2013 time frame, the various Defendants filed petitions with the United States Court of Appeals for the Tenth Circuit. The Tenth Circuit granted the Defendants' request for an appeal and as a result the District Court action was stayed before the Court resolved the document production issues and the privilege issues that had been identified shortly before the stay. After this matter was remanded by the Tenth Circuit, the District Court resurrected the document production and privilege issues at a status conference on April 23, 2015. At that time, the Court ordered the Defendants and the Broad Defendants to review documents that Plaintiffs had requested prior to the stay of this matter and identify which documents remain privileged in light of the Court's rulings.[3] . . . The Broad Defendants acknowledge that even though they are technically no longer parties to this action, in the interests of preserving the resources of the Court and all parties, they agree to continue to respond to the prior requests for production (which were originally requested in 2013) without the need for the documents to be subpoenaed.

[#538] at 2-3. The Broad Defendants' post-appeal, post-settlement response to the outstanding Requests for Production consists of the privilege logs and documents at issue here. *See* [#538-3, #538-4, #538-5]. The privilege logs recite the "joint defense privilege," "common interest doctrine," and attorney work product as the basis for withholding documents. The documents were provided to the Court on compact discs and reviewed *in camera*.

Plaintiffs make no arguments regarding the applicability of the "joint defense privilege" to the documents provided by the Broad Defendants. Nor do they oppose the Broad Defendants' request for an *in camera* review of the documents listed on the three privilege

---

[3] As the District Judge has noted, "[t]his case has been a virtual nightmare of motion practice." [#406] at 2. The electronic docket currently consists of 623 numbered entries. The undersigned has identified a single previous ruling relating to the documents at issue. In a March 4, 2013 Order, the District Judge held that "[a]ny documents withheld on the basis of attorney-client privilege or work product protection that the Broad [D]efendants do not reasonably believe are necessary to defend themselves against [P]laintiffs' claims should be submitted to the Court for *in camera* review. . . ." *Id.* at 31. Of course, that Order was entered before the settlement between Plaintiffs and the Broad Defendants, which explains the next sentence of their attorney's letter quoted above.

logs at issue.  *See Plaintiffs' and Class Members' Response to Defendant Meisels' and the Broad Defendants' Status Reports and Revised Privilege Logs and Response (sic) to the Hutchens' Defendants' Response to Order to Show Cause* [#547] at 9, 10.

## II.  Analysis

### A.      "Joint Defense" Privilege

In federal court, the phrase "joint defense privilege" has frequently been used to refer to two closely-related, but nevertheless separate, legal privileges known as the "joint client privilege" and the "common interest rule privilege."  "The "joint client privilege" applies when clients or parties share the same lawyer; the "common interest rule privilege" applies "when parties with separate lawyers consult together under the guise of common interest or defense."  *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 435 n.1 (Bankr. S.D.N.Y. 1997).  The courts frequently combine the separate situations addressed by the joint client privilege and the common interest rule privilege into a single concept most frequently referred to as the "joint defense privilege."  As this Court has held:

> The joint defense privilege preserves the confidentiality of communications and information exchanged between two or more parties and their counsel who are engaged in a joint defense effort. . . . It must be noted that the joint defense privilege is merely an extension of the attorney-client privilege and the work product doctrine.  In other words, it confers no independent privileged status to documents or information.  Thus to be eligible for protection under the joint defense privilege, it must be established that the materials fall within the ambit of either the attorney-client privilege or the qualified immunity afforded to work product.  Additionally, the timing of the communications is important.  'The privilege arises out of the need for a common defense, as opposed merely to a common problem.'  As a result, one relying on the joint defense privilege must establish that (a) there was existing litigation or a strong possibility of future litigation; and (b) the materials were provided for the purpose of mounting a common defense against it.

*Metro Wastewater Reclamation Dist. v. Cont'l Cas. Co.*, 142 F.R.D. 471, 478-479 (D. Colo. 1992) (internal citations omitted).  Thus, in order to establish that the joint defense privilege protects documents from discovery, the movant must show: (1) the documents are protected by the attorney-client privilege and/or the work product doctrine; (2) there was existing litigation or a strong possibility of future litigation at the time of the communications reflected in the documents; and (3) the documents were exchanged between parties and their separate counsel for the purpose of mounting a common defense against the litigation.  *Id.*  If all three criteria are met, the documents are protected from discovery unless the privilege is waived by consent of all parties involved in the joint defense.  *Id.* at 479 n.7.

**B.     Attorney-Client Privilege**

The attorney-client privilege protects communications made in confidence between a client and his attorney, but not the underlying facts contained within those communications. *E.E.O.C. v. Outback Steakhouse, Inc.*, 251 F.R.D. 603, 610 (D. Colo. 2008).  "The privilege extends to confidential communications by or to the client in the course of gaining counsel, advice, or directions with respect to the client's rights or obligations." *Mountain States Tel. & Tel. Co. v. DiFede,* 780 P.2d 533, 541 (Colo. 1989) (citations omitted).

**C.     Work Product Doctrine**

The work product doctrine protects documents that are prepared in anticipation of litigation or for trial unless they are otherwise discoverable under Fed. R. Civ. P. 26(b)(1) and the requesting party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.  Fed. R. Civ. P. 26(b)(3)(A).  "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his

client's case."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).

**D.     Documents Listed on Privilege Log #538-3: Broad and Cassel Privilege Log for Post Representation Communications Related to the Former Client**

The Broad Defendants assert that the documents listed on the privilege log docketed

at #538-3 ("Privilege Log #538-3") are protected by "joint defense/common interest."  [#538-3]

at 1, 2.  In their Status Report Regarding Production of Documents and Privilege Logs, they

assert that the privilege logs generally list either "documents that involve communications

between the Broad Defendants and other Defendants in this lawsuit," or "documents that

involve the Broad Defendants': a) work product protected internal communications; b)

attorney-client privileged communications between the Broad Defendants and their outside

attorneys; c) an investigative file generated in anticipation of litigation; 4) [sic] investigative

work product or attorney-client privileged communications between the Broad Defendants and

their client; and 5) [sic] investigative work product communications with third parties in

anticipation of litigation." [#538] at 3, 4.[4]  They provide an affidavit from their attorney, Issac

J. Mitrani, who states that his firm was retained to investigate the internet allegations against

Broad and Cassel and to provide legal advice to the firm. [#538-6]  In addition, in their Notice

---

[4] The only factual background supplied by the Broad Defendants regarding the documents in Privilege Log #538-3 is as follows:

In September 2008, a mortgage broker named Ron Schmitz who had been a broker for borrowers to whom 308 Elgin Street, Inc. had issued loan commitments, published allegations of wrongdoing against Broad and Cassel, Carl Romano and [Ronald Gaché] on the internet related to our representation of 308 Elgin Street, Inc.

*Declaration of Ronald Gaché Pursuant to Minute Order (#557)* [#561-1] at 1.  The documents listed on Privilege Log #538-3 reflect communications between Mr. Gaché and a host of others (e.g., Alvin Meisels, an attorney for Hutchens, and Tom Warren, a private investigator employed by Hutchens). Because the communications appear to involve parties with separate lawyers who consulted together under the guise of common interest, the "common interest rule privilege" is the applicable privilege here.

in Response to August 5, 2015 Minute Order [#561], the Broad Defendants assert that the documents listed on Privilege Log #538-3 "concerned statements alleging wrongdoing that were made about both Mr. Hutchens and the Broad Defendants on a website posting. These communications were made in the context of contemplated and possible litigation arising from Hutchens' activities. . . . The Broad Defendants and Hutchens had a common interest in the anticipated litigation based on the allegations made in the website posting, and [] the communications were exchanged in furtherance of that common interest. Thus, the Broad Defendants assert protection under the work product doctrine." *Id.* at 2. However, the affidavit of Ronald Gaché, which is offered to support the existence of a joint defense agreement, is conspicuously silent about whether the threat of litigation over the Jewish Whistleblower website allegations led to the communications reflected in the documents listed on Privilege Log #538-3. Indeed, Mr. Gaché's only "explanation" of those communications is that the allegations of wrongdoing mentioned on the website were made in September 2008 by a mortgage broker named Ron Schmitz. *Declaration of Ronald Gaché Pursuant to Minute Order (#557)* [#561-1]. Moreover, Mr. Mitrani's affidavit refers to his engagement by the Broad Defendants "in September 2008" and his "investigation in anticipation of litigation," but states no facts from which the Court may conclude that there was a strong possibility of future litigation in 2008. [#538-6]

Thus, as far as the undersigned can determine from piecing together the various filings relating to the Broad Defendants' desire to claim protection from discovery for the documents listed on Privilege Log #538-3, the chronology is as follows: the Broad Defendants were hired to represent 308 Elgin, a Hutchens entity. During their representation they became aware of allegations of fraud against Hutchens made on the internet. The accusing website apparently

also made allegations of wrongdoing against the Broad Defendants. Instead of disclosing Hutchens' criminal background in the course of representing 308 Elgin, they vouched for his business and professional integrity and facilitated the payment of a $265,000 advance fee to him or his entities.    A meeting occurred on September 14, 2008, between the Broad Defendants and Alvin Meisels, an attorney for Hutchens.  On an unknown subsequent date in September, the Broad Defendants withdrew from representing 308 Elgin.  On an unknown date in 2008, the Broad Defendants hired attorney Issac J. Mitrani to investigate the internet allegations against the Broad Defendants and to provide advice to the Broad and Cassel law firm.  According to Mr. Gaché, "[i]n early 2009, [the] Broad [Defendants] contemplated that *there might be* litigation arising out of Hutchens' activities." [#561-1] at 2 (emphasis added).

The documents on Privilege Log #538-3 reflect communications dated between January 14, 2009, and May 25, 2009.  The emails were sent between the Broad Defendants and Hutchens (who is identified as "Private Lender") about the internet allegations of wrongdoing.  Mr. Mitrani, the Broad Defendants' attorney, is not a sender or receiver of any of the emails listed on Privilege Log #538-3.  These emails therefore involve communications (a) by or to an attorney who had his own counsel (b) about allegations of wrongdoing against the attorney and others (c) by or to the attorney's former client.  As for the required showing of existing litigation or the strong possibility of future litigation, although Gaché's affidavit does not specifically provide information about litigation in connection with Privilege Log #583-3, it nevertheless states that the Broad Defendants were sued in Florida state court "in summer 2009" regarding their representation of 308 Elgin about loan commitments to a different borrower, the Oxley Companies. [#561-1] at 2.

As discussed above, in order to sustain their burden of showing that the joint defense privilege applies, the Broad Defendants are obligated to show that the documents are protected by the attorney-client privilege or work product doctrine.  None of the documents listed on Privilege Log #538-3 appears to be protected by the attorney-client privilege for two reasons.  First, the emails were sent in 2009, after the Broad Defendants ceased representing 308 Elgin.  As a result, Hutchens was no longer an agent for a "client" of the firm, and these communications were therefore not made during the existence of an attorney-client relationship.  *United States v. Tilga,* No. 09-CR-865JEC, 2010WL737027 (D.N.M. Feb. 17, 2010) (finding absence of attorney-client relationship precluded application of attorney-client privilege); "Existence of Attorney-Client Relationship," 48 Am. Jur. Proof of Facts 525, § 5 ("In general, however, the applicability of the attorney-client privilege depends on the existence of an attorney-client relationship as of the time the communications at issue were made."). Second, the emails were sent for purposes other than obtaining legal advice.  *See, e.g.*, *Losavio v. Dist. Court*, 533 P.2d 32, 35 (Colo. 1975) (holding attorney-client privilege "is established by the act of a client seeking professional advice from a lawyer and extends only to confidential matters communicated by or to the client in the course of gaining counsel, advice or direction with respect to the client's rights and obligations.").

Given the inapplicability of the attorney-client privilege to the documents listed on Privilege Log #538-3, they must qualify as work product to be protected by the "joint defense privilege."  In order to be "work product," they must have been "prepared in anticipation of litigation or for trial."  Fed. R. Civ. Pro. 26(b)(3)(A).  Indeed, Courts in this district generally require a showing that the work at issue was prepared due to "the real and imminent threat of litigation."  *Plaza Ins. Co. v. Lester,* No. 14-cv-0162-LTB-CBS, 2015 WL 3528336, at *6 (D.

Colo. June 4, 2015).  Mr. Gaché's affidavit refers to the litigation eventually filed by the Oxley Companies "in summer of 2009," but does not connect that litigation to the documents listed on Privilege Log #538-3.  Instead, he explains that the Oxley lawsuit is the basis for his assertion of privilege "in the log filed at #538-4." [#561-1] at 2.  As mentioned above, Gaché's only explanation of the context of the emails listed in Privilege Log #538-3 is that a broker had published allegations of wrongdoing against the Broad Defendants on the internet in September 2008. [#561-1] at 1.  Even crediting Gaché's statement that he and Hutchens communicated "beginning in early 2009 . . . concerning our then-common interest in addressing the [internet] allegations" and that he "contemplated that there might be litigation arising out of Hutchens' activities," [#561-1] at 1-2, the possibility of litigation does not equate to "the real and imminent threat of litigation."  *Lester,* 2015 WL 3528336, at *6.

This showing is not sufficient to establish that the documents on Privilege Log #538-3 are protected by the work product doctrine, because there is no evidence of any *real or imminent* threat of litigation which led to their creation. *Resurrection Healthcare v. GE Health Care*, No. 07 C 5980, 2009 WL 691286, at *2 (N.D. Ill. Mar. 16, 2009) (holding that party's failure to show that documents were created in response to threat of litigation resulted in finding that they were not protected work product).  Accordingly, because the documents on Privilege Log #538-3 do not constitute work product and are not subject to the attorney-client privilege, they are not protected by the "joint defense privilege" and must be produced.

**E.    Documents Listed on Privilege Log #538-4: Ron Gaché Privilege Log**

The documents listed on Privilege Log #538-4 are emails dated between April 1, 2011, and December 2, 2011, and were therefore sent very shortly before or while this lawsuit was underway.  Fifteen of the eighteen emails listed were sent between Hutchens and Gaché.

The remaining three were sent by Hutchens to Gaché and others.  In order to understand who the others are, the Court ordered the Broad Defendants to submit a roster of relevant individuals explaining their involvement in the events underlying the case (the "Roster").  *See* [#592].  The other individuals to whom the emails on Privilege Log #538-4 were sent include Michael Spiro, Michael Blinick, Louis Strezos, and Scott Hutchinson, none of whom are identified on the Roster [#598].  In addition, neither their identities nor any conclusive explanation of their involvement is determinable from the content of the emails themselves.

The attorney-client privilege does not apply to any of the emails on Privilege Log #538-4.  Gaché and Hutchens were not in an attorney-client relationship when the emails were sent, and the lack of an explanation of the identities of Spiro, Blinick, Strezos, and Hutchinson compels the Court to conclude that any attorney-client privilege which might be applicable to those three emails has been waived.[5]  *See Tilga*, 2010WL737027; *Perkins v. Fed. Fruit & Produce Co., Inc.*, No. 11-cv-00542-JAP-KLM, 2014 WL 51159, at *3-4 (discussing waiver of attorney-client privilege).

However, the work product doctrine protects these emails, which address the broker's internet allegations against the Broad Defendants and the common interest of Hutchens and Gaché in defending against those allegations, as well as the Oxley Companies' lawsuits then pending against all. [#561-1] at 2; *EEOC v. Outback Steakhouse of Fl., Inc.,* 251 F.R.D. 603, 610 (D. Colo. 2008).  Plaintiffs have made no showing of substantial need or undue burden to overcome work product protection, as required by Fed. R. Civ. P. 26(b)(3)(A)(ii).

---

[5] The identities and involvements of these gentlemen may well be addressed in one or more of the 623 docket entries in the electronic case file.  But as one judge famously wrote, "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  I decline to hunt further here.

Finally, the requirements for assertion of the joint defense privilege are also met here. (1) The documents are protected by the work product doctrine; (2) there was existing litigation at the time; and (3) the documents were exchanged between parties for the purpose of mounting a common defense against the litigation. *Metro Wastewater Reclamation Dist.,* 142 F.R.D. at 478-479.  Accordingly, the documents on Privilege Log #538-4 are protected from disclosure and need not be produced.

**F.      Documents Listed on Privilege Log #538-5:    Broad and Cassel Privilege Log for Post Representation Communications Related to the Former Client**

The Broad Defendants assert that the documents listed on Privilege Log #538-5 are protected by the work product doctrine and, as to a few,[6] also by the attorney-client privilege. The documents listed are dated between September 2 and December 8, 2008.  As noted above, the Broad Defendants withdrew from representing 308 Elgin Street in September, 2008.  Mr. Gaché's affidavit contains no reference to Privilege Log #538-5 and contains no information specifically directed to the documents listed on that log. [#561-1].  Instead, as mentioned above, he indicates that "in early 2009, [the] Broad [Defendants] contemplated that *there might be* litigation arising out of Hutchens' activities."  *Id.* (emphasis added).

For the reasons explained in Section D above, this showing is insufficient to establish that the documents are protected by the work product doctrine.  *See Lester,* 2015 WL 3528336, at *6.  Even if the documents were protected by the work product doctrine or the attorney-client privilege, because the Broad Defendants have failed to establish that there was "a strong possibility of future litigation" at the time when these documents were created, the

---

[6] The Broad Defendants assert the attorney-client privilege as to 9 of the 114 documents separately listed in Privilege Log #538-5.

"joint defense privilege" is not applicable.  *See Metro Wastewater Reclamation Dist.,* 142

F.R.D. at 478-479.  Hence, the documents listed on Privilege Log #538-5 must be produced.

### III. Conclusion

For the reasons set forth above,

IT IS HEREBY **ORDERED** that the Broad Defendants shall produce the documents

listed on Privilege Log #538-3 and #538-5 to Plaintiffs **on or before January 27, 2016**.


Dated:  January 20, 2016


BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge